Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

Brave And Free Santa Cruz, D.B., a minor, S.B., a minor, N.Y. & H.B., parents of D.B & S.B., D.C. a minor, B.P., mother of D.C., N.D., a minor, A.D. & S.D., parents of N.D., Dr. Douglas V. Hulstedt, M.D.;

　　　　　　Plaintiffs

vs.

Tomás Aragón In His Official Capacity As Director Of The California Department Of Public Health, Tony Thurmond In His Official Capacity As State Superintendent Of Public Instruction, Reji Varghese In His Official Capacity As Executive Director Of The Medical Board Of California, Rob Bonta In His Official Capacity As Attorney General Of The State Of California, Mandy K, Cohen, In Her Official Capacity As Director, U.S. Centers For Disease Control (CDC), Dana Eaton in his official capacity as Superintendent of the Brentwood Union School District, and Anisha Munshi, Superintendent, Gilroy Unified School District;

　　　　　　Defendants

**CASE NO. 2:24-at-01085**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

**(1)** Infringement Of The Fundamental Right Of Un-Immunized Plaintiff Children, As Exercised By Their Parents, To Refuse Medical Treatments, 42 U.S.C. § 1983

**(2)** Infringement Of The Fundamental Right Of Un-Immunized Plaintiff Children, As Exercised By Their Parents, To Refuse Medical Treatments Where The Vaccine Has Not Been Shown To Effectively Protect Others From Serious Illness, 42 U.S.C. § 1983

**(3)** Infringement Of The Substantive Due Process Right Of Un-Immunized Plaintiff Children To Attend School, 42 U.S.C. § 1983

**(4)** Infringement Of The Right Of Un-Immunized Plaintiff Children Of Their First Amendment Right To Assemble In Willing Spaces To Listen And Learn, 42 U.S.C. § 1983

**(5)** Unconstitutional Conditioning Of Un-Immunized Plaintiffs' California Benefit Of A Free Public Education On Condition That Plaintiffs Give Up Their Fundamental Right To Refuse Medical Treatment, 42 U.S.C. § 1983

**(6)** Infringement Of Un-Immunized Plaintiffs' Fourteenth Amendment Equal Protection Right To Attend California's Public Schools Under The California Constitution, Article IX, Section 5, 42 U.S.C. § 1983

1
2
3
4

**(7)** Denial By Defendant Gilroy Unified School District And The California Department of Public Health Of A Free Appropriate Public Education (FAPE) To Plaintff 5 And Others In Violation Of The IDEA Act, 20 U.S.C. § 1400 *Et. Seq.*, And California Health And Safety Code Section 120335(h)

5
6

**(8)** Infringement Of The First Amendment Free Speech Rights Of Plaintiff Dr. Douglas V. Hulstedt, M.D.

7
8

**(9)** Common Law Fraudulent Misrepresentation, Federal Torts Claims Act, 28 U.S.C. § 2674. Trial By Jury Demanded

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

1.1   Subject Matter Jurisdiction As To Claims One Through Six And Eight Arise Under 42 U.S.C. Section 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.2   Subject Matter Jurisdiction As To Claim Nine Arises Under The U.S.C. Section 1364 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.3   Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.4   Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.    NATURE OF THIS ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.1   As A Medical Matter, California's Childhood Vaccine Mandates Have Substituted Epidemics Of Hundreds Of Annual Vaccine-Related Sudden Infant Deaths And Thousands Of Annual Severe Permanent Autism Cases For The Previous Occasional Outbreaks Of Minor, Self-Limited, Childhood Infections . . . . . . . . . . . . . . . . . 2

2.2   As A Legal Matter, California's Mandate That All School Children Be Injected With Vaccines That Congress Has Declared To Have "Unavoidable Adverse Side Effects," Including Death And Serious Permanent Injury, Infringes The Plaintiffs' Fundamental First And Fourteenth Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.3   Overview Of The Factual Background And Legal Claims In The Case . . . . . . . . . . 4

      2.3.1   California Mandates Childhood Immunizations Upon Pain Of Loss Of The Child's Fundamental Right To Education . . . . . . . . . . . . . . . . . . . . . . . 4

      2.3.2   In The National Childhood Vaccine Injury Act Of 1986 (NCVIA) Congress Explicitly Recognized That Childhood Vaccines Have "Unavoidable Adverse Side Effects" Including Death And Serious Permanent Injury, Such That They Are Unavoidably Unsafe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      2.3.3   The Most Recent Report Of The Institute Of Medicine, Required Under The NCVIA, Found That, For Most Of California's Mandated Immunizations, There Was Insufficient Evidence To Find Them To Be Safe . . . . . . . . . . . 7

      2.3.4   The CDC's Data On Childhood Vaccine Safety Must Be Disregarded Because The CDC Has Never Conducted Any Placebo-Controlled Studies Of Vaccine Safety, The "Gold Standard" For Such Safety Studies . . . . . . . . . . . . . . . 10

2.3.5   The "Unavoidable Adverse Effects" Noted In The NCVIA Are Staggering, Likely Including More Than One Hundred California Infants Who Die Suddenly Every Year While Asleep Within A Day Or Two After A California-Mandated Immunization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2.3.6   The "Unavoidable Adverse Effects" Noted In The NCVIA Are Staggering, Likely Including One Out Of Every Thirty-Six Previously Normally Developing California Children Who Are Suddenly Stricken With Autism Every Year After A California-Mandated Immunization . . . . . . . . . . . . 12

2.3.7   Even The Traditional Proponents Of Childhood Vaccines Now Recognize "The Need For More Rigorous Science" As To The Nature And Frequency Of Vaccine Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

2.4   The Supreme Court's 1905 Decision In *Jacobson v. Massachusetts* Has Long Been The Precedent Used To Justify Government-Mandated Vaccinations . . . . . . . . . . . . 14

2.5   *Jacobson v. Massachusetts* No Long Supplies The Proper Rule Of Decision In Modern Vaccine Cases For Multiple Reasons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2.5.1   *Jacobson v. Massachusetts* No Long Supplies The Proper Rule Of Decision In Modern Vaccine Cases Because It Was Decided Before The Supreme Court's Adoption, Under *Skinner v. Oklahoma* In 1942, Of Strict Scrutiny For Mandated Medical Treatments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2.5.2   *Jacobson v. Massachusetts* No Long Supplies The Proper Rule Of Decision In This Vaccine Cases Because The Penalty For Noncompliance Under *Jacobson* Was A Small Fine Whereas California's Penalty Is Permanent Exclusion From The Schooling Necessary To Be An Educated And Productive Citizen. . . 17

2.5.3   *Jacobson* Was Explicitly Decided Upon The Then, In 1905, Prevailing Understanding That The Risks Of Small Pox Vaccination Were Insignificant, As Compared To The Present Circumstances Wherein Congress Has Declared Childhood Vaccines To Have "Unavoidable Adverse Side Effects," Including Death And Serious Permanent Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2.5.4   *Jacobson v. Massachusetts* No Long Supplies The Proper Rule Of Decision In Vaccine Cases Where Many Mandated Vaccines Have  Not Been Shown To

Prevent Transmission Of Infection To Others . . . . . . . . . . . . . . . . . . . . . . 18

2.6   The Constitutional Challenges To California's Mandated Childhood Immunizations
      Presented In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      2.6.1   This Is A Challenge To The Constitutionality Of California's Mandated
              Childhood Immunizations As An Infringement Of The Un-Immunized
              Plaintiffs' Fundamental Right To Refuse Unwanted Medical Treatments
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      2.6.2   This Is Also A Challenge To The Constitutionality Of California's Mandated
              School Immunizations As Infringements Of The Un-Immunized Plaintiffs'
              Fundamental Right To Refuse Vaccination Where The Vaccine Has Not Been
              Shown To Be Necessary As A Public Health Measure . . . . . . . . . . . . . . 19

      2.6.3   This Is Also A Challenge To The Constitutionality Of California's Mandated
              Childhood Immunizations As Infringements Of The Un-Immunized Plaintiff
              Children's Fundamental Substantive Due Process Right To Attend School To
              Become Educated, Productive Members Of Society . . . . . . . . . . . . . . . . 20

      2.6.4   This Is Also A Challenge To The Constitutionality Of California's Mandated
              Immunizations As Required To Attend Willing Public And Private Schools,
              Pre-Schools, And Daycare Centers As Infringements Of Un-Immunized
              Plaintiff Children's First Amendment Rights To Peaceably Assemble In
              Willing Spaces To Listen And Acquire Information . . . . . . . . . . . . . . . . 20

      2.6.5   This Is Also A Challenge To The Constitutionality Of California's Mandated
              School Immunizations As Unconstitutional Conditions Imposed Upon Plaintiff
              Children's California Constitutional Rights To Attend California's Common
              (Public) Schools, But Only If They Give Up Their Federal Fundamental
              Substantive Due Process Right To Refuse Medical Treatment . . . . . . . . 21

      2.6.6   This Is Also A Challenge To The Constitutionality Of California's Mandated
              School Immunizations As Infringements Upon Un-Immunized Plaintiff
              Children's Equal Protection Rights Under The Fourteenth Amendment To
              Attend California Schools On The Same Basis As Immunized Children. . 21

2.7   This Is Also A Request For Injunctive Relief To Require California Schools To Allow

Disabled Students With Individualized Educations Plans (IEP's), Such As D.C., To Attend School Regardless Of Their Immunization Status, As Required Under Both Federal And State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2.8  This Is Also A Request For Injunctive Relief, Under The First Amendment, To Enjoin Defendant The Medical Board Of California From Compelling Speech And Censoring Speech By Plaintiff Dr. Douglas Hulstedt And All Other California Physicians On The Subject Of Childhood Immunizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2.9  This Is Also A Request For Injunctive Relief To Enjoin Defendant U.S. Centers For Disease Control (CDC) From Fraudulently Representing To The Plaintiffs, Through Its Vaccine Information Statements, And The State Of California That Its Recommended Vaccines Are "Safe" Until (a) The CDC Has Conducted Placebo-Controlled Studies That Support, With Appropriate Statistical Analyses And Qualifications, Any Such Claims Of Vaccine Safety, And (b) Disclosed Its Financial Conflicts Of Interest With The Vaccine Industry . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3.  THE PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
3.1  Plaintiff Brave And Free Santa Cruz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
3.2  Plaintiff S.B., A Minor Child . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
3.3  D.B., A Minor Child . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
3.4  N.Y., Mother Of D.B. And S.B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
3.5  H.B., Father Of D.B. And S.B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
3.6  Plaintiffs D.C. And B.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
3.7  Plaintiffs N.D., S.D. and A.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
3.8  Plaintiff Dr. Douglas V. Hulstedt, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4.  THE DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
4.1  Defendants California Department Of Public Health and Tomás Aragón In His Official Capacity As Director Of The California Department of Public Health . . . . . . . . . 31
4.2  Defendant Tony Thurmond In His Official Capacity As California State Superintendent Of Public Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

4.3 Defendant Reji Varghese In His Official Capacity As Executive Director Of The Medical Board Of California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4.4 Defendant Rob Bonta, In His Official Capacity as Attorney General of the State of California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4.5 Defendant Mandy K, Cohen, In Her Official Capacity as Director, U.S. Centers For Disease Control (CDC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4.6 Defendant Brentwood Union School District . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4.7 Defendant Gilroy Unified School District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5. FACTS AND LAW COMMON TO THE CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . 34

5.1 The Right To Refuse Coerced Medical Treatment Is A Fundamental Right Under The Substantive Due Process Clause Of The Fourteenth Amendment To The U.S. Constitution And Any Infringement Is Reviewed Under The Strict Scrutiny Standard Of Review That Requires That The Infringement Be Narrowly Tailored To Achieve A Compelling State Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

5.2 California Cannot Show That Its Childhood Immunization Mandates Are Narrowly Tailored To Achieve A Compelling State Interest . . . . . . . . . . . . . . . . . . . . . . . . 35

5.3 Details Of The Thirty Two Immunizations For Ten Different Infections Mandated For School Children Under California Health And Safety Code Section 120335 . . . . 37

5.4 Neither California Nor The CDC Have Reported Studies Comparing The Adverse Events In Vaccinated Children Versus Those In Unvaccinated Children ("VU Studies", Similar To Placebo-Controlled Studies) To Prove The Safety And Effectiveness Of Their Vaccines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

5.5 Unofficial Studies Show That The Immunizations Mandated Under Health and Safety Code Section 120335 Cause Serious, Irreparable, Injury And Death . . . . . . . . . . 40

    5.5.1 Comparison Of Autism Rates Between Vaccinated And Unvaccinated Children ("VU Studies") Show That Mandated Immunizations Are The Likely Cause Of Many Cases Of Childhood Autism, Especially Among African-American Boys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        5.5.1.1 Two VU Studies Found Lower Than Expected Rates Of Autism In The

Amish Community That Has Low Rates Of Vaccination. . . . . . . . 41

5.5.1.2 Autism And Other Neurodevelopmental Disorders Are Four Times More Common Among Vaccinated Home Schooled Children Than Among Those Home Schooled That Are Unvaccinated, And Even More Common Among Non-White Boys. . . . . . . . . . . . . . . . . . . . . . . 41

5.5.1.3.    According To The CDC's Vaccine Adverse Event Reporting System (VAERS), The Most Common Age For The Onset Of Autism Spectrum Disorder Is Age One To Three Years And It Most Commonly Strikes On The Very Same Day As A Vaccination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

5.5.1.4 Autism Is More Common Among Ethiopian And Somali Children Born In Western Countries Than Among Those Born In Their Native Countries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

5.5.1.5 U.S. Pediatric Doctors With Substantial Numbers Of Unvaccinated Children In Their Practices Find That Autism And Neurodevelopmental Delay Rates Are Much Higher Among The Vaccinated Than Among The Unvaccinated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

5.5.1.6 If Childhood Vaccines Don't Cause Autism, How Do You Explain The McDowell Infant Triplets All Becoming Autistic On The Very Same Day Within A Few Hours Of Their CDC-Recommended Vaccinations? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

5.5.2   Infant Immunizations Are The Likely Cause Of A Substantial Number Of Sudden Unexpected Infant Deaths (SUID)(Crib Deaths). . . . . . . . . . . . . 56

5.5.2.1 A Veteran Police Investigator Has Reported That 50% Of The More Than 250 SUID Cases She Has Investigated Occurred Within 48 Hours Of The Infant's Immunization And 70% Within One Week . . . . . 56

5.5.2.2 VAERS Data From The CDC Also Show Increased Frequency Of Sudden Unexplained Infant Death (SUID) Immediately Following Infant Immunizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

5.5.2.3 The Rate Of Sudden Unexpected Infant Death For African-American

Infants Is Twice That Of Non-Hispanic White And Hispanic Infants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

5.5.2.4 The Studies Cited By The CDC To Show That Infant Immunizations Do Not Cause SUID Did Not Examine The Interval Between Immunization And Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

5.5.3   Human Papilloma Virus Vaccines Injure Adolescents . . . . . . . . . . . . . . . 70

5.5.3.1 Human Papilloma Virus Vaccines Account For The Clear Majority Of All Adverse Reactions Reported To The VAERS Database Prior To The COVID Vaccines Introduced In 2021 . . . . . . . . . . . . . . . . . . . 70

5.5.3.2 HPV-Immunized Colombian Adolescent Girls Were More Likely To Develop Serious Autoimmune Disorders Than Those Not So Immunized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

5.5.3.3 HPV Immunized Japanese Girls Were More Likely To Suffer From Memory Impairment, Involuntary Movements, And Dyscalculia Than Were Those Not So Immunized . . . . . . . . . . . . . . . . . . . . . . . . . . 72

5.5.3.4 Asthma Is Reportedly Eight Times More Common Among HPV-Immunized U.S. Adolescents And Young Adults Than Among Those Not HPV Immunized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

5.5.4   Increased Rates Of Asthma, Type 1 Diabetes, Inflammatory Bowel Disease, Rheumatoid Arthritis, and Thyroid Inflammation Are Reported In Vaccinated Children Versus Those Unvaccinated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

5.6   Tellingly, The Foregoing VU Studies Showing Harms And No Overall Benefit To California's Mandated Immunizations Have Never Been Refuted By Any Studies Conducted By Either California Or The CDC . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

5.7   The American Academy Of Pediatrics (AAP) And Its Member Pediatricians Are Conflicted On The Issue Of Vaccine Safety Because Vaccine Administration Is A Mainstay And Driver Of The Pediatric Business Model . . . . . . . . . . . . . . . . . . . 78

5.8   Childhood Immunizations Required By California Health And Safety Code Section 120335 Are Not Clearly Necessary To Prevent Serious Infection In Children . . . 80

5.8.1   There Is No Compelling State Interest That Can Be Shown To Be Served By

Measles Immunizations Required Under Health and Safety Code Section 120335 Because No Overall Net Benefit Of Measles Immunization Has Been Shown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

5.8.2   There Is No Compelling State Interest That Can Be Shown To Be Served By Polio Immunizations Required Under Health and Safety Code Section 120335 Because No Overall Net Benefit Of Polio Immunization Has Been Shown By VU Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

5.8.3   There Is No Compelling State Interest That Can Be Shown To Be Served By Human Papilloma Virus (HPV) Immunizations Required Under Health and Safety Code Section 120335 Because No Overall Net Benefit Of HPV Immunization Has Been Shown By VU Studies. . . . . . . . . . . . . . . . . . . . 83

5.9   Other Than Measles Virus, Defendants Have Little Or No Data To Show That California's Mandated Vaccines Prevent Person-To-Person Transmission . . . . . . 83

6.   THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH AND THE FEDERAL CENTERS FOR DISEASE CONTROL COLLABORATE TO MIS-INFORM PARENTS ON THE RISKS OF THOSE IMMUNIZATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

6.1   The CDC Refuses To Do The Necessary VU (Placebo-Controlled) Studies Of The Safety And Effectiveness Of Its Vaccines Required To Assure The Public Of The Safety Of Those Vaccines, That Should Tell Us Something Important . . . . . . . . . 84

6.2   Instead Of VU Studies, The CDC Relies, For Vaccine Safety Assessment, Upon Data From Its Vaccine Safety Datalink System (VSD) That Is Fatally Underpowered For Negative Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

6.2   California Relies Upon The Representations Of The Federal Centers For Disease Control (CDC) That The Vaccines That California Mandates Are Safe; Without Those Assurances Of Vaccine Safety California's Mandates Are Untenable . . . . . . . . . . 89

6.3   The CDC's Representation That Its Recommended Vaccines Are "Safe" Is Flatly Contradicted And Refuted By The Very Studies It Cites As Authority For That Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

6.4   The 2012 Institute Of Medicine Report Did Not Find That The Eight Studies Vaccines

1   Were "Very Safe," In Truth, It Said That There Were Not Enough Data To Know
2   Whether They Were Safe Or Not . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

3   6.5   The 2013 Institute Of Medicine Report Rejected Any VU Studies To Determine
4   Vaccine Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

5   6.6   Despite The Fact That The Institute Of Medicine Declined To Find The CDC'S
6   Recommended Vaccines To Be "Safe," It Has Continued For Many Years To Allow
7   The CDC To Make That Claim Anyway . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

8   6.7   In 2000 The CDC Held A Secret Two-Day Off Campus Meeting To Discuss How To
9   Conceal The Adverse Effects Of Its Recommended Vaccines From The Public,
10   Including The Increased Rates Of Autism Among African-American Boys Vaccinated
11   With The Neurotoxic Mercury-Containing Thimerosal Preservative Used In Some Of
12   Its Recommended Vaccines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

13   6.8   In 2014 CDC Whistleblower William Thompson Publically Admitted, With Regret,
14   That He And His CDC Colleagues Concealed The Increased Rate Of Autism They
15   Found In Vaccinated African-American Boys . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

16   6.9   The CDC's Predecessor, The U.S. Public Health Service, Did The Same Thing To
17   African-American Men In The Infamous Tuskegee Study When It Concealed And
18   Withheld Treatment From Them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

19   6.10   Despite The Very Close Temporal Relationship Between Infant Immunizations And
20   Sudden Unexpected Infants Deaths, Numbering More Than Three Thousand Healthy
21   Infants Per Year, The CDC Stoutly Denies Any Connection . . . . . . . . . . . . . . . 105

22   6.11   The CDC Is Unable To Identify Adverse Reactions To Its Recommended Vaccines
23   Because The FDA Does Not Require Vaccines To Be Tested Against Placebo Controls
24   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

25   6.12   The CDC Has A Major Financial Conflict Of Interest Regarding Its Promotion Of
26   Childhood Vaccines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

27   6.13   The Outside Academic Experts Who Typically Appear As Expert Witnesses In Support
28   Of Childhood Immunization Programs Are Financially Conflicted Because They And
Their Institutions Get Most Of Their Funds From Defendant The Department Of
Health And Human Services (DHHS) And Its Subdivisions, Including Defendant The

CDC And The National Institutes Of Health NIH). . . . . . . . . . . . . . . . . . . . . . . 107

7.     THE CDC'S SUPPRESSION OF DISFAVORED OPINIONS AS "MISINFORMATION" ON SOCIAL MEDIA FURTHER UNDERMINES ITS CREDIBILITY ON THE SAFETY OF ITS RECOMMENDED VACCINES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

    7.1     Post-COVID, The Public No Longer Trusts The CDC Or Its Vaccines. . . . . . . 107

    7.2     The CDC Waged A War Against Any Free Speech By The Public That Questioned The CDC's COVID Vaccines, Calling It "Misinformation" . . . . . . . . . . . . . . . . . . . 108

    7.3     California Has Also Attempted To Suppress Dissenting Voices On Vaccine Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

8.     CALIFORNIA MAKES NO EFFORT TO NARROWLY TAILOR ITS IMMUNIZATION MANDATES FOR THE UNAVOIDABLY UNSAFE VACCINES TO THE NEEDS AND VULNERABILITIES OF EACH CHILD BASED ON KNOWN FACTORS SUCH AS AGE, SEX, RACE, OR HISTORY OF PREVIOUS INFECTION SO AS TO ACHIEVE A COMPELLING STATE INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

9.     THIS IS ALSO A REQUEST FOR INJUNCTIVE RELIEF TO REQUIRE CALIFORNIA SCHOOLS TO ALL ALLOW DISABLED STUDENTS WITH INDIVIDUALIZED EDUCATION PROGRAMS (IEP'S), SUCH AS D.C., TO ATTEND SCHOOL REGARDLESS OF THEIR IMMUNIZATION STATUS, AS REQUIRED UNDER BOTH FEDERAL AND STATE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

    9.1     The IDEA Act Provides Federal Funds To California For Special Education Programs That Must Provide Qualified Children With A Free Appropriate Public Education (FAPE), To Include *Both* Special Education Services *And* Mainstream Classroom Teaching Whenever Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

    9.2     All California Students With IEP's Are Legally Exempt From The Immunizations Required Under Health and Safety Code Section 120335 . . . . . . . . . . . . . . . . . . 114

    9.3     As Shown By Their Web Pages, The Policy Of The California Department Of Public Health And The Schools Under Its Jurisdiction Is To Require All Children, Including

Those With IEP's Under The IDEA, To Comply With Its Immunization Mandates

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

9.4    B.P., Mother Of D.C., Who Has An IEP Plan, Was Told By The Gilroy Unified School

District That Her Child Could Not Attend Classes There Unless He Complied With

California's School Immunization Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . 120

10.    THIS IS ALSO A REQUEST FOR INJUNCTIVE RELIEF, UNDER THE FIRST

AMENDMENT, TO ENJOIN DEFENDANT THE MEDICAL BOARD OF CALIFORNIA,

FROM MAINTAINING ITS REVOCATION OF THE MEDICAL LICENSE OF DR.

DOUGLAS V. HULSTEDT IN RETALIATION FOR SPEECH THAT DID NOT COMPORT

WITH   CALIFORNIA'S   GUIDELINES   ON   THE   SUBJECT   OF   CHILDHOOD

IMMUNIZATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

10.1    The Rights Of Physicians To Speak Candidly With Patients And Patients' Rights To

Hear Their Physician's Candid Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

10.2    The Medical Board Of California Revoked Dr. Hulstedt's Medical License, Not For

His *Conduct*, But In Retaliation For His *Speech*, Refusing To Parrot The Stance Of The

CDC, The American Academy Of Pediatrics, And The Medical Board On Childhood

Vaccines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

10.3    The Medical Board Of California Rebuffed Dr. Hulstedt's Request For Reinstatement,

Never Even Acknowledged It, More Evidence Of Retaliation. . . . . . . . . . . . . . . 130

11.    THIS ACTION ALSO REQUESTS THAT THE U.S. CENTERS FOR DISEASE CONTROL

BE ENJOINED FROM REPRESENTING TO PLAINTIFFS AND THE PUBLIC THAT THE

CHILDHOOD VACCINES ON ITS CHILDHOOD VACCINATION SCHEDULE ARE

"SAFE" EVEN THOUGH CONGRESS HAS FOUND THEM TO HAVE "UNAVOIDABLE

ADVERSE EFFECTS" INCLUDING DEATH AND SERIOUS, PERMANENT, INJURY

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

12.    CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

1   FIRST CAUSE OF ACTION

2          Infringement Of The Fundamental Substantive Due Process Right Of Un-Immunized Plaintiff

3          Children, As Exercised By Their Parents, To Refuse Medical Treatments, U.S. Constitution,

4          Fourteenth Amendment, 42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

5

6   SECOND CAUSE OF ACTION

7

8          Infringement Of The Un-Immunized Plaintiffs' Fundamental Right To Refuse Vaccination

9          Where The Vaccine Has Not Been Shown To Effectively Prevent Transmission Of The

10         Infection To Others,  Fourteenth Amendment, 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . 134

11

12  THIRD CAUSE OF ACTION

13

14         Infringement Of The Fundamental Substantive Due Process Right Of Un-Immunized Plaintiff

15         Children To Attend School, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983

16         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

17

18  FOURTH CAUSE OF ACTION

19

20         Infringement Of The Right Of Un-Immunized Children To Peacefully Assemble To Listen and

21         Learn As Provided Under The First Amendment, 42 U.S.C. § 1983 . . . . . . . . . . . . . . . 136

22

23  FIFTH CAUSE OF ACTION

24

25         Unconstitutional Conditioning Of Un-Immunized Plaintiffs' California Benefit Of A Free

26         Public Education On Condition That Plaintiffs Give Up Their Fundamental Right To Refuse

27         Medical Treatment, 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

28

SIXTH CAUSE OF ACTION

Infringement Of Un-Immunized Plaintiffs' Fourteenth Amendment Equal Protection Right To Attend California's Public Schools Under The California Constitution, Article IX, Section 5, 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

SEVENTH CAUSE OF ACTION

Denial By Defendant Gilroy Unified School District And The California Department of Public Health Of A Free Appropriate Public Education (FAPE) To D.C. And Others In Violation Of The IDEA Act, 20 U.S.C. § 1400 *Et. Seq.*, And California Health And Safety Code Section 120335(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

EIGHTH CAUSE OF ACTION

Infringement Of The First Amendment Rights Of Dr. Douglas Hulstedt, M.D., To Speak To His Patients And For Them To Listen To Him, U.S. Constitution, First Amendment, 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

NINTH CAUSE OF ACTION

Common Law Fraudulent Misrepresentation, Federal Torts Claims Act, 28 U.S.C. § 1346(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

11.   IRREPARABLE INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

12.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

COME NOW Plaintiffs Brave and Free Santa Cruz, D.B. & S.B., both minors, and their parents, N.Y. & H.B., D.C., a minor, B.P., mother of D.C., N.D, a minor, and his parents, S.D. & A.D., and Dr. Douglas V. Hulstedt, M.D., by their attorney, and hereby allege against the Defendants as follows:

## 1.  JURISDICTION AND VENUE

### 1.1  Subject Matter Jurisdiction As To Claims One Through Six And Eight Arise Under 42 U.S.C. Section 1983

1.  This court has jurisdiction over this action because it arises under the laws of the United States, 28 U.S.C. §§ 1331, 1343, and 1346,  with claims one through four arising under 42 U.S.C. Section 1983 (deprivation of civil rights).

2.  This Court has authority to grant the requested injunctive relief under 28 U.S.C. Section 1343; the requested declaratory relief under 28 U.S.C. Sections 2201 and 2202, and costs and attorneys and expert's' fees under 42 U.S.C. section 1988 (b)-(c).

### 1.2  Subject Matter Jurisdiction As To Claim Nine Arises Under The U.S.C. Section 1364

3.  This court has jurisdiction over claim eight, the common law fraudulent misrepresentation claim, under the Federal Tort Claims Act, 28 U.S.C. section 2671 *et. seq.* and under 28 U.S.C. Section 1346 (United States as defendant).

### 1.3  Personal Jurisdiction

4.  Personal jurisdiction of defendants Mandy K, Cohen, in her official capacity as director, U.S. Centers For Disease Control (CDC), and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services (DHHS) arise under Fed.R.Civ.P., Rule 4(i).

5.  Personal jurisdiction as to defendants the California Department of Public Health, the Medical Board of California, and the Attorney General of the State of California, Brentwood Union School District, and the Gilroy Unified School District, arise under Fed.R.Civ.P., Rule 4(j).

### 1.4  Venue

6.  Venue is appropriate in this court because a substantial part of the acts giving rise to this lawsuit occurred in this district, specifically the acts of the California Department of Public Health and the Medical Board of California, which are located within this district. 28 U.S.C. § 1391

## 2.  NATURE OF THIS ACTION

**2.1   As A Medical Matter, California's Childhood Vaccine Mandates Have Substituted Epidemics Of Hundreds Of Annual Vaccine-Related Sudden Infant Deaths And Thousands Of Annual Severe Permanent Autism Cases For The Previous Occasional Outbreaks Of Minor, Self-Limited, Childhood Infections**

7.     California's childhood vaccine mandates have substituted, as shown below, an epidemic of hundreds of deaths annually (in California alone) due to Sudden Unexpected Infant Death (SUID), and thousands of new cases annually (in California alone) of severe childhood autism and neuro-developmental delay, as well as numerous other childhood autoimmune disorders, for the previous minor inconvenience of occasional outbreaks of self-limited, treatable, childhood infections such as measles. Thus, the vaccines cause far, far more harm than the infections that they seek to prevent.

8.     Under the 1986 National Childhood Vaccine Injury Act, Congress explicitly recognized that childhood vaccines have "unavoidable adverse side effects" for which Congress gave the childhood vaccine industry statutory immunity as to the resulting damages. Yet, the CDC then blandly tells parents that the same vaccines are "safe and effective," does not warn parents that they won't be able to sue the vaccine makers for the resulting deaths and injuries to their children, and the State of California actually goes so far as to *mandate* that children be injected with the very same vaccines that Congress has found to have "unavoidable adverse side effects," resulting in the above mentioned epidemics of infant death and neuro-developmental injury. This is unconscionable and must be stopped.

**2.2   As A Legal Matter, California's Mandate That All School Children Be Injected With Vaccines That Congress Has Declared To Have "Unavoidable Adverse Side Effects," Including Death And Serious Permanent Injury, Infringes The Plaintiffs' Fundamental First And Fourteenth Amendment Rights**

9.     This is a challenge to the constitutionality of California's mandate that all children wishing to attend public or private schools, pre-schools, nurseries, and daycare centers, be injected with vaccines that Congress has declared, in the National Childhood Vaccine Injury Act (NCVIA) of 1986 to have "unavoidable adverse side effects" and capable of causing such death and serious permanent injury that Congress gave the vaccine makers statutory immunity from liability for those deaths and serious permanent injuries. How in heaven's name can California mandate that innocent little children to be injected with vaccines that Congress has declared to be "unavoidably unsafe" and capable of causing so many deaths and serious permanent injuries that the vaccine makers had to have immunity from liability for those deaths and injuries, vaccines that, as shown below, cause thousands of sudden infant deaths every year and tens of thousands of cases of severe autism every year?

1      10.     Meanwhile, California tells parents that the mandated vaccines are quite safe, citing

2   statements to that effect by the federal U.S. Centers For Disease Control (CDC).

3      11.     But, the CDC and the vaccine makers can't have it both ways on this issue of vaccine

4   safety. The fact that the vaccine makers went to Congress to get statutory immunity for their childhood

5   vaccines is a powerful admission by that industry that their vaccines are not safe and do, indeed, often

6   cause death and serious permanent injury. If their vaccines are, indeed, "safe," they should ask

7   Congress to lift that statutory immunity as unnecessary.

8      12.     Under *Skinner v. Oklahoma* (1942), laws that force medical procedures upon the

9   unwilling that can cause serious, permanent injury and harm must be reviewed under the Strict

10  Scrutiny standard of review, *i.e.,* they must be *narrowly tailored* to achieve a *compelling state interest*.

11     13.     In the case of childhood vaccines, "narrowly tailored" means that the vaccine must be,

12  not merely desirable or beneficial, but must be **absolutely necessary** to achieve the compelling state

13  interest of public health, not just from life-threatening infections, but weighed against the deaths and

14  serious injuries that result from those vaccines, and must do so without infringing on the rights of the

15  individual to be free from death or serious injury.

16     14.     The U.S. Supreme Court's 1905 decision in *Jacobson v. Massachusetts* does not

17  provide authority for California's mandated childhood immunizations. *Jacobson* found that

18  Cambridge, Massachusetts city government's imposition of a requirement that all adults be vaccinated

19  with small pox vaccine during a small pox epidemic in that city  survived *rational basis* review as an

20  infringement of the constitutional right to be free of bodily restraint because: (1) the Court agreed that

21  the vaccinations were "reasonably required for the safety of the public," (2) the vaccination

22  requirement was analogous to the city's historic police power to impose quarantine during epidemics,

23  (3) that small pox was often fatal when communities were not widely vaccinated, and (4) it was the

24  "common knowledge" of both the public and the medical profession that vaccination was safe and

25  effective for the purpose of preventing the spread of small pox and the resulting deaths.

26     15.     By contrast, in the present case of the ten different vaccines now mandated by

27  California: (1) *strict scrutiny* is now the standard of review for forced medical procedures of

28  permanent effect ever since *Skinner v. Oklahoma* (1942)(where Oklahoma proposed to surgically

    sterilize Mr. Skinner), (2) the serious, permanent harms, up to and including death, identified by

    Congress under the National Childhood Vaccine Injury Act of 1986 (NCVIA) cannot possibly be

equated with the minor inconvenience, inflicting no bodily harm, of a brief, temporary quarantine, (3) the short, self-limited, infectious diseases supposedly prevented by California's mandated immunizations, even the highly contagious measles virus, are now seldom, if ever, fatal and are easily treated by modern treatments as compared to the serious, permanent harms, including death, often caused by those vaccines, and (4) if there is any "common knowledge" that childhood vaccines are "safe and effective," it is due to the promotion of that idea by the CDC that gets about 4.5 billion dollars per year to promote and distribute them, whereas: (a) the very enactment of the NCVIA refutes the "safe and effective" mantra, (b) the most recent report on childhood vaccine safety by the Institute of Medicine, mandated under the NCVIA, found that there was insufficient data for most of those vaccines to find them to be safe, and (c) the Vaccine Adverse Effects Reporting System, also required under the NCVIA, has countless reports of serious injury and death of children due to these vaccines now mandated by California. For all these reasons, *Jacobson* is not a blank check for mandating all kinds of vaccines in all circumstances; in fact, the *Jacobson* Court specifically stated that, "We now decide only that the statute covers the present case..."

16.     **Thus the fundamental constitutional question raised in this case is whether California can mandate the indiscriminate injection into all the innocent little children in the state of something that Congress has determined to be unavoidably unsafe and which can, and often does, kill or seriously injure them, without violating their fundamental rights?**

**2.3     Overview Of The Factual Background And Legal Claims In The Case**

**2.3.1   California Mandates Childhood Immunizations Upon Pain Of Loss Of The Child's Fundamental Right To Education**

17.     California Health and Safety Code Section 120325 provides that:

120325. In enacting this chapter, but excluding Section 120380, and in enacting Sections 120400, 120405, 120410, and 120415, it is the intent of the Legislature to provide:
(a) A means for the eventual achievement of total immunization of appropriate age groups against the following childhood diseases:
(1) Diphtheria.
(2) Hepatitis B.
(3) Haemophilus influenzae type b.
(4) Measles.
(5) Mumps.
(6) Pertussis (whooping cough).
(7) Poliomyelitis.
(8) Rubella.
(9) Tetanus.
(10) Varicella (chickenpox).
(11) Any other disease deemed appropriate by the department, taking into consideration the recommendations of the Advisory Committee on Immunization Practices of the United States

Department of Health and Human Services, the American Academy of Pediatrics, and the American Academy of Family Physicians.

(b) That the persons required to be immunized be allowed to obtain immunizations from whatever medical source they so desire, subject only to the condition that the immunization be performed in accordance with the regulations of the department and that a record of the immunization is made in accordance with the regulations.

(c) Exemptions from immunization for medical reasons.

(d) For the keeping of adequate records of immunization so that health departments, schools, and other institutions, parents or guardians, and the persons immunized will be able to ascertain that a child is fully or only partially immunized, and so that appropriate public agencies will be able to ascertain the immunization needs of groups of children in schools or other institutions.

(e) Incentives to public health authorities to design innovative and creative programs that will promote and achieve full and timely immunization of children.

18.     California Health and Safety Code Section 120335 then makes these immunizations mandatory for all children attending public or private schools, nursery schools, day care centers, and the like:

120335. (a) As used in this chapter, "governing authority" means the governing board of each school district or the authority of each other private or public institution responsible for the operation and control of the institution or the principal or administrator of each school or institution.

(b) The governing authority shall not unconditionally admit any person as a pupil of any private or public elementary or secondary school, child care center, day nursery, nursery school, family day care home, or development center, unless, prior to his or her first admission to that institution, he or she has been fully immunized. The following are the diseases for which immunizations shall be documented:

(1) Diphtheria.
(2) Haemophilus influenzae type b.
(3) Measles.
(4) Mumps.
(5) Pertussis (whooping cough).
(6) Poliomyelitis.
(7) Rubella.
(8) Tetanus.
(9) Hepatitis B.
(10) Varicella (chickenpox).
(11) Any other disease deemed appropriate by the department, taking into consideration the recommendations of the Advisory Committee on Immunization Practices of the United States Department of Health and Human Services, the American Academy of Pediatrics, and the American Academy of Family Physicians.

19.     Prior to 2016, California allowed exemptions from the above requirements for medical reasons as well as for personal or religious beliefs.

20.     However, with the enactment of SB 277 by the California Legislature in 2015, the personal and religious belief exemptions were eliminated. Students could still be exempted for medical reasons as were those students who qualified for an Individual Education Program due to special educational needs.

21.     California conducts no studies of its own as to the safety or effectiveness of the childhood vaccines that it requires of all California children. Instead, as seen above under Health and Safety Code Section 120335(b)(11), it relies for that information upon the federal Advisory Committee On Immunization Practices (ACIP), a program within the federal Centers of Disease Control (CDC) that, as stated above, gets 4.5 billion dollars a year to promote that narrative and distribute the vaccines that California mandates based on the CDC narrative.

22.     Neither California nor the CDC have data to show that California's mandated immunizations are necessary to prevent the transmission of any of the infections those immunizations are supposed to prevent, with the exception of measles for which there is effective treatment and from which no otherwise healthy children die.

### 2.3.2   In The National Childhood Vaccine Injury Act Of 1986 (NCVIA) Congress Explicitly Recognized That Childhood Vaccines Have "Unavoidable Adverse Side Effects" Including Death And Serious Permanent Injury, Such That They Are Unavoidably Unsafe

23.     Congress long ago, in 1986, recognized that childhood vaccines can have serious, even fatal, adverse effects when it enacted the National Childhood Vaccine Injury Act (NCVIA).[1]

24.     The NCVIA explicitly recognized, in at least five different ways, that childhood vaccines were unavoidably unsafe and can cause injury and even death.

25.     First, Section 2101 of the NCVIA provides that:

Sec. 2101. The Secretary shall establish in the Department of Health and Human Services a National Vaccine Program to achieve optimal prevention of human infectious diseases through immunization and **to achieve optimal prevention against adverse reactions to vaccines.** The Program shall be administered by a Director selected by the Secretary.

(Emphasis added.)

26.     Second, Congress stated that:

"No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, **if the injury or death resulted from side effects that were unavoidable** even though the vaccine was properly prepared and was accompanied by proper directions and warnings."
(42 U.S.C. § 300aa–22(b)(1), emphasis added.)

27.     Third, the NCVIA also mandated that health care providers report such adverse vaccine

---

[1] National Childhood Vaccine Injury Act of 1986 (Public Law 99-660, 42 U.S.C. §§ 300aa *et seq.*)

events to the Secretary of Health and Human Services.[2] These reports are now submitted to, compiled by, and made available to the public in summary form by the Vaccine Adverse Events Reporting System (VAERS), a program jointly managed by the U.S. Centers for Disease Control (CDC) and the U.S. Food and Drug Administration (FDA).

28.     Fourth, under 42 U.S.C. Section 300aa-14(a), the NCVIA explicitly recognized that childhood vaccines can cause "injuries, disabilities, illnesses, conditions, and deaths...after vaccine administration..."

29.     Fifth, Congress mandated that periodic reports on vaccine risks, safety and adverse events be prepared by the prestigious Institute of Medicine of the National Academy of Sciences.[3]

30.     Thus, by its very title, its provisions, and its language, the NCVIA explicitly recognizes that childhood vaccines mandated by the State of California for school attendance can cause death and serious, permanent, injuries and are thus unavoidably unsafe.

### 2.3.3  The Most Recent Report Of The Institute Of Medicine, Required Under The NCVIA, Found That, For Most Of California's Mandated Immunizations, There Was Insufficient Evidence To Find Them To Be Safe

31.     The NCVIA was especially concerned about injuries and adverse reactions to the then existing pertussis vaccine and therefore provided, under Section 312 of the NCVIA that

SEC. 312. RELATED STUDIES.
(a) Review of Pertussis Vaccines and Related Illnesses and Conditions — Not later than 3 years after the effective date of this title, the Secretary of Health and Human Services shall complete a review of all relevant medical and scientific information (including information obtained from the studies required under subsection (e)) on the nature, circumstances, and extent of the relationship, if any, between vaccines containing pertussis (including whole cell, extracts, and specific antigens) and the following illnesses and conditions:
(1) Hemolytic anemia.
(2) Hypsarrhythmia.
(3) Infantile spasms.
(4) Reye's syndrome.
(5) Peripheral mononeuropathy.
(6) Deaths classified as sudden infant death syndrome.
(7) Aseptic meningitis.
(8) Juvenile diabetes.
(9) Autism.
(10) Learning disabilities.
(11) Hyperactivity.
(12) Such other illnesses and conditions as the Secretary may choose to review or as the

[2] *Id.,* at § 300aa-25(b).

[3] *Id.,* at Sections 312, 313.

1    Advisory Commission on Childhood Vaccines established under section 2119 of the Public
2    Health Service Act recommends for inclusion in such review.

3    32.    Thus, Section 312 of the NCVIA required the Secretary of Health and Human Services

4    to complete, within 3 years, a review of all relevant medical and scientific information on the adverse

5    effects of the then pertussis vaccines, including the studies required under subsection (e) of Section

6    312.

7    33.    Subsection 312(e)(2)(A) of the NCVIA provided that:

8    (2)(A) The Secretary shall request the Institute of Medicine of the National Academy of
     Sciences to conduct the studies required by paragraph (1) under an arrangement by which the
9    actual expenses incurred by such Academy in conducting such study will be paid by the
     Secretary.

10   34.    Section 313 of the NCVIA provided for similar studies of vaccine safety to be
     conducted by the Secretary of the Department of Health and Human Services regarding all the other
11   childhood vaccines listed under Section 2114 of the Act:

12   SEC. 313. STUDY OF OTHER VACCINE RISKS.
     (a) STUDY.—
13   (1) Not later than 3 years after the effective date of this title, the Secretary shall, after
     consultation with the Advisory Commission on Childhood Vaccines established under section
14   2119 of the Public Health Service Act—
     (A) arrange for a broad study of the risks (other than the risks considered under section 102)
15   to children associated with each vaccine set forth in the Vaccine Injury Table under section
     2114 of such Act, and
16   ...
     (2)(A) The Secretary shall request the Institute of Medicine of the National Academy of
17   Sciences to conduct the study required by paragraph (1) under an arrangement by which the
     actual expenses incurred by such Academy in conducting such study will be paid by the
18   Secretary.

19   35.    The Institute of Medicine ("IOM") of the National Academy of Sciences (now renamed

20   as the National Academy of Medicine) has conducted several reviews of vaccine safety since the

21   NCVIA was passed. The most recent comprehensive study was completed and reported in 2012.

22   36.    Specifically, in 2012 a committee of the Institute of Medicine (IOM) of the National

23   Academy of Sciences produced a report entitled, "Adverse Effects of Vaccines, Evidence and

24   Causality."[4] The IOM was authorized by Congress to conduct this review under the federal National

25   Childhood Vaccine Injury Act of 1986. The charge to the committee in conducting the 2012 study was

26

27   _____
     [4] IOM (Institute of Medicine). 2012. Adverse effects of vaccines: Evidence
28   and causality. Washington, DC: The National Academies Press. Committee to Review Adverse Effects
     of Vaccines Board on Population Health and Public Health Practice Kathleen Stratton, Andrew Ford,
     Erin Rusch, and Ellen Wright Clayton, Editors. Available at:
     https://nap.nationalacademies.org/download/13164#.

1   "...to assess dispassionately the scientific evidence about whether eight different vaccines cause

2   adverse events (AE), a total of 158 vaccine-AE pairs, the largest study undertaken to date, and the first

3   comprehensive review since 1994."

4       37.     Of the 158 adverse reactions to the eight different vaccines studied in the 2012 IOM

5   report, the committee, "concluded the evidence favors acceptance of four specific vaccine–adverse

6   event relationships. These include HPV vaccine and anaphylaxis, MMR vaccine and transient

7   arthralgia in female adults, MMR vaccine and transient arthralgia in children, and certain trivalent

8   influenza vaccines used in Canada and a mild and temporary oculorespiratory syndrome."

9       38.     The IOM committee also, "concluded the evidence favors rejection of five

10   vaccine–adverse event relationships. These include MMR vaccine and type 1 diabetes, diphtheria,

11   tetanus, and pertussis (DTaP) vaccine and type 1 diabetes, MMR vaccine and autism, inactivated

12   influenza vaccine and asthma exacerbation or reactive airway disease episodes, and inactivated

13   influenza vaccine and Bell's palsy."

14       39.     Thus, of the 158 vaccine-adverse event pairs that the IOM committee was asked to

15   study, **"[t]he vast majority of causality conclusions in the report are that the evidence was**

16   **inadequate to accept or reject a causal relationship."** (*Ibid.*)(emphasis added.)

17       40.     While the Institute of Medicine (now known as the National Academy of Medicine)

18   began preparing and submitting such reports in 1994, it has not submitted such a report since 2012

19   when it concluded that the available scientific data as to the safety of nearly all the childhood vaccines

20   was inadequate to draw any conclusions as to the safety of those childhood vaccines. Perhaps that

21   finding was the reason that the Secretary of Health and Human Services has never asked the Institute

22   of Medicine for any further reports.

23       41.     Thus, the IOM report could not say whether the eight vaccines that it studied were safe

24   or not with respect to all possible adverse effects. Yet the CDC continues, to this day, to claim that the

25   IOM report "found that with rare exceptions, these vaccines are very safe,"[5] a flagrant

26   misrepresentation of the IOM study findings.

27

28
_____

[5] CDC Webpage "Autism."
https://www.cdc.gov/vaccinesafety/concerns/autism.html#:~:text=Vaccine_ingredients_do_not_cause
autism.&text=Since 2003%2C there have been,thimerosal-containing vaccines and ASD.

### 2.3.4 The CDC's Data On Childhood Vaccine Safety Must Be Disregarded Because The CDC Has Never Conducted Any Placebo-Controlled Studies Of Vaccine Safety, The "Gold Standard" For Such Safety Studies

42.     The other principal problem with the data on childhood vaccine safety is the glaring failure of the FDA and CDC to require that childhood vaccine safety and effectiveness be determined by comparison to placebo (inactive) control injections, as pointed out in two recent books, *Turtles All The Way Down: Vaccine Science and Myth,* and *Vax-Unvax: Let the Science Speak.*[6,7] As NIH infectious disease expert Dr. Fauci testified to the House Select Subcommittee on the Coronavirus Crisis on July 31, 2020, the randomized, placebo-controlled study is the "gold standard" for clinical trials.[8] Where the safety of millions of children is involved, nothing less than the "gold standard" should be accepted.

43.     The refusal of the FDA and CDC to conduct their own such "gold standard" placebo-controlled studies of childhood vaccine safety is telling, especially considering that similar studies have been done by others and summarized in the *Vax-Unvax* book cited above. Those studies show large, often several-fold, increases in the adverse events, typically chronic auto-immune disorders, suffered by vaccinated children as compared to unvaccinated controls.

44.     The FDA and CDC appear to be avoiding doing any such "gold standard" studies themselves, perhaps afraid of what they suspect that they will find. Further, where all children are mandated to get these immunizations, there are very few naturally occurring un-immunized control subjects. Thus, immunization mandates have the perverse effect of eliminating the very un-immunized subjects that could challenge the mandates.

### 2.3.5 The "Unavoidable Adverse Effects" Noted In The NCVIA Are Staggering, Likely Including More Than One Hundred California Infants Who Die Suddenly Every Year While Asleep Within A Day Or Two After A California-Mandated Immunization

45.     According to the U.S. Centers For Disease Control (CDC), there are about 3,400 Sudden Unexpected Infant Deaths (SUID) in the United States each year of infants mostly between

---

[6] *Turtles All The Way Down: Vaccine Science and Myth,* Anonymous, 2022, Chapter Six.

[7] *Vax-Unvax: Let the Science Speak.* Robert F. Kennedy, Brian Hooker. 2023.

[8] Testimony of then NIH Infectious Diseases Chief, Dr. Anthony Fauci, to the House Select Subcommittee on Coronavirus Crisis, July 31, 2020, at: https://www.cnn.com/politics/live-news/fauci-coronavirus-testimony-07-31-20/index.html

the ages of two and six months. The incidence for African-American infants is twice that of white infants. The CDC recommends that infants receive a total of about 18 immunizations during this time period. California Health and Safety Code section 120335 mandates a total of nine immunizations during this period. The CDC's VAERS data show that *two thirds of all the deaths of children reported to VAERS are infants less than six months old.*

46.     Typically, about 220 of those sudden unexpected infant deaths occur in California. Thus, on average, every month twenty California families are horribly and forever scarred by the sudden and inexplicable loss of their precious infant. Parents, especially mothers, never recover from losing a child, especially the never ending feelings of guilt, both conscious and unconscious. For those parents searching the internet to understand why their child died and who reasonably come to believe that their infant's death was caused by immunizations to which they consented without being informed of the risk, the torment of guilt and anger is unrelenting. The deceased infant is not the only victim.

47.     For comparison, if twenty California children died every month in school shootings, the outcry would be thunderous, no parents would let their children anywhere near the schools, and the government would put a stop to all the deaths and heartache very quickly. No court would allow the perpetrators to be released to kill again and again.

48.     There is no dispute that all or nearly all of the infants dying of SUID have been immunized as required by California. The only dispute is about whether or not those immunizations are a cause of a least some of those deaths.

49.     Unlike all other drugs, neither the CDC nor the U.S. Food and Drug Administration ("FDA") test any of the childhood vaccines against placebo controls to determine whether they are actually beneficial or actually harmful, where a "placebo control" is an injection of an inactive substance, such as saline solution.

50.     Thus, while the CDC says that infant immunizations don't cause SUID, the CDC has never done any studies to actually determine whether the rate of SUID is higher in immunized children as compared to those placebo controls not so immunized and, remarkably, has no plans to do any such placebo-controlled studies of SUID.

51.     However, as set forth in detail below, a veteran police investigator who investigated SUID cases for many years has confidently stated that about half of all SUID cases occur within 48

hours of an immunization and 70% within one week.

52.     Under the Child Vaccine Injury Act of 1986, the CDC maintains a public on-line database, the Vaccine Adverse Event Reporting Systems (VAERS), to which the public, health care providers and the general public may report any and all suspected adverse reactions to any vaccines.

53.     Between 1990 and 2019 the VAERS database received 2605 reports of infants dying after immunizations.[9] *Fifty-eight percent of those reported Sudden Unexpected Infant Deaths occurred with three days post-immunization and seventy-eight percent occurred with seven days post-immunization. Id.* While it can be argued that the clustering of these reports shortly post-immunization could be ascertainment bias, with those occurring soon after immunization being more likely to be reported, that explanation is called into question by the fact that there were nearly twice as many deaths reported to have occurred on the second day post-immunization (760) than were reported to have occurred on the first day post-immunization (440). *Id.*

**2.3.6    The "Unavoidable Adverse Effects" Noted In The NCVIA Are Staggering, Likely Including One Out Of Every Thirty-Six Previously Normally Developing California Children Who Are Suddenly Stricken With Autism Every Year After A California-Mandated Immunization**

54.     The rate of childhood autism and Autism Spectrum Disorder (ASD) has skyrocketed as the childhood immunization schedule has grown. Childhood autism was not even described until 1943 and was very rare at that time. Now, according to the CDC, ASD afflicts one in thirty six of all children in the U.S., of which four out of five are boys. Thus, the odds of a boy born now developing ASD are a frightening one in twenty-two.

55.     Childhood ASD is a developmental disorder that usually appears between age one and four and has no cure, only supportive services. About one fourth are so severely affected that they have little or no speech and need constant supervision. Therefore they impose an enormous lifetime burden on both their families and their communities. The fact that autism is more common in some families than in others indicates that genetics plays a role in the causation of the disorder, likely causing a susceptibility to ASD. But the greatly increased incidence over the past decades shows that environmental factor(s) is/are now the predominant proximal cause and, obviously, the most amenable

---

[9] Miller, N: Vaccines and sudden infant death: An analysis of the VAERS database 1990–2019 and review of the medical literature. Toxicology Reports 8 (2021) 1324-1335. https://doi.org/10.1016/j.toxrep.2021.06.020.

1    to reversal.

2        56.    All or nearly all autistic children have had the immunizations recommended by the

3    CDC and required by California. The question is whether or not those mandated immunizations are

4    a cause of the autism? The strongest evidence on that question is that, among those one to three year

5    old children who had the onset of ASD, it *most commonly had its onset on the same day as a*

6    *vaccination,* according to the CDC's own VAERS database.

7        57.    The CDC refuses to do placebo-controlled studies to determine whether immunized

8    children are more likely to have autism than those not so immunized, arguing that it would be

9    unethical to do such studies since it would place children at risk of harm. The CDC's argument is, of

10   course, circular because it assumes that which it purports to then prove, that immunizations are safe,

11   effective, beneficial, and not harmful.

12       58.    However, a non-CDC sponsored study from 2017 comparing the rate of developmental

13   disorders between immunized children as compared to those not immunized found that the rate of

14   Autism Spectrum Disorder (ASD) was 4.7 times higher in the immunized children as compared to

15   those not immunized.[10]

16       59.    Furthermore, it has been reported that childhood autism is nearly unheard of among

17   Amish children, who are generally not immunized. Nor is childhood autism seen in children born in

18   Ethiopia and Somalia, where they are not routinely immunized, whereas it is common among

19   Ethiopian and Somali children born in first-world countries where childhood immunization is routine.

20       60.    The Kaiser Family Foundation reports that there were 419,104 children born in

21   California in 2022. With ASD now expected to afflict one in thirty-six, that is *over 11,000 new cases*

22   *of autistic children in California every year, nearly three thousand of them severe with little or no*

23   *language, and most of them likely the result of vaccine injury.*

24            **2.3.7    Even The Traditional Proponents Of Childhood Vaccines Now Recognize**
             **"The Need For More Rigorous Science" As To The Nature And Frequency**
25            **Of Vaccine Injuries**

26       61.    For many years one of the leading advocates for childhood vaccines, and frequent

27

28
         ───────────────────
              [10] Mawson AR, Ray BD, Bhuiyan AR, Jacob B (2017) Pilot comparative study on the health of
         vaccinated and unvaccinated 6- to 12-year-old U.S. children. J Transl Sci 3: DOI:
         10.15761/JTS.1000186 (Mawson I).

consultant to the vaccine industry, was Professor Stanley Plotkin of the Children's Hospital of Philadelphia.

62.     Even Professor Plotkin now acknowledges that, "In 234 reviews of various vaccines and (adverse) health outcomes conducted from 1991 to 2012, the IOM[11] found inadequate evidence to prove or disprove causation in 179 (76%) of the relationships it explored, illustrating the need for more rigorous science."[12]

63.     Given that even the traditional vaccine industry proponents of childhood immunizations now, belatedly, recognize "the need for more rigorous science" as to whether and how often those childhood vaccines cause injury and death, California cannot possibly shown that its mandates for the injection of those inadequately studied vaccines into all California children are absolutely necessary to achieve a compelling state interest.

### 2.4     The Supreme Court's 1905 Decision In *Jacobson v. Massachusetts* Has Long Been The Precedent Used To Justify Government-Mandated Vaccinations

64.     The primary legal authority for mandated vaccination that is always cited is *Jacobson v. Massachusetts*.[13]

65.     *Jacobson*, a mandated small pox vaccination case, was decided more than 100 years ago in 1905 under the assumptions that:

(1) it was the "common knowledge" of both the lay and medical communities of 1905, in the pre-Flexner era before medicine had any academic and not much scientific underpinning, that such vaccination was necessary and essential to control spread of the disease and that the benefits of small pox vaccination outweighed the potential risks.[14]

---

[11] The Institute of Medicine of the National Academy of Sciences, the organization designated under the National Childhood Vaccine Injury Act of 1986, to investigate and report on vaccine safety.

[12] D. A. Salmon, W. A. Orenstein, S. A. Plotkin, and R. T. Chen. Funding Postauthorization Vaccine-Safety Science. N Engl J Med 2024; 391:102-105. DOI: 10.1056/NEJMp2402379.

[13] *Jacobson v. Massachusetts*, 197 US 11 (1905).

[14] *Jacobson v. Commonwealth of Massachusetts* (1905) 197 U.S. 11, 23-24 (a court considering "...whether or not the statute is constitutional...would have been obliged to consider the evidence in connection with facts of common knowledge, which the court will always regard in passing upon the constitutionality of a statute...[the court] would have considered this testimony of experts in connection with the facts that for nearly a century most of the members of the medical profession have regarded vaccination, repeated after intervals, as a preventive of smallpox; that, while they have recognized the possibility of injury to an individual from carelessness in the performance of it, or even in a conceivable

(2) small pox vaccination was effective as a public health measure by mitigating the transmission of the small pox virus from one person to another,[15]

(3) that the risks of small pox vaccination were negligible as compared to the benefits,[16]

(4) that small pox vaccination was only to be required when public health demanded it in an "emergency."[17]

(5) that small pox was an epidemic at that time and place,[18] and

(6) most importantly, that small pox vaccination was a *necessity* for control of the epidemic.[19]

66. As for the standard of review to be applied by the reviewing court for this kind of invasion of a fundamental right, the *Jacobson* court held that:

> The defendant insists that his liberty is invaded when the state subjects him to fine or imprisonment for neglecting or refusing to submit to vaccination; that a compulsory vaccination law is unreasonable, arbitrary, and oppressive, and, therefore, hostile to the inherent right of every freeman to care for his own body and health in such way as to him seems best...
> The possession and enjoyment of all rights are subject to such *reasonable* conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community.[20]

67. Thus, the standard of review for the invasion of " the inherent right of every freeman to care for his own body and health in such way as to him seems best was that the invasion was "reasonable."

---

case without carelessness, they generally have considered the risk of such an injury too small to be seriously weighed as against the benefits coming from the discreet and proper use of the preventive; and that not only the medical profession and the people generally have for a long time entertained these opinions, but legislatures and courts have acted upon them with general unanimity."

[15] *Id.,* at 23-24 ("for nearly a century most of the members of the medical profession have regarded vaccination, repeated after intervals, as a preventive of smallpox...")

[16] *Id.*, at 23-24 ("they [the medical profession] generally have considered the risk of such an injury too small to be seriously weighed as against the benefits...")

[17] *Id.,* at p. 27 ("the legislature of Massachusetts required the inhabitants of a city or town to be vaccinated only when, in the opinion of the board of health, that was necessary for the public health or the public safety...in such an emergency.")

[18] *Id.,* at p. 27 ("a community has the right to protect itself against an epidemic of disease which threatens the safety of its members.)

[19] *Id.* at p. 28 ("...it cannot be adjudged that the present regulation of the board of health was not necessary in order to protect the public health and secure the public safety...[s]mallpox being prevalent and increasing at Cambridge..."

[20] *Id.,* at p. 26, emphasis added.

68.     In present day parlance, this would be deemed to be "rational basis" review, the then prevailing standard of review.

69.     This was before the adoption of the strict scrutiny standard of review adopted by the Court in *Skinner v. Oklahoma* (1942) for cases involving medical treatments that irreparably harm the person, in that case, medical sterilization.[21]

70.     The holding in *Jacobson*  was explicitly limited to the facts presented in that case in that era. ("We now decide only that the statute covers the present case...", *id.,* at 39,)

71.     Because, at that time, Henning Jacobson had no hard evidence of harm, potential or actual, to himself, his objections as to his rights to bodily integrity and freedom of choice were swept away for the broader benefits to society at large.

72.     Because of the public perception of the success of vaccination in the eradication of smallpox with little or no risk of injury, the common knowledge has subsequently arisen that vaccines can be safely and effectively used to eradicate many other infections at little or no risk.

73.     This "common knowledge" of the unalloyed benefits of vaccination has been incorporated by other courts into their decisions since *Jacobson*[22] without necessarily going through all the analytical steps required under *Jacobson* or considering the post-*Skinner* strict scrutiny standard of review required in cases involving the possibility of permanent injury or death that experience has shown can result from such immunizations and that were recognized by Congress in the NCVIA. .

**2.5**     ***Jacobson v. Massachusetts* No Long Supplies The Proper Rule Of Decision In Modern Vaccine Cases For Multiple Reasons**

74.     In a recent concurrence, Justice Gorsuch recently pointed out two reasons that *Jacobson* is not now good authority for mandated vaccinations.[23]

---

[21] *Skinner v. Oklahoma ex rel. Williamson*, 316 US 535, 541 (1942) (holding that strict scrutiny applies to mandated medical sterilization).

[22] *Brown v. Smith* (2018) 24 Cal.App.5th 1135, 1142 (the Court granted the defendants' request that it take judicial notice "of the safety and effectiveness of vaccinations in preventing the spread of dangerous communicable diseases, a fact that is commonly known and accepted in the scientific community and the general public."

[23] *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020)(Justice Gorsuch, concurring.)

### 2.5.1 *Jacobson v. Massachusetts* No Long Supplies The Proper Rule Of Decision In Modern Vaccine Cases Because It Was Decided Before The Supreme Court's Adoption, Under *Skinner v. Oklahoma* In 1942, Of Strict Scrutiny For Mandated Medical Treatments

75.   First, Justice Gorsuch observed that *Jacobson* was decided before the adoption by the Supreme Court of the strict scrutiny standard, under *Skinner v. Oklahoma* in 1942 (*supra*) for the review of cases involving fundamental rights such as the right to refuse medical treatments.

### 2.5.2 *Jacobson v. Massachusetts* No Long Supplies The Proper Rule Of Decision In This Vaccine Cases Because The Penalty For Noncompliance Under *Jacobson* Was A Small Fine Whereas California's Penalty Is Permanent Exclusion From The Schooling Necessary To Be An Educated And Productive Citizen

76.   Second, Justice Gorsuch noted that, in *Jacobson,* the burden for non-compliance with the vaccine mandate was a minor fine, five dollars, equivalent to about $140 dollars today. (*Id.,* at p. 70, "[t]he imposition on Mr. Jacobson's claimed right to bodily integrity, thus, was avoidable and relatively modest.") Thus, the coercion applied for non-compliance was minor. By contrast, the penalty imposed by California for non-compliance is severe, the loss of the child's fundamental right to attend school and become an educated, productive, member of society.

### 2.5.3 *Jacobson* Was Explicitly Decided Upon The Then, In 1905, Prevailing Understanding That The Risks Of Small Pox Vaccination Were Insignificant, As Compared To The Present Circumstances Wherein Congress Has Declared Childhood Vaccines To Have "Unavoidable Adverse Side Effects," Including Death And Serious Permanent Injury

77.   Mandated vaccination survived judicial review in *Jacobson* because the medical and lay opinion in 1905 was that the risks of small pox vaccination were minimal. We are now in a different era. The subsequent widespread use of childhood vaccines has resulted in harm in many cases. This resulted in the enactment of the National Childhood Vaccine Injury Act of 1986 (NCVIA) by Congress. The NCVIA recognized that some childhood vaccines are unavoidably unsafe. As the Supreme Court noted in *Bruesewitz v. Wyeth*:

...the [NCVIA] Act expressly eliminates liability for a vaccine's *unavoidable, adverse side effects:*

"No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, *if the injury or death resulted from side effects that were unavoidable* even though the vaccine was properly prepared and was accompanied by proper directions and warnings."

(*Bruesewitz v. Wyeth LLC* (2011) 562 U.S. 223, 230.)(emphasis added.)

78.    Because Congress itself has recognized, under the NCVIA, that childhood vaccines can cause serious injury and even death, this alone precludes an uncritical application of the 1905 *Jacobson* precedent to modern childhood vaccination cases. There was no NCVIA in 1905 to guide the Court. Now, post-NCVIA, these must be a weighing of the risks and benefits and, as Justice Gorsuch noted, it must be under a strict scrutiny standard of review.

79.    Given that *Skinner* requires mandated medical treatments that can cause death and permanent injury, such as the childhood vaccines found by Congress under the NCVIA to be capable of just such outcomes, must be reviewed under a strict scrutiny standard of review, then the state must show that immunization with those unavoidably unsafe vaccines must be not only desirable or beneficial, but absolutely *necessary* to the public health to pass constitutional muster.

### 2.5.4    *Jacobson v. Massachusetts* No Long Supplies The Proper Rule Of Decision In Vaccine Cases Where Many Mandated Vaccines Have Not Been Shown To Prevent Transmission Of Infection To Others

80.    A recent Ninth Circuit decision, now still subject to appeal, held that *Jacobson* does not apply where the vaccine at issue has not been shown to be a public health measure because it does not prevent the spread of the viral infection toward which it is directed.[24]

81.    Some mandated vaccines, such as the oral polio vaccine, have not been shown to prevent transmission of the infection.

### 2.6    The Constitutional Challenges To California's Mandated Childhood Immunizations Presented In This Case

### 2.6.1    This Is A Challenge To The Constitutionality Of California's Mandated Childhood Immunizations As An Infringement Of The Un-Immunized Plaintiffs' Fundamental Right To Refuse Unwanted Medical Treatments

82.    First, this case is a challenge to the constitutionality of California's mandated childhood immunizations as infringements of the Plaintiffs' fundamental Substantive Due Process Right, as exercised by their plaintiff parents, to refuse unwanted medical treatments that Congress has found to be unavoidably unsafe and to risk death and serious, permanent injury, infringements that cannot pass strict scrutiny review since California cannot show that those infringements are narrowly tailored to achieve a compelling state interest, as required for government mandated medical treatments under

---

[24] *Health Freedom Def Fund v Carvalho* 2255908 9th Cir Jun 07 2024.

1    *Skinner v. Oklahoma.*[25]

2         83.    The Supreme Court held, in *City of Akron,* "the state must refrain from enacting

3    "regulations designed to influence ... informed choice" because its legitimate interest "is in ensuring

4    that the ... consent is informed and unpressured."[26] Obviously California's immunization mandates aim

5    to due exactly that which is forbidden.

6         84.    These infringements upon plaintiffs' fundamental rights by California and its

7    subdivisions are not narrowly tailored so as to achieve a compelling state interest because California

8    cannot show that they are either absolutely necessary or sufficient to achieve, or even improve, overall

9    public health. In fact, California has failed to produce compelling evidence that any of its mandated

10   immunizations are essential, or even desirable, for the overall health of California's children, given

11   their limited benefits and all of their serious and fatal side effects that will be extensively discussed

12   below. Nor can California show that its immunization mandates are narrowly tailored since they apply

13   to nearly all children. There is no tailoring at all. Thus, these infringements should be enjoined.

14        85.    Defendant U.S. Centers for Disease Control (CDC) and its parent agency, the U.S.

15   Department of Health and Human Services, are joined to the Fourteenth Amendment claims because:

16   (1) California relies upon the representations of the CDC for assurances of the safety and effectiveness

17   of its mandated immunizations, and (2) some of the representations of the CDC as to the safety of its

18   recommended vaccines are falsehoods perpetrated upon California's parents that can and should be

19   enjoined until corrected.

20                    **2.6.2   This Is Also A Challenge To The Constitutionality Of California's**
                              **Mandated School Immunizations As Infringements Of The Un-Immunized**
21                            **Plaintiffs' Fundamental Right To Refuse Vaccination Where The Vaccine**
                              **Has Not Been Shown To Be Necessary As A Public Health Measure**
22

23        86.    Second, this case is also a challenge to the constitutionality of California's mandated

24   school immunizations as infringements of the un-immunized plaintiffs' fundamental Substantive Due

25   Process Right, as exercised by their plaintiff parents, to refuse vaccination where the vaccine has not

26   been shown to be necessary or effective as a public health measure by preventing transmission of the

27   relevant virus. There infringements cannot pass strict scrutiny review since California cannot show that

28
     _____

          [25] *Skinner, supra.*

          [26] *City of Akron v. Akron Center For Reproductive Health, Inc.* (1983) 462 U.S. 416, 446.

1 those infringements are narrowly tailored to achieve a compelling state interest, *i.e.,* the prevention of

2 transmission.

3                    **2.6.3   This Is Also A Challenge To The Constitutionality Of California's**
                          **Mandated Childhood Immunizations As Infringements Of The Un-**
4                         **Immunized Plaintiff Children's Fundamental Substantive Due Process**
                          **Right To Attend School To Become Educated, Productive Members Of**
5                         **Society**

6        87.     Third, this case is also a challenge to the constitutionality of California's mandated

7 immunizations as infringements of plaintiff children's fundamental substantive due process right to

8 attend school to become educated, productive members of society by requirements that they submit

9 to immunization with vaccines that the Congress has found to be unavoidably unsafe and to risk death

10 and serious, permanent injury. These infringements cannot pass strict scrutiny review since California

11 cannot show that those infringements are narrowly tailored to achieve a compelling state interest.

12        88.     Plaintiffs 1 and 2, minor children, are unable to exercise their fundamental right to

13 attend school, public or private, anywhere in the State of California unless they submit to the

14 unavoidably unsafe school immunizations that California mandates through defendants the California

15 Department of Public Health and the local school district that serves them, the Brentwood Union

16 School District. That prohibition on school attendance impermissibly infringes upon their fundamental

17 rights to become educated, productive members of society.

18                    **2.6.4   This Is Also A Challenge To The Constitutionality Of California's**
                          **Mandated Immunizations As Required To Attend Willing Public And**
19                        **Private Schools, Pre-Schools, And Daycare Centers As Infringements Of**
                          **Un-Immunized Plaintiff Children's First Amendment Rights To Peaceably**
20                        **Assemble In Willing Spaces To Listen And Acquire Information**

21        89.     Fourth, this case is also a challenge to the constitutionality of California's mandated

22 immunizations as required to attend willing public and private schools, pre-schools, and daycare

23 centers as infringements of un-immunized plaintiff children's First Amendment rights to peaceably

24 assemble in willing spaces to speak and hear for the purpose of education to become educated,

25 productive, members of society. These infringements cannot pass strict scrutiny review since

26 California cannot show that those infringements are narrowly tailored to achieve a compelling state

27 interest.

28

1

2

3

4

      **2.6.5   This Is Also A Challenge To The Constitutionality Of California's Mandated School Immunizations As Unconstitutional Conditions Imposed Upon Plaintiff Children's California Constitutional Rights To Attend California's Common (Public) Schools, But Only If They Give Up Their Federal Fundamental Substantive Due Process Right To Refuse Medical Treatment**

5

6

7

8

9

10

      90.    Fifth, this case is also a challenge to the constitutionality of California's mandated school immunizations as unconstitutional conditions imposed upon plaintiff children's California constitutional rights to attend California's common (public) schools, but only if they give up their federal fundamental Substantive Due Process Right to refuse medical treatment. These conditions cannot pass strict scrutiny review since California cannot show that those conditions are narrowly tailored to achieve a compelling state interest.

11

12

13

      **2.6.6   This Is Also A Challenge To The Constitutionality Of California's Mandated School Immunizations As Infringements Upon Un-Immunized Plaintiff Children's Equal Protection Rights Under The Fourteenth Amendment To Attend California Schools On The Same Basis As Immunized Children**

14

15

16

17

18

      91.    Sixth, this case is also a challenge to the constitutionality of California's mandated school immunizations as infringements upon un-immunized plaintiff children's Equal Protection Rights under the Fourteenth Amendment to attend California schools on the same basis as immunized children. These infringements cannot pass Rational Basis Review since California cannot show that those infringements have an overall public health benefit.

19

20

      **2.7   This Is Also A Request For Injunctive Relief To Require California Schools To Allow Disabled Students With Individualized Educations Plans (IEP's), Such As D.C., To Attend School Regardless Of Their Immunization Status, As Required Under Both Federal And State Law**

21

22

23

24

25

      92.    Under the Individuals With Disabilities Education Act (20 U.S.C. § 1400 *et. seq.*)(IDEA), states are given federal money to assist in educating children with disabilities[27] on condition that the state provide a free appropriate public education (FAPE) to all eligible children, with the contents of the FAPE determined for each child by a required Individualized Education Program (IEP).

26

27

      93.    The federal IDEA act makes no exception to its mandate for an FAPE for each child with an IEP if the child is not immunized according to California's requirements.

28

---

[27] *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 993 (2017).

94.     California Health and Safety Code Section 120335, subsection (h) exempts school children attending school under IEP's from California's childhood immunization mandates:

> (h) This section does not prohibit a pupil who qualifies for an individualized education program, pursuant to federal law and Section 56026 of the Education Code, from accessing any special education and related services required by his or her individualized education program.

95.     Nonetheless, D.C., a child with an IEP for a vaccine-induced learning disability who is, for that reason not fully immunized, was, under very recently, told that he could not start his public school in the schools of defendant Gilroy Unified School District. While the school nurse did recently relent on that demand, the demand could be resumed at any time. The denial of a FAPE to California children with IEP's, such as D.C., is, as above, a violation of both federal and state law.

96.     On information and belief, Plaintiff Brave and Free Santa Cruz speaks for many of California's estimated 800,000 IEP students, many, like D.C., with vaccine-induced learning disabilities, have been improperly told by their schools that they must comply with California's immunization requirements.

97.     This complaint also seeks injunctive relief for D.C. and all other similarly situated California children with IEP's who have been or are being denied their FAPE's based on their immunization status, an injunction to require Defendant California Department of Public Health to notify all California schools that they may not require any immunizations of their IEP students and that they must so advise all parents of such children who may have been told otherwise by those schools.

**2.8     This Is Also A Request For Injunctive Relief, Under The First Amendment, To Enjoin Defendant The Medical Board Of California From Compelling Speech And Censoring Speech By Plaintiff Dr. Douglas Hulstedt And All Other California Physicians On The Subject Of Childhood Immunizations**

98.     On February 27, 2023 Defendant the Medical Board of California revoked the medical license of Plaintiff Dr. Douglas V. Hulstedt, M.D., a pediatrician.

99.     The Medical Board's reason for doing so was Dr. Hulstedt's recommendation to the parent of one of his pediatric patients that the child not receive any further childhood vaccines.

100.     The Medical Board held that, in making that recommendation, Dr. Hulstedt fell below the standard of care for a California physician by not adhering, in his recommendations, to the guidelines on the issue of childhood immunizations set forth by the financially conflicted CDC and the equally financially conflicted American Academy of Pediatrics (AAP).

101.    In doing so the Medical Board infringed upon (a) Dr. Hulstedt's First Amendment right to speak as he wished to, (b) his right not to be compelled to parrot the "guidelines" of the CDC and AAP, and (c) the right of parents to hear Dr. Hulstedt's opinions and not just those of the CDC and AAP.

102.    This complaint also seeks injunctive relief to enjoin the Medical Board of California from infringing upon the First Amendment rights of Dr. Hulstedt, all other California-licensed physicians to speak freely on the controversial issue of childhood immunizations, and the rights of patients and parents to hear those opinions of Dr. Hulstedt and all other California-licensed physicians on the issue of childhood immunizations.

**2.9    This Is Also A Request For Injunctive Relief To Enjoin Defendant U.S. Centers For Disease Control (CDC) From Fraudulently Representing To The Plaintiffs, Through Its Vaccine Information Statements, And The State Of California That Its Recommended Vaccines Are "Safe" Until (a) The CDC Has Conducted Placebo-Controlled Studies That Support, With Appropriate Statistical Analyses And Qualifications, Any Such Claims Of Vaccine Safety, And (b) Disclosed Its Financial Conflicts Of Interest With The Vaccine Industry**

103.    Plaintiffs respectfully request that this Court enjoin defendant CDC from mis-representing to them and the public, through the CDC's Vaccine Information Statements (VIS) and its website  that its recommended vaccines are "safe" until: (a) the CDC has conducted placebo-controlled trials that support with appropriate statistical analysis and qualifications as to any such statements of safety, (b) the National Academy of Medicine, as required under the NCVIA, has reviewed the CDC's placebo-controlled studies and deemed them to be adequate to find that those vaccines are "safe," (c) the CDC discloses, on its VIS statements and its website, that it receives 42% of its budget to promote and distribute childhood vaccines, (d) the CDC includes on its VIS statements and website the information that Congress has declared childhood vaccines to have unavoidable adverse effects, including death and permanent learning disability.

**3.    THE PLAINTIFFS**

**3.1    Plaintiff Brave And Free Santa Cruz**

104.    Plaintiff Brave And Free Santa Cruz is an unincorporated freedom advocacy group that was organized on July 4, 2022 with its principal activities in Santa Cruz County, California. It meets regularly in Santa Cruz County. It maintains a website at braveandfreesantacruz.org/.

105.    The group meets monthly with attendance that varies between 20 and 100, depending

1  on the speaker. It has 365 people on its email list. The group has a steering committee comprised of

2  eight members that meets once a month. The group does a weekly outreach literature table at the Santa

3  Cruz Farmer's Market.

4      106.   The group's members include current and/or potential parents and grandparents of

5  unvaccinated children who wish their children and grandchildren to have the right to attend public or

6  private schools, pre-schools, and daycare centers without regard to immunization status. Those actual

7  and potential parents and grandparents of unvaccinated children are also at risk of bearing the personal

8  and financial costs of:(1) caring for any of those children who become injured as a result of any

9  immunizations mandated for those children under California law, and/or (2) bearing the personal and

10  financial burdens of home schooling the children excluded from the public and private schools under

11  Health and Safety Code Section 120335. The group also includes some members and/or attendees with

12  family members who attend school under Individualized Education Programs.

13      107.   Brave and Free Santa Cruz's members have standing to challenge the constitutionality

14  of California's school immunization mandates because they are at risk of harm to their personal and

15  financial interests as the result of Health and Safety Code Section 120335, risk that will be mitigated

16  by a favorable decision by this Court.The group also has standing to challenge the policy of the

17  California Department of Public Health to unlawfully require children attending school under

18  Individualized Education Programs (IEP) to meet the immunization requirements under Health and

19  Safety Code Section 120335 because some of its membership have family members attending school

20  under such Individual Education Programs.

21      **3.2**   **Plaintiff S.B., A Minor Child**

22      108.   Plaintiff S.B. is a seven year old child who is being home schooled due to her parent's

23  concerns about the immunizations required by the Brentwood Union School District that serves the

24  area in which she lives. S.B. wishes to attend the Brentwood Public Schools to pursue her education

25  to become an informed and productive member of society and to see her friends. However, S.B. does

26  not have all the immunizations that Brentwood Public School District requires and her parents object

27  to those immunizations for health and personal reasons, including religious objections to vaccines

28  derived from aborted fetal tissue.

      109.   Specifically, the Brentwood Union School District states, on the "Enrollment" page of

its website, that, "Children will not be enrolled unless an immunization record is presented and immunizations are up-to-date."[28]

110.    Classes for the Brentwood Union School District for the 2024-2025 school year began on July 30, 2024. But S.B. is now excluded from enrolling for those classes because she does not meet the school district's immunization requirements. Thus, her claims related to that exclusion are now ripe for decision by the court.

111.    S.B., a minor, is not being identified for privacy reasons.

112.    S.B. has standing to challenge the constitutionality of Health and Safety Code Section 120335 because she is already excluded from exercising her constitutional right to go to school, an injury that will be redressed by a favorable decision by this Court.

**3.3    D.B., A Minor Child**

113.    D.B., a sibling of S.B., is an 11 year old child who wishes to enroll in the sixth grade in the Brentwood Union School District for the 2024-2025 school year but cannot do so because she does comply with the immunization requirements that apply to her. She wishes to pursue her education to become an informed and productive member of society in that school district without being required to comply with those requirements.

114.    Specifically, the Brentwood Union School District states, on the "Enrollment" page of its website, that, "Children will not be enrolled unless an immunization record is presented and immunizations are up-to-date."[29]

115.    Classes for the Brentwood Union School District for the 2024-2025 school year began on July 30, 2024. But D.B. is now excluded from enrolling for those classes because she does not meet the school district's immunization requirements. Thus, her claims related to that exclusion are now ripe for decision by the court.

116.    D.B., a minor, is not being identified for privacy reasons.

117.    D.B. has standing to challenge the constitutionality of Health and Safety Code Section

---

[28] Brentwood Union School District, Enrollment. https://www.brentwood.k12.ca.us/o/busd/page/enrollment.

[29] Brentwood Union School District, Enrollment. https://www.brentwood.k12.ca.us/o/busd/page/enrollment.

120335 because she is already excluded from exercising her constitutional right to go to school, an injury that will be redressed by a favorable decision by this Court.

### 3.4   N.Y., Mother Of D.B. And S.B.

118.   N.Y. is the mother of both D.B. and S.B. and the wife of H.B. She wishes that her children could attend the public schools in the Brentwood Union School District but objects to complying with the district's immunization requirements for health, safety, and personal reasons, including religious objections to vaccines derived from aborted fetal tissue.

119.   N.Y. is a refugee of direct Mayan descent from war-torn Guatemala where her people were the victims of decades of genocide and unspeakable horrors. It has been estimated that as many as 300,00 Mayan people were killed by non-Mayan government forces backed by U.S. "trainers." For this reason, Mayans came to mistrust such "outsiders." She remembers from childhood in Guatemala that her grandmother and all her extended family did not trust the government-mandated vaccines, and that one of her sibling's had a severe allergic reaction to a government-mandated immunization in Guatemala and nearly died. She is aware that autism is unheard of in her extended family, who do not immunize their children, but is also aware of several autism cases among other, immunized, Guatemalan children. This greatly increases her concerns.

120.   She came to the United States to enjoy safety and freedom for herself and so that her children could have a better life, educated in American schools. Now, as the result of California's mandate that her children be injected with California's unsafe vaccines, she has neither safety nor freedom and limited education for her children and fears that genocide can happen even here in the United States.

121.   N.Y., as the mother of D.B. and S.B., has a fundamental right to have her children educated in an accredited school of her choice, be it public or private. Under California's school immunizations requirements, which apply to both public and private schools, she is denied that fundamental parental right.

122.   Because classes for the 2024-2025 school year in the Brentwood Union School District began on July 30, 2024 and her two children were excluded from enrolling for those classes because her two children do not meet the school district's immunization requirements, requirements at issue in this case, her claims are now ripe for decision in this court.

123.    N.Y., the parent of a minor plaintiff, is not being identified for privacy reasons since identifying the parent identifies the child.

124.    N.Y. has standing to challenge the constitutionality of Health and Safety Code Section 120335 in this case because: (1) she must already bear the personal and financial costs of home schooling her children, and (2) she is also at risk of bearing the personal and financial costs of caring for any of her children who become injured as a result of any immunizations mandated for those children under California law, both of which injuries will be redressed by a favorable decision by this Court.

### 3.5    H.B., Father Of D.B. And S.B.

125.    H.B. is the father of both D.B. and S.B. He is also from Guatemala. He wishes that his children could attend the public schools in the Brentwood Union School District but objects to complying with the district's immunization requirements for health, safety, and personal reasons, including religious objections to vaccines derived from aborted fetal tissue. He has, himself, experienced adverse reactions to government-mandated vaccines.

126.    H.B., as the father of D.B. and S.B., has a fundamental right to have his children educated in an accredited school of his choice, be it public or private. Under California's school immunizations requirements, which apply to both public and private schools, he is denied that fundamental parental right.

127.    H.B. is also at risk of bearing the personal and financial costs of caring for any of his children who become injured as a result of any immunizations mandated for those children under California law.

128.    Because classes for the 2024-2025 school year in the Brentwood Union School District began on July 30, 2024 and his two children were excluded from enrolling for those classes because his two children do not meet the school district's immunization requirements, requirements at issue in this case, his claims are now ripe for decision in this court.

129.    H.B., the parent of a minor plaintiff, is not being identified for privacy reasons since identifying the parent identifies the child.

130.    H.B. has standing to challenge the constitutionality of Health and Safety Code Section 120335 in this case because: (1) he must already bear the personal and financial costs of home

1  schooling his children, and (2) he is also at risk of bearing the personal and financial costs of caring

2  for any of his children who become injured as a result of any immunizations mandated for those

3  children under California law, both of which injuries will be redressed by a favorable decision by this

4  Court.

5      **3.6      Plaintiffs D.C. And B.P**

6      131.    D.C. is a twelve year old child who wishes to attend the public schools operated by the

7  Gilroy Unified School District in Santa Clara County, California, where he resides.

8      132.    B.P. is the mother of D.C.

9      133.    At age two and one half, D.C. was growing and developing normally and had a

10 vocabulary appropriate for his age, *i.e.,* some intelligible words strung together in short sentences.

11     134.    D.C. did not have the usual infant and child vaccines by age two years and three

12 months, at which time he started a series of immunizations designed to bring him up to date.

13     135.    Within a few hours of receiving the second of that series of immunizations, at age two

14 and one-half years, D.C. began to run a fever and the injected arm became quite red and swollen.

15 Within a day or two of that immunization he lost all intelligible speech and spoke only in "gibberish."

16     136.    D.C. then regressed in his development to the point that he had no intelligible speech

17 for the next two years.

18     137.    Since kindergarten, D.C. has been attending classes within the Gilroy Unified School

19 District under an Individualized Education Program (IEP) devised for him by that school district.

20     138.    On June 6, 2024 B.P. was informed by defendant Gilroy Unified School District in the

21 email below that her son, D.C., will not be allowed to enroll in the district's schools for the 2024-2025

22 school year unless he can present evidence that he complied with all of the immunization requirements

23 under Health and Safety Code Section 120335:

24         "If you are receiving this notification, our school records show that your child has not provided
           proof of their Tdap vaccination and does not currently meet the requirements of the California
25         School Immunization law, Health and Safety Code Sections 120325-120375 and/or County
           Immunization Requirements for 7th grade...Your student will NOT receive their 7th grade
26         schedule until immunization requirements are met."

27     139.    However, even though D.C. does not now comply with those requirements because he

28 has not been immunized with one of the vaccines, the Tdap vaccination, he is legally exempt from the

requirements of Health and Safety Code Section 120335 under Health and Safety Code Section

120335(h):

> (h) This section does not prohibit a pupil who qualifies for an individualized education program, pursuant to federal law and Section 56026 of the Education Code, from accessing any special education and related services required by his or her individualized education program.

140.    Because D.C. is legally exempt from the school immunization mandates under Health and Safety Code Section 120335(h), his mother, B.P., sent, via counsel, a demand letter to the Superintendent of the Gilroy Unified School District on June 15, 2024 demanding that D.C. be allowed to continue his education in the schools of that district.

141.    B.P. never received a response to the letter of June 15, 2024.

142.    On July 23, 2024 B.P. filed a complaint with the Office of Civil Rights of the U.S. Department of Education alleging that her son, D.C., was the victim of discrimination by the Gilroy Unified School District on the basis of his disabilities. She has had no response from the Office of Civil Rights to this date as to that complaint.

143.    On August 7, 2024 the school nurse at the school within the Gilroy Unified School District that Plaintiff D.C. attended last year and would like to attend this coming year inquired, by email, of B.P. as to D.C.'s current immunization status. B.P. then sent the school nurse a copy of the Demand Letter sent to the School District on June 15, 2024.

144.    B.P. was then notified later that day by that school nurse that D.C. would be allowed to attend school when it opens for the next term.

145.    However, because Defendant Anisha Munshi, Superintendent of the Gilroy Unified School District, never responded to the Demand Letter sent to her on June 15, 2024, neither Plaintiffs D.C. nor B.P. has any assurance that D.C. will not be again excluded at some time in the future.

146.    D.C., a minor, is not being identified for privacy reasons

147.    B.P., the parent of a minor plaintiff, is not being identified for privacy reasons since identifying the parent identifies the child.

148.    D.C. has standing to challenge his potential exclusion from his school due to his failure to comply with the requirements of Health and Safety Code Section 120335 in this case because he would then be deprived of his constitutional right to attend school, a risk that will be redressed by a favorable decision by this Court.

149.    B.P. has standing to challenge the potential exclusion of her son, Plaiintiff 5, from his

school due to his failure to comply with the requirements of Health and Safety Code Section 120335 in this case because she would have to bear the personal and financial costs of home schooling her child, a risk that will be redressed by a favorable decision by this Court.

**3.7     Plaintiffs N.D., S.D. and A.D.**

150.     N.D. is a 12 year old child who resides in Santa Cruz County and who wishes to attend the same school he has gone to since he was 2 years old. He did not need any vaccines to attend until he started 7th grade. The private school he attends would very much like him to attend without forced vaccination but is bound by state law. It is a small school and he has life long friends that go there.

151.     Even though, or more likely because, he is unvaccinated, he has rarely been ill, perhaps two episodes of swimmer's ear and just two episodes of minor, self-limited, fever. He never had any sick visits with his pediatrician, only well child visits. On the other hand, all of his friends and classmates, who presumably got the required immunizations, are sick and miss school often.

152.     N.D. has standing in this case in that he is forced to be injected with vaccines to which he and his parents object in order to attend his school, a condition that will be redressed by a favorable decision of the court in this case.

153.     S.D. is the father of N.D and A.D. is the mother of N.D.. Both parents choose nutrition-based medicine. S.D. has had a naturopath for most of his life. The naturopath has always advised against vaccines and gives advice about healthy foods, exercise, rest and spiritual meditation. Both parents believe strongly that the immunizations mandated under Health and Safety Code Section 120335 will cause long term damage that can't be remedied.

154.     S.D. and A.D. have standing in this case because they are forced and coerced to consent to immunizations that they reasonably believe could be harmful to their child, a condition that will be redressed by a favorable decision by this Court.

**3.8     Plaintiff Dr. Douglas V. Hulstedt, M.D.**

155.     Dr. Douglas V. Hulstedt, M.D., practiced general pediatrics in Monterey, California for many years.

156.     In 2023 his medical license was revoked by the Medical Board of California for, purportedly, practicing below the standard of care. Specifically, the Medical Board ostensibly revoked Dr. Hulstedt's medical license for recommending to the parent of one of his pediatric patients that the

child should not receive any more immunizations due to the child's medical and family history. The Medical Board found this to be below the applicable standard of care since, according to the Medical Board, doctors are only allowed to make recommendations on immunizations that comport with the "guidelines" of the Centers For Disease Control (CDC).

157.     Dr. Hulstedt has standing to challenge the revocation of his medical license as an actual infringement of his protected First Amendment speech rights, in that he has suffered an actual injury-in-fact traceable to infringement of that right by Defendant the Medical Board of California, an injury that will be redressed by a favorable decision of this Court.

**4.     THE DEFENDANTS**

**4.1     Defendants California Department Of Public Health and Tomás Aragón In His Official Capacity As Director Of The California Department of Public Health**

158.     Defendant California Department of Public Health oversees the enforcement of California Health and Safety Code Section 120335 as applied to all California educational and child care facilities.

159.     Defendant Tomás Aragón is the Director of the California Department Of Public Health

160.     All California schools, public and private, and all pre-schools are required to file annual reports with the California Department of Public Health as to the immunization status of all their students.[30]

161.     Defendant Tomás Aragón is, by virtue of his office, also the State Registrar of Vitals Statistics under Health and Safety Code Section 102175. As the State Rgistrar, he has supervisory powers over the local registrars in each county. Health and Safety Code Section 102185, including as to the registration of Sudden Unexpected Infant Deaths.

**4.2     Defendant Tony Thurmond In His Official Capacity As California State Superintendent Of Public Instruction**

162.     Defendant Tony Thurmond is the California State Superintendent of Public Instruction and the administrative head of the California Department of Education, the state agency responsible

---

[30] California Code of Regulations, Title 17, Division 1, Chapter 4, Subchapter 8. Immunization Against Poliomyelitis, Diphtheria, Pertussis, Tetanus, Measles, Mumps, Rubella, Haemophilus Influenzae Type B (Hib), Hepatitis B, and Varicella. https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Immunization/IMM-1080.pdf

for enforcing the state's education law and regulations.

**4.3   Defendant Reji Varghese In His Official Capacity As Executive Director Of The Medical Board Of California**

163.    Defendant Reji Varghese is the Executive Director of the Medical Board of California, the state agency responsible for the licensing of all medical doctors in the State of California and the state agency responsible for all disciplinary actions with respect to those physicians.

**4.4   Defendant Rob Bonta, In His Official Capacity as Attorney General of the State of California**

164.    Defendant Rob Bonta is the elected Attorney General of the State of California. As such, he also is responsible for the enforcement of California Health and Safety Code Section 120335 and all other California statutes as applied to all California educational, child care, and medical facilities.

**4.5   Defendant Mandy K, Cohen, In Her Official Capacity as Director, U.S. Centers For Disease Control (CDC)**

165.    Defendant Mandy K, Cohen is the Director of the U.S. Centers For Disease Control (CDC), an entity within the U.S. Department of Health and Human Services.

**4.6   Defendant Brentwood Union School District**

167.    Defendant Brentwood Union School District is the public school district that serves the area in which plaintiffs 1 and 2 reside.

168.    The Brentwood Union School District publicly states, on the "Enrollment" page of its website, that "Children will not be enrolled unless an immunization record is presented and immunizations are up-to-date."[31] That page also states that, "The following will be needed for enrollment: ... Full Immunization Records ..."

169.    The text "Full Immunization Records" contains a hyperlink, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/School/tk-12-immunizations.aspx, which links to a webpage of defendant the California Department of Public Health, Immunization Branch, captioned as "Shots Required for TK–12 and 7th Grade."

170.    Thus, defendant Brentwood Union School District enforces California Health and

---

[31] Brentwood Union School District, Enrollment page. https://www.brentwood.k12.ca.us/o/busd/page/enrollment.

1   Safety Code Section 120335 against children residing in its geographic area.

2       171.    Classes began for the 2024-2025 school year in the Brentwood Union School District

3   on July 30, 2024 with Plaintiffs 1 and 2 excluded.

4       **4.7    Defendant Gilroy Unified School District**

5       172.    Defendant Gilroy Unified School District, located in southern Santa Clara County, is

6   the public school district that serves the area in which D.C. resides.

7       173.    According to its website, the Gilroy Unified School District has an enrollment of about

8   10,500 students in grades TK-12.

9       174.    It is estimated that about 13% of students in California public schools (about 800,000)

10  were enrolled in Individualized Education Programs (IEP) in the 2021-2022 school year, a number that

11  continues to increase every year, up from 10% in the early 2000's.[32]

12      175.    Thus, a reasonable estimate for the number of students in the Gilroy Unified School

13  District enrolled in IEP programs would be about 1,350.

14      176.    The 2023-2024 Student Handbook of the Gilroy Unified School District states that:

15      Immunization Requirements: State law requires that all students under age 18 be immunized
16      against certain diseases unless they are exempt for medical reasons . The school must have
        proof that your child is current on required immunizations at the time he/she is registered.
        Please check with your pediatrician, family physician or medical clinic to make sure your child
17      is fully immunized; your child may be excluded from school if these are not met.[33]

18      177.    Thus, the Gilroy Unified School District continues to demand that all of its students

19  must be "fully immunized," including the 13% under IEP's who are legally exempt from those

20  requirements under federal and state law. The parents of those IEP students are thus misled by the

21  Gilroy Unified School District as to the actual requirements of "state law" on childhood

22  immunizations.

23      178.    Classes began for the 2024-2025 school year in the Gilroy Unified School District

24  began on August 21, 2024.

25  _____

26  [32] EdSource: Parents' guide to 504 plans and IEPs: What they are and how they're different.
    https://edsource.org/2022/parents-guide-to-504-plans-and-ieps-what-they-are-and-how-theyre-differe
27  nt/669493.

28  [33]    Gilroy   Unified   School   District,   Student   Handbook,   at   page   28.
    https://resources.finalsite.net/images/v1694623538/gusdk12caus/qtqccn6jqgm5paqaopw4/2023-24_
    Student_Handbook_Gilroy_Unified_School_District_updated091323.pdf

5.      **FACTS AND LAW COMMON TO THE CLAIMS FOR RELIEF**

**5.1    The Right To Refuse Coerced Medical Treatment Is A Fundamental Right Under The Substantive Due Process Clause Of The Fourteenth Amendment To The U.S. Constitution And Any Infringement Is Reviewed Under The Strict Scrutiny Standard Of Review That Requires That The Infringement Be Narrowly Tailored To Achieve A Compelling State Interest**

179.    The right to refuse unwanted, coerced, medical treatments is a fundamental right under the Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

180.    In overruling an "...order moved for, subjecting the plaintiff's person to examination by a surgeon, without her consent," the U.S. Supreme Court held, as early as 1891, that:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law...[t]he order moved for, subjecting the plaintiff's person to examination by a surgeon, without her consent and in advance of the trial, was not according to the common law, to common usage, or to the statutes of the United States. The Circuit Court, to adopt the words of Mr. Justice Miller, "has no power to subject a party to such an examination as this."[34]

181.    The right of a competent person to refuse medical treatment was further reaffirmed by the U.S. Supreme Court in the *Cruzan* case in 1990 when the Court stated that "[t]his notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment...[t]he logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment."[35]

182.    Nor is coerced consent valid. As the U.S. Supreme Court held in *City of Akron*, "...the State's interest in ensuring that this information (as to the abortion procedure) be given will not justify abortion regulations designed to influence the woman's informed choice between abortion or childbirth."[36]

183.    The *Akron* Court went even further, holding that "[t]he State's interest is in ensuring that the woman's consent is informed and unpressured..." *Id.,* at 446. Thus, the state must refrain from enacting "regulations designed to influence ... informed choice" because its legitimate interest "is in ensuring that the ... consent is informed and unpressured."

---

[34] *Union Pacific R. Co. v. Botsford* (1891) 141 US 250, 251, 258.

[35] *Cruzan v. Director, Missouri Department of Health* (1990) 497 U.S. 261, 269-270, citing *Union Pacific R. Co. v. Botsford*.

[36] *City of Akron v. Akron Center For Reproductive Health, Inc.* (1983) 462 U.S. 416, 444.

1    184.   The corollary to this rule would be that statutes and regulations designed to influence

2    and pressure constitutionally protected informed choice and consent would not be a "legitimate

3    interest" of the State.

4    185.   Thus, informed consent to medical treatment must be freely given and cannot be

5    obtained by state influence or coercion. State statutes and regulations designed to influence the

6    patient's informed consent decision are void. Coerced consent to medical treatment is not consent.

7    186.   The U.S. Supreme Court also found, in *Washington v. Harper*, that "[t]he forcible

8    injection of medication into a nonconsenting person's body represents a substantial interference with

9    that person's liberty."[37]

10   187.   Because the Supreme Court has held that "the patient generally possesses the right not

11   to consent, that is, to refuse treatment," that right has been subject to a strict scrutiny standard of

12   review since *Skinner v. Oklahoma* was decided in 1942, outlawing the forced surgical sterilization of

13   certain criminals.[38] Under that strict scrutiny standard, any infringement of a fundamental right, here

14   the right to refuse forced medical treatment, must be narrowly tailored so as to achieve a compelling

15   state interest.[39]

16   188.   Because California mandates that children be treated with certain immunizations in

17   order to attend school, public or private, pre-school, or even daycare, these mandates are coercive and

18   "designed to influence" and pressure the decision of the child's parents into giving consent for these

19   immunizations, they infringe on the fundamental right under the Substantive Due Process Clause of

20   the Fourteenth Amendment of the parents, acting on behalf of the minor child, to refuse those

21   immunizations. For this reason these state mandates that infringe upon that right must pass strict

22   scrutiny review by being narrowly tailored to achieve a compelling state interest.

23   **5.2   California Cannot Show That Its Childhood Immunization Mandates Are Narrowly Tailored To Achieve A Compelling State Interest**

24

25   189.   To begin, California has not identified a compelling state interest that is to be achieved

26

27   [37] *Washington v. Harper* (1990) 494 U.S. 210, 229 (holding that an inmate may be so injected after procedural due process has been accorded).

28   [38] *Skinner v. Oklahoma ex. rel. Williamson* (1942 316 U.S. 535.

     [39] *Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 US 520, 546.

1    by its childhood immunization mandates that severely infringe upon the fundamental right to refuse

2    medical treatment as set forth under *Cruzan*. California Health and Safety Code Section 120325 merely

3    states that:

4    [I]t is the intent of the Legislature to provide:
     (a) A means for the eventual achievement of total immunization of appropriate age groups
5    against the following childhood diseases:
     (1) Diphtheria.
6    (2) Hepatitis B.
     (3) Haemophilus influenzae type b.
7    (4) Measles.
     (5) Mumps.
8    (6) Pertussis (whooping cough).
     (7) Poliomyelitis.
9    (8) Rubella.
     (9) Tetanus.
10   (10) Varicella (chickenpox).
     (11) Any other disease deemed appropriate by the department, taking into consideration the
11   recommendations of the Advisory Committee on Immunization Practices of the United States
     Department of Health and Human Services, the American Academy of Pediatrics, and the
12   American Academy of Family Physicians.

13        190.    Nor does California makes any attempt at all to tailor its mandates so as to meet any

14   objective parameters that would define when the compelling state interest, whatever it is, has been

15   achieved. For example, polio has now been eradicated throughout the world except for a few isolated

16   areas of Pakistan and Afghanistan. The few cases that occur in the United States are due to the vaccine

17   itself. This is just one example of California's failure to narrowly tailor the application of its mandate

18   to the need for the specific immunizations and their hazzards.

19        191.    The Child Vaccine Injury Act of 1986 recognized the hazzards of childhood vaccines

20   and set up, by statute, procedures for monitoring those hazzards, such as the periodic reviews by the

21   Institute of Medicine.

22        192.    California has failed to set up any monitoring system or mechanism that would even

23   allow it to tailor its mandates to the needs for, and hazzards, of those mandates. Furthermore,

24   California's mandates are statutory, fixed and inflexible. They cannot be tailored.

25        193.    California's immunization requirements are also not narrowly tailored since none of

26   the vaccines has ever been formally tested against a placebo control by either the Food and Drug

27   Administration or the Centers for Disease Control for their benefits and harms for the overall

28   population that California requires to be immunized, much less specific at-risk sub-populations such

     as particular racial and ethnic minorities, ages, or sexes. That is, California cannot show that children

immunized as it requires are any healthier than those not so immunized. Therefore, California cannot tailor its mandate to apply only where it can show net benefit and absence of harm. Because there are no placebo controls, neither California nor the CDC nor the FDA can show that there is any net benefit at all for children's health for any of California's required immunizations, much less benefits that are absolutely essential to serve a compelling state need or to justify all the injuries and deaths suffered.

194.    California's immunization mandates for children cannot meet the demanding strict scrutiny standard of review because those immunizations, as shown below, often cause irreparable harm, injury, and even death, not just to a few, but to many children. Under the Fourteenth Amendment guarantees of life and liberty, the State may not deliberately inflict injury and death upon innocent children under any foreseeable circumstances, even for the putative greater good of all other children. California cannot show that it has any compelling state interest that would ever justify these severe harms, such as profound, non-speaking, autism, and deaths due to Sudden Unexpected Infant Death (SUID), that often result from its mandated immunizations.

**5.3    Details Of The Thirty Two Immunizations For Ten Different Infections Mandated For School Children Under California Health And Safety Code Section 120335**

194.    Thirty-two immunizations for ten different infectious diseases are mandated for children to be allowed to enter kindergarten in California, as shown below:[40]

---

[40] Shots Required For TK-12 and 7th Grade. California Department of Public Health. https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/School/tk-12-immunizations.aspx

# Shots Required for TK–12 and 7th Grade



**En Español**

## Students Admitted at TK/K–12 Need Records of:

- **Diphtheria, Tetanus, and Pertussis (DTaP, DTP, Tdap, or Td) — 5 doses**
  (4 doses OK if one was given on or after 4th birthday. 3 doses OK if one was given on or after 7th birthday.)
  For 7th–12th graders, at least 1 dose of pertussis-containing vaccine is required on or after 7th birthday.

- **Polio (OPV or IPV) — 4 doses**
  (3 doses OK if one was given on or after 4th birthday)

- **Hepatitis B — 3 doses**
  (Required at admission to any grade except 7th grade)

- **Measles, Mumps, and Rubella (MMR) — 2 doses**
  (Both given on or after 1st birthday)
- **Varicella (Chickenpox) — 2 doses**

The TK/K–12 immunization requirements apply to new admissions and transfers for all grades, including 7th grade, and students whose exemptions are no longer valid.

## Students Advancing to 7th Grade Need Records of:

- **Tetanus, Diphtheria, Pertussis (Tdap) —1 dose**
  (Whooping cough booster usually given at 11 years and up)

- **Varicella (Chickenpox) — 2 doses**
  (Usually given at ages 12 months and 4-6 years)

California schools are required to check immunization records for all new student admissions at transitional kindergarten (TK)/Kindergarten through 12th grade and all students advancing to 7th grade before entry. Parents must show their child's Immunization Record as proof of immunization.

195.

The CDC recommends that the following twenty eight immunizations be given within the first fifteen months of life, including fifteen immunizations within the first six month of life when children are most vulnerable to Sudden Unexplained Death Syndrome:[41]

---

[41] Child and Adolescent Immunization Schedule by Age. CDC.
https://www.cdc.gov/vaccines/schedules/hcp/imz/child-adolescent.html

## Birth to 15 Months

These recommendations must be read with the notes that follow. For those who fall behind or start late, provide catch-up vaccination at the earliest opportunity as indicated by the green bars. To determine minimum intervals between doses, see the catch-up schedule (Table 2).

| Vaccine and other immunizing agents | Birth | 1 mo | 2 mos | 4 mos | 6 mos | 9 mos | 12 mos | 15 mos |
|---|---|---|---|---|---|---|---|---|
| Respiratory syncytial virus (RSV-mAb [Nirsevimab]) | 1 dose depending on maternal RSV vaccination status, See notes | | | | | 1 dose (8 through 19 months), See notes | | |
| Hepatitis B (HepB) | 1st dose | ←2nd dose→ | | | ←3rd dose→ | | | |
| Rotavirus (RV) RV1 (2-dose series); RV5 (3-dose series) | | | 1st dose | 2nd dose | See notes | | | |
| Diphtheria, tetanus, & acellular pertussis (DTaP: <7 yrs) | | | 1st dose | 2nd dose | 3rd dose | | | ←4th dose→ |
| Haemophilus influenzae type b (Hib) | | | 1st dose | 2nd dose | See notes | | ←3rd or 4th dose, See notes→ | |
| Pneumococcal conjugate (PCV15, PCV20) | | | 1st dose | 2nd dose | 3rd dose | | ←4th dose→ | |
| Inactivated poliovirus (IPV: <18 yrs) | | | 1st dose | 2nd dose | ←3rd dose→ | | | |
| COVID-19 (1vCOV-mRNA, 1vCOV-aPS) | | | | | 1 or more doses of updated (2023–2024 Formula) vaccine (See notes) | | | |
| Influenza (IIV4) | | | | | Annual vaccination 1 or 2 doses | | | |
| Influenza (LAIV4) | | | | | | | | |
| Measles, mumps, rubella (MMR) | | | | | See notes | | ←1st dose→ | |
| Varicella (VAR) | | | | | | | ←1st dose→ | |
| Hepatitis A (HepA) | | | | | (See notes) | | ←2-dose series, See notes→ | |
| Tetanus, diphtheria, & acellular pertussis (Tdap: ≥7 yrs) | | | | | | | | |
| Human papillomavirus (HPV) | | | | | | | | |
| Meningococcal (MenACWY-CRM ≥2 mos, MenACWY-TT ≥2years) | | | | See notes | | | | |
| Meningococcal B (MenB-4C, MenB-FHbp) | | | | | | | | |
| Respiratory syncytial virus vaccine (RSV [Abrysvo]) | | | | | | | | |
| Dengue (DEN4CYD: 9-16 yrs) | | | | | | | | |
| Mpox | | | | | | | | |

**5 . 4**

**Neither California Nor The CDC Have Reported Studies Comparing The Adverse Events In Vaccinated Children Versus Those In Unvaccinated Children ("VU Studies", Similar To Placebo-Controlled Studies) To Prove The Safety And Effectiveness Of Their Vaccines**

196.     The VU studies shown below raise substantial questions about the safety of the vaccines

mandated by California and recommended by the CDC. Plaintiffs offer these VU studies to raise the issue of the safety of the vaccines that California mandates for children and that the CDC recommends. While the merits of these various VU studies can and should be debated, the larger and more important point of presenting these VU studies is to make the point that neither California nor the CDC have ever reported any of their own VU studies to refute them. The failure of California and the CDC to report any refuting VU studies of their own should be taken as an adverse admission by California and the CDC that the VU studies presented below are generally valid. Such studies are, as Dr. Fauci once told the Congress,[42] the "gold standard" for clinical research studies. The CDC should have done them many years ago before recommending these vaccines for general use, including for school children in California such as Plaintiffs.

### 5.5    Unofficial Studies Show That The Immunizations Mandated Under Health and Safety Code Section 120335 Cause Serious, Irreparable, Injury And Death

#### 5.5.1    Comparison Of Autism Rates Between Vaccinated And Unvaccinated Children ("VU Studies") Show That Mandated Immunizations Are The Likely Cause Of Many Cases Of Childhood Autism, Especially Among African-American Boys

197.    As noted above, the CDC also continues, to this day, to represent that, "Any hint of a problem with a vaccine prompts the CDC and FDA to carry out further investigations."

198.    As shown next, there are a lot more than just a few hints. In fact, there are ample data from VU studies to show that many of the immunizations mandated under Health and Safety Code Section 120335 are not safe, that they have numerous, serious adverse effects, up to and including death.

199.    Prospective randomized clinical trials (RCT's) are ideal for identifying adverse events caused by drugs. Some retrospective, epidemiological, studies can also be valid, such as studies in which a population of interest is identified wherein some subjects have already used the drug under study whereas other "control" subject have not. The incidence of adverse events in the drug-treated population is then compared to the incidence in the control group and excess adverse events in the treated group are ascribed to the drug under study unless some other confounding factor(s) are identified to explain the differences.

---

[42] Fauci testifies on coronavirus response. CNN Politics, July 31, 2020. https://www.cnn.com/politics/live-news/fauci-coronavirus-testimony-07-31-20/index.html.

200.    Retrospective studies where vaccinated and unvaccinated groups occur naturally are referred to as "VU studies."

### 5.5.1.1 Two VU Studies Found Lower Than Expected Rates Of Autism In The Amish Community That Has Low Rates Of Vaccination

201.    In 2010, Robinson *et. al.* studied autism rates in an Old Order Amish community, where immunization is much less common, and reported that the incidence of Autism Spectrum Disorder in that community was 1 in 271 children and compared to the rate then prevailing generally in the United States of 1 in 91.[43]

202.    In 2005 journalist Dan Olmsted looked into the question of, "Where are the autistic Amish?"[44] He calculated, based on the then prevailing incidence of autism, that there should be about 50 children with classic, full-blown autism, easily recognized autism among the Amish population living in Lancaster County, Pennsylvania. (*Id.*) Despite diligently searching, even among classes for "special needs" children, he could only identify three such children. (*Id.*)

### 5.5.1.2 Autism And Other Neurodevelopmental Disorders Are Four Times More Common Among Vaccinated Home Schooled Children Than Among Those Home Schooled That Are Unvaccinated, And Even More Common Among Non-White Boys

203.    In 2017 Mawson *et. al.* reported, in two published reports, Mawson I[45] and Mawson II[46], a study of 666 children who were home-schooled, of whom 261 (39%) were unvaccinated, 208 (31%) were partially vaccinated, and 197 (30%) were fully vaccinated. As a group the children were similar, mostly white (88%), with a slight preponderance of females (52%), and averaged 9 years of age. (*Id.*)

204.    The first Mawson report (Mawson I) described the incidence of several acute and

---

[43] Prevalence Rates of Autism Spectrum Disorders Among the Old Order Amish. Robinson, J.L., *et al.*, https://imfar.confex.com/imfar/2010/webprogram/Paper7336.html.

[44] The Age of Autism, The Amish anomaly. Dan Olmstead, April 18, 2005. Available at https://drive.google.com/file/d/1BCJfmWLMrjSuZ8vRYa6LL4slSnhXdfk3/view.

[45] Mawson AR, Ray BD, Bhuiyan AR, Jacob B (2017) Pilot comparative study on the health of vaccinated and unvaccinated 6- to 12-year-old U.S. children. J Transl Sci 3: DOI: 10.15761/JTS.1000186 (Mawson I).

[46] Mawson AR, Bhuiyan A, Jacob B, Ray BD (2017) Preterm birth, vaccination and neurodevelopmental disorders: a cross-sectional study of 6- to 12-year-old vaccinated and unvaccinated children. *J Transl Sci* 3: DOI: 10.15761/JTS.1000187 (Mawson II).

1    chronic conditions in both the vaccinated and unvaccinated groups.

2        205.    The Mawson I paper presented its data in tabular format, more precise but less readable.

3    In their book, Vax-Unvax, Robert Kennedy Jr. and Brian Hooker transformed the Mawson tabular data

4    into graphic form, which is more readily comprehended, as presented next.

5        206.    Vaccinated children had far more chronic diseases than did those not vaccinated,

6    including allergic rhinitis, allergy, attention deficit disorder, autism, eczema, learning disability, and

7    neuro-developmental disorders, as illustrated below:[47]



Figure 2.1—The odds ratios of chronic diseases for vaccinated
versus unvaccinated children (Mawson et al. 2017a).

25       207.    According to the CDC, the incidence of autism in eight year old U.S. children is higher

---

[47] Robert Kennedy Jr, Brian Hooker. Vax-Unvax, Figure 2.1 (data of Mawson).

among African-American and Hispanic children.[48]

| Prevalence of Autism Spectrum Disorder in 8-year-olds (2020) Data Courtesy of CDC[1] | | Prevalence[2] | Percent[2] |
|---|---|---|---|
| Overall | | 27.6 per 1,000 | 2.8% |
| Sex | Boys | 43.0 per 1,000 | 4.3% |
| | Girls | 11.4 per 1,000 | 1.1% |
| Race/Ethnicity | White | 24.3 per 1,000 | 2.4% |
| | Black | 29.3 per 1,000 | 2.9% |
| | Asian/Pacific Islander | 33.4 per 1,000 | 3.3% |
| | Hispanic[3] | 31.6 per 1,000 | 3.2% |
| | American Indian or Alaska Native (AI/AN) | 26.5 per 1,000[4] | 2.7% |
| | Two or more races | 22.9 per 1,000 | 2.3% |

[1]The percent (i.e., rate per 100) was calculated by NIMH.

[2]Please see the measurement caveats regarding age below.

[3]All other groups are non-Hispanic.

[4]Arizona was the only Autism and Developmental Disabilities Monitoring Network site meeting the threshold for statistical precision for AI/AN autism spectrum disorder prevalence in 2020; the Arizona site-specific prevalence was 26.8 per 1,000. Please see the ADDM publication for more information.

208.    What the CDC has found but never publicly disclosed is that children vaccinated with the MMR (measles-mumps-rubella) vaccine before the age of 36 months are more likely to develop autism that those vaccinated after 36 month of age, with the difference being much more striking among African-American children:[49]

---

[48] Autism Spectrum Disorder (ASD) Identification among 8-year-old Children. CDC. https://www.cdc.gov/ncbddd/autism/addm-community-report/spotlight-on-racial-ethnic-differences.html

[49] Robert Kennedy Jr, Brian Hooker. Vax-Unvax, Figure 4.1 (data of DeStephano *et al,* 2004).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    209.    The CDC concealed the data about the increased autism rate among the African-

19    American children for many years until CDC whistle-blower William W. Thompson revealed it in

20    2014. Dr. Thompson released, through his attorney, a public statement on his role in publishing a

21    research paper from the CDC on the relationship of immunization with the Measles/Mumps/Rubella

22    (MMR) vaccine and the subsequent development of childhood autism:

23        I regret that my coauthors and I omitted statistically significant information in our 2004 article
           published in the journal Pediatrics. The omitted data suggested that African American males
24        who received the MMR vaccine before age 36 months were at increased risk for autism.
           Decisions were made regarding which findings to report after the data were collected, and I
25        believe that the final study protocol was not followed.[50]

26    210.    It took ten years for this information to get to the public, and then not from the CDC

27    itself but only from one lone whistle blower, Dr. William Thompson. During that time untold numbers

28

        [50] Statement of William W. Thompson, Ph.D., Regarding the 2004 Article Examining the
    Possibility of a Relationship Between MMR Vaccine and Autism. August 27, 2014.

COMPLAINT - PAGE 44

of African-American boys developed autism following CDC-recommended immunizations. Even after Dr. Thompson revealed the CDC's concealment of this important information from the public, and especially from African-American parents of infant boys, the CDC still made no attempt to get the word out to African-American parents. Instead, the CDC told parents, including African-American parents, that "[a]dditional studies and a more recent rigorous review by the Institute of Medicine have found that MMR vaccine does not increase the risk of autism,[51] even though the Institute of Medicine review did not include African-American children.[52]

> ### 5.5.1.3. According To The CDC's Vaccine Adverse Event Reporting System (VAERS), The Most Common Age For The Onset Of Autism Spectrum Disorder Is Age One To Three Years And It Most Commonly Strikes On The Very Same Day As A Vaccination

211. According th the CDC's VAERS database, the most common age for the onset of Autism Spectrum Disorder (ASD) is age one to three years:



**Age At Onset Of Autism Spectrum Disorder As Reported To VAERS, 1990 To Present**

---

[51] CDC Statement: 2004 MMR and Autism Study. https://www.cdc.gov/vaccinesafety/concerns/autism/cdc2004pediatrics.html.

[52] Adverse Effects of Vaccines: Evidence and Causality [Institute of Medicine. 2012], pp. 145-148. https://www.nap.edu/catalog/13164/adverse-effects-of-vaccines-evidence-and-causality

212.   Among those one to three year old children who had the onset of ASD, it **most commonly occurred on the same day as a vaccination:**



213.   As can be seen below on Table 2 of Mawson I, vaccinated children were less likely than unvaccinated children to have had the acute illnesses chickenpox (varicella, 74% less), whooping cough (pertussis, 70% less), and rubella (84% less) while the vaccinated were more likely than the unvaccinated to have had otitis media (middle ear infection, 3.8 times more likely) and pneumonia (5.9 times more likely).[53]

**Table 2.** Vaccination status and health outcomes – Acute Conditions

| | Vaccinated (n=405) | Unvaccinated (n=261) | Total (n=666) | Chi-square | P-value | Odds Ratio (95% CI) |
|---|---|---|---|---|---|---|
| Chickenpox | | | | | | |
| Yes | 32 (7.9%) | 66 (25.3%) | 98 (14.7%) | 38.229 | < 0.001 | 0.26 (0.2 - 0.4) |
| No | 373 (92.1%) | 195 (74.7%) | 568 (85.3%) | | | |
| Otitis media | | | | | | |
| Yes | 80 (19.8%) | 16(5.8%) | 96 (14.4%) | 26.643 | < 0.001 | 3.8 (2.1 - 6.6) |
| No | 325 (80.2%) | 245 (94.2%) | 507 (85.6%) | | | |
| Pneumonia | | | | | | |
| Yes | 26 (6.4%) | 3 (1.2%) | 29 (4.4%) | 10.585 | < 0.001 | 5.9 (1.8 - 19.7) |
| No | 379 (93.6%) | 258 (98.8%) | 637 (95.6%) | | | |
| Whooping cough | | | | | | |
| Yes | 10 (2.5%) | 22 (8.4%) | 32 (4.8%) | 12.326 | < 0.001 | 0.3 (0.1 - 0.6) |
| No | 395 (97.5%) | 239 (91.6%) | 634 (95.2%) | | | |
| Rubella | | | | | | |
| Yes | 1 (0.3%) | 5 (1.9%) | 6 (0.9%) | 4.951 | 0.037 | 0.1 (0.01 - 1.1) |
| No | 404 (99.6%) | 256 (98.1%) | 660 (99.1%) | | | |

[53] Mawson, Table 2.

214.    As can be seen below on Table 3 of Mawson I,[54] vaccinated children were more likely than unvaccinated children to have had the chronic illnesses: (a) allergic rhinitis (30 times more likely), (b) allergies (3.9 times more likely), (c) attention deficit hyperactivity disorder (ADHD, (d) 4.2 times more likely), (e) autism spectrum disorder (ASD, 4.2 times more likely), (f) eczema (2.9 times more likely), learning disability (5.2 times more likely), (g) neuro-developmental disorder (3.7 times more likely), and (h) any chronic condition (2.4 times more likely):

**Table 3.** Vaccination status and health outcomes – Chronic Conditions

| Chronic Disease | Vaccinated (n=405) | Unvaccinated (n=261) | Chi-square | P-value | Odds Ratio (95% CI) |
|---|---|---|---|---|---|
| Allergic rhinitis | | | | | |
| Yes | 42 (10.4%) | 1 (0.4%) | 26.21 | < 0.001 | 30.1 (4.1 - 219.3) |
| No | 363 (89.6%) | 260 (99.6%) | | | |
| Allergies | | | | | |
| Yes | 90 (22.2%) | 18 (6.9%) | 29.44 | < 0.001 | 3.9 (2.3 - 6.6) |
| No | 315 (77.9%) | 243 (93.1%) | | | |
| ADHD | | | | | |
| Yes | 19 (4.7%) | 3 (1.0%) | 6.23 | 0.013 | 4.2 (1.2 - 14.5) |
| No | 386 (95.3%) | 258 (99.0%) | | | |
| ASD | | | | | |
| Yes | 19 (4.7%) | 3 (1.0%) | 6.23 | 0.013 | 4.2 (1.2 - 14.5) |
| No | 386 (95.3%) | 258 (99.0%) | | | |
| Eczema (atopic dermatitis) | | | | | |
| Yes | 38 (9.5%) | 9 (3.6%) | 8.522 | 0.035 | 2.9 (1.4 - 6.1) |
| No | 367 (90.5%) | 252 (96.4%) | | | |
| Learning Disability | | | | | |
| Yes | 23 (5.7%) | 3 (1.2%) | 8.6803 | 0.003 | 5.2 (1.6 - 17.4) |
| No | 382 (94.3%) | 258 (98.9%) | | | |
| Neurodevelopment Disorder | | | | | |
| Yes | 42 (10.5%) | 8 (3.1%) | 12.198 | < 0.001 | 3.7 (1.7 - 7.9) |
| No | 313 (89.5%) | 253 (96.9%) | | | |
| Any Chronic Condition | | | | | |
| Yes | 178 (44.0%) | 65 (24.9%) | 24.8456 | < 0.001 | 2.4 (1.7 - 3.3) |
| No | 227 (56.0%) | 196 (75.1%) | | | |

215.    Mawson I also reported, in Table 8, significant differences in neuro-developmental delay (NDD) outcomes based on the child's vaccination status (vaccinated 3.1 times more likely than unvaccinated), race (non-white 2.3 times more likely than white), sex (males 2.3 times more likely than females), and gestational age (preterm 5.0 times more likely than term).

---

[54] Mawson Table 3.

1

2

**Table 8.** Adjusted logistic regression analyses of risk factors and NDD*

3

| | Adjusted Model (Model 1) | Adjusted Model with Interaction (Model 2) |
|---|---|---|
| **Vaccination Status** | | |
| **Vaccinated** | 3.1 (1.4 - 6.8) | 2.5 (1.1 - 5.6) |
| **Not Vaccinated** | Ref | Ref |
| **Race** | | |
| **Non-White** | 2.3 (1.0 - 5.2) | 2.4 (1.1 - 5.4) |
| **White** | Ref | Ref |
| **Child's Gender** | | |
| **Male** | 2.3 (1.2 - 4.3) | 2.3 (1.2 - 4.4) |
| **Female** | Ref | Ref |
| **Preterm birth** | | |
| **Yes** | 5.0 (2.3 - 11.1) | NS |
| **No** | Ref | |
| **Preterm birth and Vaccination interaction** | | |
| **No interaction** | | Ref |
| **Preterm and Vaccinated** | Not in the model | 6.6 (2.8 - 15.5) |

*Number of observation read 666, number of observations used 629. NDD=47, Not NDD = 582

216.    The Mawson II report looked in more detail and the interactions of preterm birth and vaccination in the incidence of neurodevelopmental delay (NDD). It found that, as compared to unvaccinated children born at term, preterm unvaccinated children were only about 1.14 times as likely to develop NDD, term and vaccinated children about 2.7 times as likely to develop NDD, preterm and vaccinated chlidren about 14.5 times more likely to develop NDD, as shown below:[55]

---

[55] Mawson II, Table 5.

**Table 3.** Vaccination status and types of NDD

| Condition | Vaccination Status | n (%) | OR (95% CI) | P-value* |
|---|---|---|---|---|
| **ADHD** | Vaccinated (N=405) | 19 (4.69) | 4.3 (1.3, 14.5) | 0.013 |
| | Unvaccinated (n=261) | 3 (1.15) | | |
| **ASD** | Vaccinated (N=405) | 19 (4.69) | 4.3 (1.2, 14.5) | 0.013 |
| | Unvaccinated (n=261) | 3 (1.15) | | |
| **Learning Disability** | Vaccinated (N=405) | 23 (5.68) | | |
| | Unvaccinated (n=261) | 3 (1.15) | 5.2 (1.5, 17.5) | 0.003 |
| **Any NDD** | Vaccinated (N=405) | 42 (10.37) | 3.7 (1.7, 7.9) | 0.005 |
| | Unvaccinated (n=261) | 8 (3.03) | | |

**\*** From Fisher's exact test.

| Not Preterm and Unvaccinated (P-/V-) | 8 | 241 | | |
|---|---|---|---|---|

\* From Fisher's exact test.
\*\* Calculated by adding 0.5 to each cell because of zero count.

217. Table 3 in Mawson II broke down the subtypes of NDD reported. Attention Deficit Hyperactivity Disorder (ADHD) was 4.3 times more common in vaccinated children as compared to those unvaccinated; Autism Spectrum Disorder was 4.3 times more common in vaccinated children as compared to those unvaccinated; Learning Disability was 5.2 times more common in vaccinated children as compared to those unvaccinated; any neurodevelopmental delay (NDD) was 3.7 times more common in vaccinated children as compared to those unvaccinated; all as shown below:[56]

### 5.5.1.4 Autism Is More Common Among Ethiopian And Somali Children Born In Western Countries Than Among Those Born In Their Native Countries

218. A 2004 Israeli study compared the incidence of Pervasive Developmental Disorder (PDD) among Israeli children born in Israel as compared to the incidence among Israeli children born

---

[56]Mawson II, Table 3.

abroad, especially in Ethiopia, who then emigrated to Israel.[57] Of 15,600 children born in Israel of Ethiopian descent there were 13 cases of PDD for an incidence of 8.3 per 10,000 versus no cases at all among 11,800 children born in Ethiopia who then emigrated to Israel, For children born in Israel not of Ethiopian descent, the incidence was 991 cases among 1,098,300 for an incidence rate of 9.0 per 10,000 as compared to 59 cases among 110,300 born abroad other than in Ethiopia for an incidence of 5.3 per 10,000, as shown below:

| | Born abroad | | | Israel-born | | |
|---|---|---|---|---|---|---|
| | Ethiopian | Other | Total | Ethiopian | Other | Total |
| PDD | 0 | 59 | 59 | 13 | 991 | 1,004 |
| Total | 11,800 | 110,300 | 122,100 | 15,600 | 1,098,300 | 1,113,900 |
| Rate/10,000 | 0 | 5.3 | 4.8 | 8.3 | 9.0 | 9.0 |
| SE | 0 | 0.7 | 0.6 | 0.2 | 0.3 | 0.3 |

219.    A similar finding was made among Somali children born in the United States, among whom severe autism is common whereas autism is unheard of in Somali or among Somali children born in Somalia who emigrated to the U.S.[58]

### 5.5.1.5 U.S. Pediatric Doctors With Substantial Numbers Of Unvaccinated Children In Their Practices Find That Autism And Neurodevelopmental Delay Rates Are Much Higher Among The Vaccinated Than Among The Unvaccinated

220.    In 2005 journalist Dan Olmsted did a follow-up study of an estimated 30,000 to 35,000 unvaccinated children in a Chicago-area pediatric practice that did not vaccinate its patients.[59] He reported that that pediatric practice had never seen a case of autism among its unvaccinated patients in the more than thirty years of the practice's existence. (*Id.*)

---

[57] A prevalence estimate of pervasive developmental disorder among Immigrants to Israel and Israeli natives. A. Kamer *et al.* Soc Psychiatry Psychiatr Epidemiol (2004) 39 : 141–145. Available at https://drive.google.com/open?id=1jXh9kgpJS77gnPZXw0-HX1BqeDloNAS3

[58] Why Is Autism Rate So High For Somalis In Minnesota? https://www.youtube.com/watch?v=xUf4L6UQhbk.

[59] The Age of Autism: 'A pretty big secret.' Dan Olmsted. UPI. December 7, 2005. https://www.upi.com/Health_News/2005/12/07/The-Age-of-Autism-A-pretty-big-secret/68291133982531/

221.   Another very detailed observational VU study was reported by Lyons-Weiler and Thomas in 2020 entitled, "Relative Incidence of Office Visits and Cumulative Rates of Billed Diagnoses Along the Axis of Vaccination."[60]

222.   The Lyons-Weiler and Thomas abstract stated that:

We performed a retrospective analysis spanning ten years of pediatric practice focused on patients with variable vaccination born into a practice, presenting a unique opportunity to study the effects of variable vaccination on outcomes. The average total incidence of billed office visits per outcome related to the outcomes were compared across groups (Relative Incidence of Offie Visit (RIOV)). RIOV is shown to be more powerful than odds ratio of diagnoses. Full cohort, cumulative incidence analyses, matched for days of care, and matched for family history analyses were conducted across quantiles of vaccine uptake. Increased o ce visits related to many diagnoses were robust to days-of-care-matched analyses, family history, gender block, age block, and false discovery risk. Many outcomes had high RIOV odds ratios after matching for days-of-care (e.g., anemia (6.334), asthma (3.496), allergic rhinitis (6.479), and sinusitis (3.529), all significant under the Z-test). Developmental disorders were determined to be difficult to study due to extremely low prevalence in the practice, potentially attributable to high rates of vaccine cessation upon adverse events and family history of autoimmunity. Remarkably, zero of the 561 unvaccinated patients in the study had attention deficit hyperactivity disorder (ADHD) compared to 5.3% of the (partially and fully) vaccinated. The implications of these results for the net public health effects of whole-population vaccination and with respect for informed consent on human health are compelling. Our results give agency to calls for research conducted by individuals who are independent of any funding sources related to the vaccine industry. While the low rates of developmental disorders prevented sufficiently powered hypothesis testing, it is notable that the overall rate of autism spectrum disorder (0.361%) in the cohort is one-fifth that of the US national rate (1.851%). The practice-wide rate of ADHD was roughly half of the national rate. The data indicate that unvaccinated children in the practice are not unhealthier than the vaccinated and indeed the overall results may indicate that the unvaccinated pediatric patients in this practice are healthier overall than the vaccinated.

(*Id.*)

213.   Figure 3 of the Lyons-Weiler and Thomas report shows that the likelihood that a child was seen in the office for a febrile illness was highly correlated with the child's vaccination status, with highly vaccinated children far more likely than unvaccinated children to be seen for fever, while the rate of "wellness checks" did not vary with vaccination status:

---

[60] Relative Incidence of Office Visits and Cumulative Rates of Billed Diagnoses Along the Axis of Vaccination. J. Lyons-Weiler and Paul Thomas. Int. J. Environ. Res. Public Health 2020, 17, 8674. Available at doi:10.3390/ijerph17228674. This paper was retracted by the publisher on July 22, 2021 for unstated reasons.

1
2
3
4
5
6
7
8
9
10
11
12
13



Figure 3. Relative Incidence of Office Visit (RIOV) percentile vaccinated vs. unvaccinated
design of analysis: power decreases from left to right; thus, a stable trend (increase or decrease)
becomes noteworthy. The data shown are for the Relative Incidence of Office Visits (RIOVs)
to average incidence ratio of billed o ce visits related to fever in the vaccinated compared to
the unvaccinated...conditions and for "Well Child" visit on the right. For all the clinical
conditions studied, RIOV reflects the total number of billed office visits per condition per
group, reflecting the total disease burden on the group and the population that it represents.

214.    Figure 5 of the Lyons-Weiler and Thomas report shows that vaccinated children (in

blue) were more likely to be seen earlier in life for most common pediatric illnesses than were

unvaccinated children (in orange):

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Figure 5. Analysis 5. Cumulative office visits in the vaccinated (orange) vs. unvaccinated (blue) patients born into the practice: the clarity of the age-specific differences in the health fates of individuals who are vaccinated (2,763) compared to the 561 unvaccinated in patients born into the practice over ten years is most strikingly clear in this comparison of the cumulative numbers of diagnoses in the two patient groups. The number of office visits for the unvaccinated is adjusted by a sample size multiplier factor (4.9) to the expected value as if the number of unvaccinated in the study was the same as the number of vaccinated.

216.    Table 7 of the Lyons-Weiler and Thomas report shows that unvaccinated children developed three of thirteen vaccine-preventable illnesses, pertusis (whooping cough)(9 cases), rotavirus (causes diarrhea)(2 cases), and varicella (chickenpox)(23 cases) more commonly than did vaccinated children (1 case of pertussis), but these infections caused no deaths and there was no increased incidence for ten of the thirteen vaccine-preventable illnesses:

**Table 7.** Incidence of vaccine-targeted diagnoses in the study cohort.

| Vaccine Targeted Diagnosis | Vaccinated | Unvaccinated | Deaths |
|---|---|---|---|
| Diphtheria | 0 | 0 | 0 |
| Hepatitis A | 0 | 0 | 0 |
| Hepatitis B | 0 | 0 | 0 |
| HiB * | 0 | 0 | 0 |
| Measles | 0 | 0 | 0 |
| Meningococcus | 0 | 0 | 0 |
| Mumps | 0 | 0 | 0 |
| Pertussis | 1 | 9 | 0 |
| Pneumococcal | 0 | 0 | 0 |
| Rotavirus | 0 | 2 | 0 |
| Rubella | 0 | 0 | 0 |
| Tetanus | 0 | 0 | 0 |
| Varicella | 6 | 23 | 0 |
| Total ** | 7 | 34 | 0 |

\* Haemophilus influenzae type B; \*\* Overall for all $\chi^2 = 99.51$. $p < 0.00001$.

**5.5.1.6 If Childhood Vaccines Don't Cause Autism, How Do You Explain The McDowell Infant Triplets All Becoming Autistic On The Very Same Day Within A Few Hours Of Their CDC-Recommended Vaccinations?**

217.    If childhood vaccines don't cause autism, as the U.S. Centers For Disease Control (CDC) insists, then how does the CDC explain the case of the McDowell triplets who all became autistic within hours of a vaccination:

We had beautiful, healthy triplets in 2006: two boys and a girl. We had an agreed upon plan of spacing out vaccinations with our doctor.

On June 25, 2007 we went to a scheduled well baby visit with our healthy, completely

neuro-typical nine month old triplets. On this visit the planned vaccination was pneumococcal. Upon injection, our daughter Claire screamed and became inconsolable, with immediate swelling in her leg. We figured this was a normal reaction to a shot, so we went on to give both boys their shot.

I am an educational audiologist who works with autistic children, so when by 12 noon Claire lost all of her facial expressions and her reflexes disappeared, I recognized that she was regressing before my eyes. By 2 pm we watched Richie shut down like Claire. By 5 pm we watched in disbelief as Robbie lost all eye contact and desire to communicate.

All three children regressed into autism within hours of vaccination. They were diagnosed with autoimmune encephalitis. A geneticist explained that the chance to this happening to 2 of our triplets would be 1 in 4 million. It happened to all 3. It is not genetic.

Where are all of the people who said that vaccines were safe? The vaccine injury was acknowledged by our doctor, but was not reported to the vaccine adverse event reporting system (VAERS), even though we specifically requested it. We were unaware that we could self-report.[61]

218.    If the McDowell triplets had all gotten on a school bus intact and gotten off the school bus the same day now autistic, there would be an investigation by the National Transportation Safety Board and no children would be riding that bus anymore.

219.    There are about 10,000 children born in the U.S. each day. The current rate at which they will likely be diagnosed with Autism Spectrum Disorder is about 1 in 36,[62] or about 275 new autism cases per day, day after day, month after month, year after year. Four out of five are boys, making the incidence among boys a shocking one out of every 22.5. As seen above, it is likely that many of them are vaccine related.

220.    If, instead, the cause of the autism was riding on school buses, and 275 children got onto the bus each morning intact and got off the bus at school suffering from autism, it would be a national scandal and no children would allowed, much less mandated, to ride buses until the buses were shown to be safe, safe to the satisfaction of the parents and not just the school bus makers and the government officials mandating that the children ride them to get to school or they would not be

---

[61] Brenda and David [McDowell] tell the story of their infant triplets, injured by a recalled pneumococcal vaccine. https://www.michiganvaccineinjury.org/post/2017/01/01/brenda-and-david-tell-the-story-of-their-infant-triplets-injured-by-a-recalled-pneumococc, Video at https://www.youtube.com/watch?v=rLv_gNA0O54.

[62] Maenner MJ, Warren Z, Williams AR, et al. Prevalence and Characteristics of AutismSpectrum Disorder Among Children Aged 8 Years — Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, 2020. MMWR Surveill Summ 2023;72(No. SS-2):1–14. DOI: http://dx.doi.org/10.15585/mmwr.ss7202a1

1    allowed to attend school.

2        **5.5.2    Infant Immunizations Are The Likely Cause Of A Substantial Number Of**
         **Sudden Unexpected Infant Deaths (SUID)(Crib Deaths)**
3

4        221.    While autism causes a great deal of cognitive harm to children and can lead to

5    decreased life expectancy, it does not kill very many children.

6        222.    However, Sudden Unexpected Infant Death (SIUD) is estimated to actually *kill* about

7    3,400 otherwise healthy infants each year in the United States.[63] Most of these infant deaths are

8    categorized into either Sudden Infant Death Syndrome (SIDS)(41%), unknown cause (32%), or

9    accidental suffocation or strangulation in bed (27%)(*id.*), based on investigative findings and post-

10   mortem examinations.

11       223.    For unknown reasons, most such post-mortem investigations and post-mortem

12   examinations do not comment on the temporal relationship of the deceased infant's death with recent

13   immunizations.

14       **5.5.2.1 A Veteran Police Investigator Has Reported That 50% Of The**
         **More Than 250 SUID Cases She Has Investigated Occurred Within**
15       **48 Hours Of The Infant's Immunization And 70% Within One**
         **Week**

16       224.    According to the CDC, "Vaccines have not been shown to cause sudden infant death

17   syndrome (SIDS), citing "[m]ultiple research studies and safety reviews [that] ... do not show any links

18   between childhood immunization and SIDS."[64]

19       225.    But none of those cited studies were done in the modern era in which many more

20   immunizations are done to infants and few looked carefully at the time from immunization to the time

21   of death and none studied the police reports of those deaths, which are done in all cases of unexpected

22   death.

23       226.    Sudden unexpected infant deaths are routinely investigated by police investigators to

24   attempt to determine whether they were accidental or otherwise. A veteran SIDS police investigator,

25   Jennifer, was recently interviewed by medical commentator Steve Kirsch on her experience with the

26   _____

27       [63] "Sudden Unexpected Infant Death and Sudden Infant Death Syndrome." CDC.
     https://www.cdc.gov/sids/data.htm.
28
         [64] Sudden Infant Death Syndrome (SIDS) and Vaccines. CDC.
     https://www.cdc.gov/vaccinesafety/concerns/sids.html.

1   temporal relationship of those deaths with infant immunizations:[65]

2   **Kirsch:** Hi. Steve Kirsch here. I'm with Jennifer. Jennifer, uh, was a police officer at a in a
    major city, about, what, three over 300,000 people. Both she and her husband worked in the
3   child abuse section of the of the police department, and so they handled the SIDS cases. So she
    was very familiar with the SIDS cases that happened over approximately a seven year period,
4   which would comprise about 250 or more cases. So, tell me what you just told me about the
    percentage of those cases that happened within 48 hours of a vaccination shot.
5   **Jennifer:** So I would, if I were to put a number on it, I would say around 50% of what we saw
    was within 48 hours of vaccination.
6   **Kirsch:** Okay. And, uh, how about within a week? What percentage would of the of the SIDS
    deaths would happen within a week after the shot?
7   **Jennifer:** I would say about 70%.
    ...
8   **Kirsch:** Now you said that your husband, did you or your husband go to this police conference
    ... was it a meeting with detectives who investigate these kinds of cases and other cases?
9   **Jennifer:** Correct. And prosecutors and things like that.
    **Kirsch:** So, so tell us what happened, what your husband reported at that conference in terms
10  of what the official narrative was, in terms of the speakers on the program and what they talked
    about, and what the side conversations were at that conference.
11  **Jennifer:** So the central theme was that almost no death is a SIDS death. That, that was fully
    admitted, and that was what the presenters, you know, reiterated throughout this-- this was in
12  St. Louis, throughout this conference. I think it was like a three-day conference. And I would
    corroborate that by saying I've never seen a SIDS autopsy report that didn't list at least one
13  symptom. Never did the presenters say it was vaccines, but detectives throughout, you know,
    the various agencies that came there for the training would have their side conversations, and
14  all of the detectives would say, "Yeah, we always see it after vaccinations too." So it's kind of
    a common thing for detectives who investigate SIDS deaths to know at least SIDS is kind of
15  a false diagnosis ...
    **Kirsch:** It sounds like from, from your well, I mean, if you had to put a percentage on it, I
16  mean, we talked about 70% within a week.
    **Jennifer:** Correct.
17  **Kirsch:** Of the total number of deaths from SIDS, if you were to ascribe a cause of death,
    because some are, are accidental, some are ... very interesting cases, but what percentage would
18  you put on that vaccine caused the [death] ... your personal opinion?
    **Jennifer:** I would say probably 85% of the time, it's vaccine related.
19  **Kirsch:** 85% of the time. So essentially, the medical community realizes this, but they write
    it off, what you're basically saying is they write it off and they justify it by saying that the ends
20  justify the means in that, "Yeah, we're gonna have these, these kids who are dying from this,
    but the vaccine is so beneficial for the for the other kids that it's a good tradeoff. And we'll try
21  to minimize the vaccine hesitancy by telling parents that it wasn't the vaccine; these things just
    happen," and hope...
22  **Jennifer:** Correct.
    **Kirsch:** ...that the parents don't compare notes.
23  **Jennifer:** Correct.
    **Kirsch:** That's how it's done?
24  **Jennifer:** That's how it's done.
    **Kirsch:** And the physicians feel probably okay about that because they'll say, "Oh, well, this
25  is saving so many lives from polio and, and all this"
    **Jennifer**: Yeah, the greater good ...
26  **Kirsch:** ...that, those deaths and if we were to tell people, admit to the public about the deaths,

27

28  [65] "Former police detective reveals 50% of SIDS cases happened within 48 hours post vaccine."
    9-26-2023.
    https://rumble.com/v3l4f9k-former-police-detective-reveals-50-of-sids-cases-happened-within-48-hours-p.html?utm_source=substack&utm_medium=email

that SIDS was, that 85% of these deaths are caused by vaccines, if we were to admit to the problem, then that would destroy the public confidence in the vaccination program. People wouldn't get vaccinated, and then people would get polio and meningitis and all this other stuff, and, and that's far worse. So well, well, basically, we'll, we'll keep our mouth shut about that and and try to take them off that. In fact, they're, they're trained, you mentioned that they were trained ...to get people off the scent.

**Jennifer:** Correct. 100%.

...

**Kirsch:** Okay. And no doubt about these numbers, 50%.

**Jennifer:** No doubt ... Well, I will stand by that. I will die on that hill.

**Kirsch:** So, 50% within 48 hours of the vaccine. That is mortality.

**Jennifer:** Oh, and, you know, the other thing we didn't talk about was that that never goes on an autopsy report. That was the other thing we never talked about.

**Kirsch:** What you mean, you mean that [the fact that] it was within 48 hours of a vaccine, never goes on the autopsy report?

**Jennifer:** Oh, no. No. So anytime you do death...

**Kirsch:** No, I'm wrong or, or no, it doesn't?

**Jennifer:** No, no, no, you're correct. It does not go on an autopsy report.

**Kirsch:** That's, that seems very, very strange to me.

**Jennifer:** Well, and, and, and I...

**Kirsch:** Isn't it to you?

**Jennifer:** Oh, yeah. But I found out the reason why a couple of years later.

**Kirsch:** Okay.

**Jennifer:** Um, it's because it's a pharmaceutical that doesn't carry liability. So if the child had a round of antibiotics, that would 100% be on a death report. But you can sue an antibiotic pharmaceutical company, right? But...

**Kirsch:** Yeah.

**Jennifer:** ...are there any stats that show antibiotics kill people? No. I mean, maybe, like, in really rare reactions, but they definitely don't have the record that vaccines have, right, which was why the liability was removed in the first place, which would be a whole nother show. But, so I that's honestly, that was, like, my trigger, where I'm like, "Whoa, wait. Why, why is that not, not on there? But the fact that you put Johnson & Johnson baby lotion on the baby the day before they died, like, why is that on there but this isn't?" That seemed kind of a big deal to me.

**Kirsch:** Right.

**Jennifer:** And nobody in my office had an answer. I'm like, "Why don't we, why isn't the medical examiner putting this on here?" And they were like, "I don't know." I mean, they thought it was as crazy as I did. So I, and I don't remember where I found out, I don't know if it was, like, in an online conversation with another police officer somewhere else or what it was, but then it was like, "Oh, it's because of the liability. It's the only pharmaceutical that doesn't have it. Therefore, it doesn't they don't have to do that." And I never really looked past it. So you might...

**Kirsch:** Wow.

**Jennifer:** ...wanna look into that more and see if it's constant...

**Kirsch:** Yeah.

**Jennifer:** ...in other jurisdictions.

**Kirsch:** Yep.

**Jennifer:** I don't know.

227.     This is a firsthand account of a police investigator specifically trained and experienced in the investigation of these infant deaths, based on may years of experience investigating such deaths. For these reasons she should be considered highly credible on this issue.

228.     This police investigator also stated that the temporal relationship of infant immunizations to SIDS deaths would be acknowledged informally at conferences of SIDS police

investigators but never formally.

229.    This police investigator also stated that, in her experience, there was seemed to be an unspoken rule that the medical examiner's report never stated the relationship of the time of death to any recent immunizations. (*Id.*)

### 5.5.2.2 VAERS Data From The CDC Also Show Increased Frequency Of Sudden Unexplained Infant Death (SUID) Immediately Following Infant Immunizations

230.    Data from the CDC's VAERS database corroborates investigator Jennifer's personal observation that most SUID deaths occur shortly after an infant immunization:[66]

**Table 2**
Onset interval of infant deaths post-vaccination, USA.

| Onset interval post-vaccination | Events reported | Cumulative % of total events |
|---|---|---|
| Day of Vaccination | 440 | 16.9 % (440/2605) |
| Day 2 | 760 | 46.1 % (1200/2605) |
| Day 3 | 312 | 58.0 % (1512/2605) |
| Day 4 | 214 | 66.3 % (1726/2605) |
| Day 5 | 131 | 71.3 % (1857/2605) |
| Day 6 | 92 | 74.8 % (1949/2605) |
| Day 7 | 92 | 78.3 % (2041/2605) |
| Days 8–60 | 564 | 100 % (2605/2605) |
| **Total deaths** | **2605** | |

Fifty-eight percent of all infant deaths reported to VAERS occurred within 3 days post-vaccination; 78.3% occurred within 7 days post-vaccination. The remaining deaths occurred between 8- and 60-days post-vaccination, an average of 11 per day (564/53 days) as compared to 760 infant deaths that occurred on Day 2 post-vaccination—a 69-fold increase. Data obtained from VAERS 1990-2019, age < 1 year, deaths reported within 60 days from day of vaccination.

231.    The above data of Miller can be graphically represented thusly:

---

[66] N.Z. Miller: Vaccines and sudden infant death: An analysis of the VAERS database 1990–2019 and review of the medical literature. Toxicology Reports 8 (2021) 1324–1335. https://doi.org/10.1016/j.toxrep.2021.06.020.



**Deaths Of U.S. Infants Age 1 To 12 Months By Day After Vaccination As Reported To VAERS, 1990-2019**

232.   The clustering of infant deaths reported to VAERS could be expected to follow vaccinations since the deaths shortly after vaccination, even if random, could be expected to be more likely to be reported to VAERS than deaths occurring much later and without such an obvious temporal connection to the vaccination.   But, if such ascertainment and reporting bias was the explanation for that clustering of infant deaths shortly after vaccination, then one would expect the number of infant deaths reported to have occurred on the first post-vaccination day would be similar to or greater that occurring on post-vaccination day 2. But, in fact, the number of deaths reported to have occurred on day 2 were nearly twice those reported to have occurred on day 1. Thus, these results do not square with an explanation that they simply represent randomly distributed deaths with a reporting bias favoring deaths occurring sooner rather than later following vaccination.

233.   A 2015 report from the CDC of post-vaccine deaths reported to VEARS between 1997-2013 found that the median interval between vaccination and death for infants less than one year of age was 2 days.[67]

234.   Similar findings of an association between recent infant immunization and Sudden

---

[67] Moro, P.L., Arana, J., Cano, M., Lewis, P., & Shimabukuro T.T. Deaths Reported to the Vaccine Adverse Event Reporting System, United States, 1997–2013. Clinical Infectious Diseases, Vol 61 (6) 980-987. https://doi.org/10.1093/cid/civ423.

Infant Death Syndrome (a subcategory of SUID) were reported by Walker *et al.*:[68]



Figure 8.8—Sudden infant death syndrome (SIDS) deaths reported within three days of DTP vaccination compared to SIDS deaths reported starting thirty days after vaccination (Walker et al. 1987).

### 5.5.2.3 The Rate Of Sudden Unexpected Infant Death For African-American Infants Is Twice That Of Non-Hispanic White And Hispanic Infants

235.    The rate of Sudden Unexpected Infant Death for African-American infants is twice that of Non-Hispanic White and Hispanic infants:[69]

---

[68] A.M. Walker *et al.,* Diphtheria-Tetanus-Pertussis Immunization and Sudden Infant Death Syndrome. Am. J. Pub. Health 77, no. 8 (1987): 945-951. https://doi.org/10.2105/AJPH.77.8.945.

[69] Sudden Unexpected Infant Death by Race/Ethnicity, 2016–2020. CDC. https://www.cdc.gov/sids/data.htm.

Sudden Unexpected Infant Death by Race/Ethnicity, 2016–2020

NH AI/AN = Non-Hispanic American Indian/Alaska Native; NHB = Non-Hispanic Black; NH NHOPI = Non-Hispanic Native Hawaiian/Other Pacific Islander; NHW = Non-Hispanic White; NH Asian = Non-Hispanic Asian

**5.5.2.4 The Studies Cited By The CDC To Show That Infant Immunizations Do Not Cause SUID Did Not Examine The Interval Between Immunization And Death**

236.    The CDC maintains a webpage captioned as, "<u>Sudden Infant Death Syndrome (SIDS) and Vaccines.</u>"[70] That page contains a paragraph heading stating that, "Vaccines have not been shown to cause sudden infant death syndrome" followed by a paragraph stating that:

Babies receive multiple vaccines when they are between 2 to 4 months old. This age range is also the peak age for sudden infant death syndrome (SIDS). The timing of the 2 month and 4 month shots and SIDS has led some people to question whether they might be related. However, studies have found that vaccines do not cause and are not linked to SIDS.[71]

This statement is followed by the statement that:

Multiple research studies and safety reviews have looked at possible links between vaccines and SIDS. The evidence accumulated over many years do not show any links between childhood immunization and SIDS.
(*Id.*)

237.    This last statement cites several studies to support it (*id.,* footnotes.), including reports

---

[70] Sudden Infant Death Syndrome (SIDS) and Vaccines.
https://www.cdc.gov/vaccinesafety/concerns/sids.html.

[71] "Sudden Infant Death Syndrome (SIDS) and Vaccines." CDC.
https://www.cdc.gov/vaccinesafety/concerns/sids.html.

by: Moro *et al,* 2018, Moon *et al,* 2016, Moro *et al.*, 2015, Eriksen *et al.,* 2015, Institute of Medicine Immunization Safety Review Committee, 2003, Silvers *et al.,* 2001, and Griffin *et al.,* 1988.

238.     But none of these cited studies were done in the modern era in which many more immunizations are done to infants and few looked carefully at the time from immunization to the time of death.

239.     With regard to the study reported by Moro *et al.* in 2018 entitled, "Safety Surveillance of Diphtheria and Tetanus Toxoids and Acellular Pertussis (DTaP) Vaccines," this study came from the Immunization Safety Office of the Division of Healthcare Quality Promotion of the CDC.[72] It reviewed adverse events following DtaP vaccinations reported to the CDC's Vaccine Adverse Event Reporting System (VAERS). It was published in the medical journal, *Pediatrics,* a publication of the American Academy of Pediatrics.

240.     Dr. Moro and his CDC colleagues searched the CDC's VAERS database for deaths reported following DtaP vaccinations between January 1, 1991 and December 31, 2016 and found 844 deaths so reported. They reviewed death certificates and autopsy reports that could be obtained for 725 of those deaths. Of those 725, 350 listed "sudden infant death syndrome" as the cause of death, 62% of which were male and 90% of which were less than six months of age. (*Id.*)

241.     The authors admit that, "[w]ith VAERS, whether an AE (adverse event) is causally associated with vaccination generally cannot be assessed."[73] Most importantly, they state that, **"[i]n this review, we made no attempt to assess causality of the reported AEs."** Thus, this study by the CDC, cited as authority for the CDC's statement that, "studies have found that vaccines do not cause and are not linked to SIDS," **did not even "attempt to assess causality."** More importantly, if the allegation of former police investigator, Jennifer, is correct that there is a general rule against linking vaccinations to medical examiner's report on SIDS cases, then any studies based on those reports, such as the Moro study, would be invalid.

242.     With regard to the study reported by Moon and the Task Force On Sudden Infant Death

---

[72] Moro PL, Perez-Vilar S, Lewis P, Bryant-Genevier M, Kamiya H, Cano M. Safety Surveillance of Diphtheria and Tetanus Toxoids and Acellular Pertussis (DTaP) Vaccines. Pediatrics. 2018;142(1). https://www.researchgate.net/publication/325552504_Safety_Surveillance_of_Diphtheria_and_Tetanus_Toxoids_and_Acellular_Pertussis_DTaP_Vaccines.

[73] *Id.*, at p. 2.

1    Syndrome entitled, "SIDS and Other Sleep-Related Infant Deaths: Evidence Base for 2016 Updated

2    Recommendations for a Safe Infant Sleeping Environment published in 2016 in the medical journal

3    *Pediatrics*,[74] this was a report from a task force convened by the American Academy of Pediatrics that

4    reviewed the literature in SIDS but presented no new data of its own. The Task Force dismissed any

5    linkage between SIDS and infant vaccines, stating that, "Four of the 6 studies showed no relationship

6    between diphtheria tetanus toxoids-pertussis vaccination and subsequent SIDS; the other 2 suggested

7    a temporal relationship, but only in specific subgroup analysis. However, all four of the first group,

8    showing no relationship, were old, from the 1980's, before many more immunizations were added to

9    the schedule.

10         243.    With regard to the report by Eriksen *et al.* cited by the CDC, (1) it only looked at one

11   vaccine, a neonatal Hepatitis B vaccine, and (2) it was funded by the CDC.

12         244.    With regard to the 2003 Institute of Medicine review cited by the CDC entitled

13   "Immunization Safety Review: Vaccinations and Sudden Unexpected Death in Infancy,"[75] the

14   committee had no original data but merely reviewed literature already extent to look for evidence of

15   causality between infant immunizations and Sudden Unexpected Infant Death. The levels of causality

16   that the committee used were: (1) no evidence, (2) evidence is inadequate to accept or reject a causal

17   relationship, (3) evidence favors rejection of a causal relationship, and (4) evidence favors acceptance

18   of a causal relationship. The committee reported these conclusions:

19   1.    The committee concludes the evidence is inadequate to accept or reject causal relationships
           between SIDS and the individual vaccines Hib, HepB, OPV, and IPV.
20   2.    The committee concludes that the evidence favors rejection of a causal relationship between
           exposure to multiple vaccines and SIDS.
21   3.    The committee concludes that the evidence is inadequate to accept or reject a causal
           relationship between exposure to multiple vaccines and sudden unexpected death in infancy,
22         other than SIDS.
23   4.    The committee concludes that the evidence is inadequate to accept or reject a causal
           relationship between exposure to multiple vaccines and sudden unexpected death in infancy,

24   _____

25         [74] Moon RY; TASK FORCE ON SUDDEN INFANT DEATH SYNDROME. SIDS and Other
     Sleep-Related Infant Deaths: Evidence Base for 2016 Updated Recommendations for a Safe Infant
26   Sleeping Environmentexternal icon. Pediatrics. 2016;138(5).
     https://www.cpsc.gov/s3fs-public/AAP_Sleep%20Death%20Technical%20Report%202016.pdf

27   _____

28         [75] Institute of Medicine (US) Immunization Safety Review Committee; Stratton K, Almario DA,
     Wizemann TM, et al., editors. Immunization Safety Review: Vaccinations and Sudden Unexpected
     Death in Infancy. Washington (DC): National Academies Press (US); 2003.
     https://www.ncbi.nlm.nih.gov/books/NBK221465/?report.

other than SIDS.

5.   Because of the nature of the available case reports and the limited, unpublished epidemiological data, the committee concludes that the evidence is inadequate to accept or reject a causal relationship between hepatitis B vaccine and neonatal death.

245.   The only causality conclusion that the committee reached was that "the evidence favors rejection of a causal relationship between exposure to multiple vaccines and SIDS." However, all the studies used to support that conclusion were case-control studies and none reported the temporal relationship of the vaccination to the death, specifically whether the infant death occurred within the first 48-72 hours after the vaccination. Furthermore, the study was funded by the CDC.

246.   With regard to the report by Silvers *et al.* entitled, "The epidemiology of fatalities reported to the Vaccine Adverse Event Reporting System 1990-1997" cited by the CDC as evidence showing that infant vaccines don't cause sudden unexpected infant death,[76] the authors reviewed all deaths reported to VAERS, most of whom were infants, and concluded that, "[t]hese data may support findings of past controlled studies showing that the association between infant vaccination and SIDS is coincidental and not causal. VAERS reports of death after vaccination may be stimulated by the temporal association, rather than by any causal relationship." However, these authors did look at the temporal relationship of the vaccination to the death of the infant and reported that, **"SIDS, the largest category of deaths, occurred at a median of 3 days following immunization, with a quarter of these deaths occurring within 24 h." This observation is at odds with their conclusion of no causal relationship.**

247.   With regard to the report by Griffin *et al.*, entitled "Risk of sudden infant death syndrome after immunization with the diphtheria-tetanus-pertussis vaccine,"[77] the authors reviewed infant deaths following DTP immunization in four Tennessee counties during the years 1974-1984, well before the numbers of infant immunizations increased in later years. They did look at the temporal relationship of the immunization with the ensuing death and found no difference in the numbers of

---

[76] Silvers et al., The epidemiology of fatalities reported to the vaccine adverse event reporting system 1990-1997. Pharmacoepidemiol Drug Saf. 2001 Jun-Jul;10(4):279-85. https://www.researchgate.net/publication/11596287_The_epidemiology_of_fatalities_reported_to_the_Vaccine_Adverse_Event_Reporting_System_1990-1997.

[77] Griffin *et al.* Risk of sudden infant death syndrome after immunization with the diphtheria-tetanus-pertussis vaccine. N Engl J Med . 1988 Sep 8;319(10):618-23. https://pubmed.ncbi.nlm.nih.gov/3261837/.

dying within the first few days, 0-3 days, 4-7 days, versus those dying between 15 and 30 days post-immunization.

248.   In summary, none of the reports relied upon by the CDC in making its statement that, "Vaccines have not been shown to cause sudden infant death syndrome (SIDS) looked at the temporal relationship of the vaccination to the death of the infant during the modern era when all the vaccines required under Health and Safety Code section 120335 were being given routinely to infants.

### 5.5.2.5 Neurotoxic Aluminum Adjuvant Overload May Also Contribute To Sudden Unexpected Infant Death (SUID)

249.   One of the reasons that older studies fail to detect adverse events may be because the numbers of immunizations now required is much greater than in earlier years and more are given on the same day and, thus, the adverse event may reflect a cumulative or even synergistic injury.

250.   One such mechanism of cumulative injury may be that many vaccines use additives, called adjuvants, to enhance their immunogenicity. The most common adjuvant is aluminum, a known neurotoxin that must be eliminated by the kidneys. Patients with little or no kidney function who are on long-term dialysis cannot excrete the trace amounts of aluminum in the dialysis fluids and can develop Dialysis Dementia Syndrome.

251.   Infants may also not excrete aluminum efficiently. The FDA has warned that:

Term infants with normal renal function may also be at risk because of their rapidly growing and immature brain and skeleton, and an immature blood-brain barrier. Until they are 1 to 2 years old, infants have lower glomerular filtration rates than adults, which affects their kidney function. The agency is concerned that young children and children with immature renal function are at a higher risk resulting from any exposure to aluminum.[78]

252.   For this reason draft guidance from the FDA sets a limit of 5 micrograms per kilogram of body weight per day of aluminum allowed in the intravenous feeding solutions given to infants continuously over 24 hours each day.[79]

253.   The average full-term newborn infant weighs about 3.25 kilograms; a one month old

---

[78] U.S. Food and Drug Administration, Department of Health and Human Services. Rules and regulations. Fed Regist. 2003 Jun 9;68(110):34286.
  https://www.govinfo.gov/content/pkg/FR-2003-06-09/pdf/03-14140.pdf

[79] Small Volume Parenteral Drug Products and Pharmacy Bulk Packages for Parenteral Nutrition: Aluminum Content and Labeling Recommendations Guidance for Industry. U.S. Food and Drug Administration, December 2022 (draft)..
  https://www.federalregister.gov/documents/2022/12/07/2022-26564/small-volume-parenteral-drug-products-and-pharmacy-bulk-packages-for-parenteral-nutrition-aluminum.

infant weighs about 4.4 kilograms, a two month old infant weighs about 5.4 kilograms; a four month old about 6.7 kilograms, and six month old about 7.6 kilograms.

254.    Thus, the FDA-allowable aluminum per day for a newborn would be about 16 micrograms; for a one month old about 22 micrograms, for a two month old about 27 micrograms, for a four month old about 34 micrograms, and for a six month old about 38 micrograms.

255.    The amount of neurotoxic aluminum injected into a newborn infant at birth who receives the CDC-recommended hepatitis B vaccine is 500 micrograms (as amorphous aluminum hydroxyphosphate sulfate),[80] all at once, about 30 times the FDA-recommended daily maximum for that age.

256.    The CDC then recommends a second dose of hepatitis B vaccine at 1 to 2 months of age, about 23 times the FDA daily allowable amount for that age.

256.    At age two months the CDC recommends a DtaP immunization, the aluminum in which can range from 330 to 625 micrograms of elemental aluminum (as aluminum phosphate).[81]

257.    At the same office visit the infant will also be injected with a pneumococcal vaccine containing 125 micrograms of elemental aluminum (as aluminum phosphate).[82,83]

258.    If the infant did not receive the HepB vaccine at one month, then that would also be given at the two month visit, for an additional 500 micrograms of aluminum.

259.    Thus, the total amount of neurotoxic aluminum give at the two month visit could total as much as 1.250 micrograms, or 46 times the FDA daily allowable amount for that age.

260.    At the four month visit the CDC recommends an additional DtaP immunization (330 to 625 micrograms of aluminum) and an additional pneumococcal vaccine (125 micrograms of aluminum) to be injected, for a possible total of another 750 micrograms. This is about 22 times the

---

[80] FDA-approved package insert for hepatitis B vaccine, at p. 7. https://www.fda.gov/files/vaccines,%20blood%20&%20biologics/published/package-insert-recombivax-hb.pdf.

[81] About Diphtheria, Tetanus, and Pertussis Vaccines. Centers for Disease Control. https://www.cdc.gov/vaccines/vpd/dtap-tdap-td/hcp/about-vaccine.html#:~:text=Tetanus%2C Diphtheria%2C and Pertussis (Tdap) Vaccines&text=5 μg FIM).

[82] PCV 15 vaccine. https://www.fda.gov/media/150819/download.

[83] PCV 20 vaccine. https://www.fda.gov/media/149987/download?attachment.

1  FDA recommended daily maximum for that age.

2      261.   The total aluminum injected at the six month visit includes an additional DtaP (330-625

3  micrograms) and an additional pneumococcal vaccine for an additional 750 micrograms of injected

4  aluminum. Since the CDC recommends a second HepB immunization some time between six and

5  eighteen months, that would be another 500 micrograms of injected aluminum if given at the six

6  month visit, bringing the total for the six month visit up to 1,250 micrograms. This is about 33 times

7  the FDA recommended daily maximum for that age.

8      262.   Thus, by age six months the infant has been subjected, on five different occasions, to

9  injections of neurotoxic aluminum far in excess of the FDA daily allowable amount. Altogether, the

10  total aluminum injected during the first six months of life, when infants are at the highest risk of

11  Sudden Unexpected Infant Death, could total as much as 3,750 micrograms.

12      263.   It has been estimated that, by 18 months of age, a child may have received 5,000

13  micrograms of neurotoxic aluminum via immunizations.[84]

14      264.   In 2008 the U.S. Agency for Toxic Substances and Disease Registry (ATSDR), a unit

15  within the U.S. Public Health Service and the U.S. Department of Health and Human Services issued

16  a report entitled, "Toxicological Profile For Aluminum."[85] This report found that, "There is a limited

17  amount of information available on the toxicity of aluminum in children. As with adults, neurological

18  and skeletal (osteomalacia) effects have been observed in children with impaired renal

19  function...Bishop et al. (1997) found significant decreases in the Bayley Mental Development Index

20  in pre term infants receiving a standard intravenous feeding solution compared to preterm infants

21  receiving an aluminum-depleted feeding solution." *Id.,* at p. 122.

22      265.   Since the amount of aluminum injected at these discreet times of immunization is far

23  in excess of the amount that can be immediately excreted, the question naturally arises as to where

24  does the excess go and does it become permanently bound there such that it cannot be later excreted?

25

26      [84] Miller NZ. Aluminum in Childhood Vaccines is Unsafe. Journal of American Physicians and
    Surgeons Volume 21 Number 4, Winter 2016.
27  https://www.researchgate.net/publication/311824598_Aluminum_in_Childhood_Vaccines_is_Unsafe

28      [85] Agency for Toxic Substances and Disease Registry (ATSDR). Toxicological profile for
    aluminum. Washington, D.C.: U.S. Department of Health and Human Services; 2008.
    https://www.atsdr.cdc.gov/ToxProfiles/tp22.pdf.

266.    In a very important study, Mold, Umar, King, and Exley looked at this question as it applies to those with autism.[86] The Abstract summary of that investigation reported that:

> Autism spectrum disorder is a neurodevelopmental disorder of unknown aetiology. It is suggested to involve both genetic susceptibility and environmental factors including in the latter environmental toxins. Human exposure to the environmental toxin aluminium has been linked, if tentatively, to autism spectrum disorder. Herein we have used transversely heated graphite furnace atomic absorption spectrometry to measure, for the first time, the aluminium content of brain tissue from donors with a diagnosis of autism. We have also used an aluminium-selective fluor to identify aluminium in brain tissue using fluorescence microscopy. The aluminium content of brain tissue in autism was consistently high. The mean (standard deviation) aluminium content across all 5 individuals for each lobe were 3.82(5.42), 2.30(2.00), 2.79(4.05) and 3.82(5.17) μg/g dry wt. for the occipital, frontal, temporal and parietal lobes respectively. *These are some of the highest values for aluminium in human brain tissue yet recorded* and one has to question why, for example, the aluminium content of the occipital lobe of a 15 year old boy would be 8.74 (11.59) μg/g dry wt.? Aluminium-selective fluorescence microscopy was used to identify aluminium in brain tissue in 10 donors. While aluminium was imaged associated with neurones it appeared to be present intracellularly in microglia-like cells and other inflammatory non-neuronal cells in the meninges, vasculature, grey and white matter. The pre-eminence of intracellular aluminium associated with non-neuronal cells was a standout observation in autism brain tissue and may offer clues as to both the origin of the brain aluminium as well as a putative role in autism spectrum disorder.

267.    The Discussion section of this important paper pointed out that:

> The aluminium content of brain tissues from donors with a diagnosis of ASD was extremely high (Table 1). While there was significant inter-tissue, inter-lobe and inter-subject variability the mean aluminium content for each lobe across all 5 individuals was towards the higher end of all previous (historical) measurements of brain aluminium content, including iatrogenic disorders such as dialysis encephalopathy. All 4 male donors had significantly higher concentrations of brain aluminium than the single female donor. *We recorded some of the highest values for brain aluminium content ever measured in healthy or diseased tissues in these male ASD donors* including values of 17.10, 18.57 and 22.11 μg/g dry wt. What discriminates these data from other analyses of brain aluminium in other diseases is the age of the ASD donors. Why, for example would a 15 year old boy have such a high content of aluminium in their brain tissues? There are no comparative data in the scientific literature, the closest being similarly high data for a 42 year old male with familial Alzheimer's disease.

(*Id.,* emphasis added.)

268.    The brains studied in this report were from five deceased individuals between the ages of 15 to 50 years of age.

269.    The significance of this study is that the investigators found much higher levels of neurotoxic aluminum in the brains of five deceased autistic patients than they had ever found in normal patients or even those with other neuropathologies. This strongly implicates aluminum as a cause of autism.

---

[86] Mold, M, Umar, D, King, A, and Exley, C: Aluminum in brain tissue in autism. Journal of Trace Elements in Medicine and Biology, Volume 46, March 2018, pp 76-82 (emphasis added). https://www.sciencedirect.com/science/article/pii/S0946672X17308763?via%3Dihub.

1    270.    The increased occurrence of aluminum particles in the brains of infants dying of Sudden

2  Infant Death Syndrome (SIDS) versus those dying of other causes or intrauterine death has also been

3  reported.[87]

4    271.    Given the large excess amounts of neurotoxic aluminum injected into infants under the

5  CDC's recommendations and California's mandates and the finding of excess aluminum in the brains

6  of infants dying of Sudden Infant Death Syndrome and of autistic adults, and the absence of any

7  studies from the CDC refuting these findings, the State of California cannot possibly show that its

8  mandates for aluminum-containing vaccines are narrowly tailored and necessary to achieve a

9  compelling state interest in the health of infants and children. Those mandates should be enjoined until

10  such time as California and the CDC can meet that standard.

### 5.5.3   Human Papilloma Virus Vaccines Injure Adolescents

#### 5.5.3.1 Human Papilloma Virus Vaccines Account For The Clear Majority Of All Adverse Reactions Reported To The VAERS Database Prior To The COVID Vaccines Introduced In 2021

14    272.    In 2012 Tomljenovic and Shaw reported that, of all the "serious" adverse events

15  reported to the CDC's Vaccine Adverse Event Reporting System database for all vaccines from the

16  year 2000, when the human pappiloma virus (HPV) vaccine was first introduced, through March of

17  2012, 1,272 (61.2%) were related to just one vaccine, the HPV vaccine:[88]

---

[87] Gatti, A.M., Ristic, M, Stanzani, S., & Lavezzi, AM. Novel chemical-physical autopsy investigation in sudden infant death and sudden intrauterine unexplained death syndromes. Nanomedicine (London)(2022) 17(5) 275-288. https://www.tandfonline.com/doi/full/I0.2217/nnm-2021-0203.

[88] L Tomljenovic and C. Shaw. Who Profits From Uncritical Acceptance Of Biased Estimates Of Vaccine Safety And Efficacy? (Letter) American Journal Of Public Health 102, number 9, (2012). https://ajph.aphapublications.org/doi/epub/10.2105/AJPH.2012.300837.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



Figure 5.1—Age-adjusted rate of adverse events due to the HPV vaccine compared to all other vaccines, as reported in the CDC VAERS database (Tomljenovic and Shaw, 2012).

19   272.    The same letter reported that, of all the "permanently disabled" adverse events reported

20   to the CDC's Vaccine Adverse Event Reporting System database for all vaccines from the year 2000,

21   when the human pappiloma virus (HPV) vaccine was first introduced, through March of 2012, 468

22   (81.2%) were related to just one vaccine, the HPV vaccine. (*Ibid.*)

23   273.    The same letter reported that, of all the "deaths" reported to the CDC's Vaccine

24   Adverse Event Reporting System database for all vaccines from the year 2000, when the human

25   pappiloma virus (HPV) vaccine was first introduced, through March of 2012, 37 (63.8%) were related

26   to just one vaccine, the HPV vaccine. (*Ibid.*)

27   274.    The CDC does not follow up these VAERS reports, even the fatalities, so the CDC has

28   no way to know whether or not these serious, permanently disabling, and fatal adverse effects were

associated with HPV vaccine administration.

### 5.5.3.2 HPV-Immunized Colombian Adolescent Girls Were More Likely To Develop Serious Autoimmune Disorders Than Those Not So Immunized

275.   Colombian adolescent girls immunized with the human papilloma virus (HPV) vaccine were more likely to develop various autoimmune disorders, including 4.4 times more likely to develop rheumatoid arthritis than those not immunized in the year following that immunization, 2.76 times more likely to develop idiopathic juvenile arthritis, and 2.86 times more likely to develop thyrotoxicosis, an inflammation of the thyroid gland.[89]

### 5.5.3.3 HPV Immunized Japanese Girls Were More Likely To Suffer From Memory Impairment, Involuntary Movements, And Dyscalculia Than Were Those Not So Immunized

276.   Fifteen and sixteen year old Japanese girls who were immunized with an HPV vaccine were 70% more likely to suffer memory impairment as compared to those not so immunized, 86% more likely to have involuntary movements (like Parkinson's Disease), and 77% more likely to have dyscalculia (learning disability in mathematics), as shown below:

---

[89] Ivette Maldonado, Nicolas Rodríguez Niño, Carlos F Valencia, *et al.* Evaluation of the safety profile of the quadrivalent vaccine against human papillomavirus in the risk of developing autoimmune, neurological, and hematological diseases in adolescent women in Colombia, Vaccine, March 7, 2024. https://pubmed.ncbi.nlm.nih.gov/38458869/

1
2
3
4
5
6
7
8
9
10
11
12
13
14



Figure 5.2—Odds ratios for neurological impairment, involuntary movement, and dyscalculia in 15- and 16-year-old women receiving the HPV vaccine versus unvaccinated controls (Yaju et al. 2019).

**5.5.3.4 Asthma Is Reportedly Eight Times More Common Among HPV-Immunized U.S. Adolescents And Young Adults Than Among Those Not HPV Immunized**

277.   Using data from the CDC's own National Health and Nutrition Examination Survey, a 2019 study reported that an asthma diagnosis was eight times more likely in the year following HPV immunization among those so immunized as compared to those not so immunized.[90]

---

[90] David A Geier, Janet K Kern, Mark R Geier. A cross-sectional study of the relationship between reported human papillomavirus vaccine exposure and the incidence of reported asthma in the United States. SAGE Open Med . 2019 Jan 8. https://pubmed.ncbi.nlm.nih.gov/30671241/

1



Figure 5.5—Odds ratio for asthma diagnosis after human papillomavirus vaccine versus unvaccinated controls (Geier et al. 2019).

### 5.5.4   Increased Rates Of Asthma, Type 1 Diabetes, Inflammatory Bowel Disease, Rheumatoid Arthritis, and Thyroid Inflammation Are Reported In Vaccinated Children Versus Those Unvaccinated

278.     Hooker and Miller analyzed data extracted from electronic medical records of three pediatric private practices that included data for 2,047 children born into those practices of which 633 (30.9%) received no vaccinations during the first year of life whereas 1414 (69.1%) had received at least one vaccination during the first year of life, and all had reached the age of three at the time of the study. Electronic medical records were examined for diagnosis codes for several diagnoses, including asthma and eczema that occurred in those patients after the age of one.

279.     As shown below, children vaccinated before one year of age and not breastfed were far more likely to have been diagnosed with asthma (23.8 times) by the time they were three years old as

compared to those not vaccinated within the first year of life and breastfed:[91]



Figure 2.7—Odds ratios for a diagnosis of asthma within vaccinated and unvaccinated children accounting for breastfeeding status (Hooker and Miller, 2021).

279.   In 2008 Classen compared the rate of type 1 diabetes in Danish children who received thee doses of polio vaccine within the first year of life as compared to those who did not receive any polio vaccine in the first year of life and who later developed type 1 diabetes.

280.   As shown below, the Danish children vaccinated with three doses of polio vaccine in

[91]Kennedy, RF and Hooker, B: Vax-Unvax. Children's Health Defense (2023), citing Hooker, BS, and Miller, NZ: Analysis of health outcomes in vaccinated  and unvaccinated children: Developmental delays, asthma, ear infections and gastrointestinal disorders. SAGE Open Medicine, Vol 8, 1. https://journals.sagepub.com/doi/10.1177/2050312120925344.

the first year of life were 2.5 times more likely to develop type 1 diabetes as compared to those unvaccinated in the first year of life with polio vaccine:[92]



Figure 4.6—Incidence of Type 1 diabetes in children receiving all three recommended polio vaccines versus children unvaccinated for polio (Classen 2008).

281. In 2015 de Chambrun *et al.* published a meta-analysis of three studies related to vaccination and the risk of developing inflammatory bowel disease, such as Crohn's Disease or ulcerative colitis.[93] They found that children who received polio vaccines in childhood were 2.28 times more likely to later develop Crohn's Disease or 3.48 times more likely to develop ulcerative colitis,

---

[92] Kennedy, RF and Hooker, B: Vax-Unvax. Children's Health Defense (2023), p. 64, citing Classen, JB: Risk of Vaccine Induced Diabetes in Children with a Family History of Type 1 Diabetes. The Open Pediatric Medicine Journal, 2008, 2, 7-10. https://benthamopen.com/contents/pdf/TOPEDJ/TOPEDJ-2-7.pdf

[93] de Chambrun GP *et al.*: Vaccination and Risk for Developing Inflammatory Bowel Disease: A Meta-Analysis of Case–Control and Cohort Studies. Clinical Gastroenterology and Hepatology 2015;13:1405–1415. https://www.cghjournal.org/article/S1542-3565(15)00638-2/pdf

as illustrated below:[94]



Figure 4.7—Relative risk of Crohn's disease and ulcerative colitis in children vaccinated against polio versus children unvaccinated against polio (Pineton de Chambrun et al. 2015).

282.    Thus, various childhood vaccines have been reported to be associated with increased risk of developing a host of autoimmune disorders.

**5.6      Tellingly, The Foregoing VU Studies Showing Harms And No Overall Benefit To California's Mandated Immunizations Have Never Been Refuted By Any Studies Conducted By Either California Or The CDC**

283.    The various private VU studies (vaxed vs. unvaxed) cited above show that, overall, the various childhood vaccines are a serious risk to the child's overall health.

---

[94] Kennedy, RF and Hooker, B: Vax-Unvax. Children's Health Defense (2023), p. 62, citing de Chambrun GP *et al., supra.*

284.    The above studies are presented simply to show that there are substantial data to raise the issue of vaccine dangers, not necessarily to prove it. However, neither the State of California nor the CDC have done **vax-unvax, placebo-controlled testing** of their mandated (in the case of the California) or recommended (in the case of the CDC) vaccines, the gold standard of medical investigation whereas the studies cited above did compare the vaccinated to the unvaccinated. Thus, the studies cited by the plaintiffs stand un-rebutted.

285.    The failure of the CDC to do such VU studies is telling. It may have something to do with the fact that the CDC gets about 4.5 billion dollars per year to promote and distribute those vaccines.

286.    Under the applicable strict scrutiny standard of legal review, the burden is upon California and the CDC to rebut plaintiffs' cited studies with their own placebo-controlled studies so as to prove that their mandated immunizations are safe and effective by that gold standard of medical investigation. However, neither California nor the CDC has **ever** done or will do such double blind, placebo-controlled, trials over many years. Strict scrutiny requires it, especially where plaintiffs have presented strong contrary evidence.

**5.7    The American Academy Of Pediatrics (AAP) And Its Member Pediatricians Are Conflicted On The Issue Of Vaccine Safety Because Vaccine Administration Is A Mainstay And Driver Of The Pediatric Business Model**

287.    California Health and Safety Code Section 120335, subsection (11) recognizes the American Academy of Pediatricians as a source of authority on childhood vaccine safety and effectiveness.

288.    The CDC recommendations for childhood vaccines are invariably supported by the American Academy of Pediatrics and many of the CDC's reports attesting to the safety of its vaccines are published in the Academy's journal, *Pediatrics.*

289.    According to a report published on July 28, 2008 by CBS News Investigative correspondent Sharyl Attkisson:

> The vaccine industry gives millions to the Academy of Pediatrics for conferences, grants, medical education classes and even helped build their headquarters. The totals are kept secret, but public documents reveal bits and pieces.
> A $342,000 payment from Wyeth, maker of the pneumococcal vaccine - which makes $2 billion a year in sales.
> A $433,000 contribution from Merck, the same year the academy endorsed Merck's HPV vaccine - which made $1.5 billion a year in sales.

Another top donor: Sanofi Aventis, maker of 17 vaccines and a new five-in-one combo shot just added to the childhood vaccine schedule last month.[95]

290.    Vaccine administration is a mainstay of the pediatrician's business model. The CDC recommendations are for one or more immunizations to be given at the following ages: birth, two months, four months, six months, nine months, twelve months, fifteen months, eighteen months, four to six years, and eleven to twelve years. These are the so-called "well child checkups." Since the vaccinated children also get sick a lot more often, they also generate many sick child visits. Unvaccinated children stay healthy, don't get sick nearly as often, and just don't generate nearly the per child income as do the vaccinated children.

291.    Thus, as an association of pediatricians, the American Academy of Pediatrics is conflicted on the issue of childhood vaccinations, considering that the rendering of that service many times during the first five years of a child's life is a major source of practice income for pediatricians.

292.    For many years one of the leading advocates for childhood vaccines, and frequent consultant to the vaccine industry, was Professor Stanley Plotkin of the Children's Hospital of Philadelphia.

293.    Even Professor Plotkin now acknowledges that, "In 234 reviews of various vaccines and (adverse) health outcomes conducted from 1991 to 2012, the IOM[96] found inadequate evidence to prove or disprove causation in 179 (76%) of the relationships it explored, illustrating the need for more rigorous science."[97]

294.    Given that even the traditional vaccine industry proponents of childhood immunizations now, belatedly, recognize "the need for more rigorous science" as to whether and how often those childhood vaccines cause injury and death, California cannot possibly shown that its mandates for the injection of those inadequately studied vaccines into all California children is absolutely necessary to achieve a compelling state interest.

---

[95] How Independent Are Vaccine Defenders? Sharyl Attkisson, CBS News. https://www.cbsnews.com/news/how-independent-are-vaccine-defenders/.

[96] The Institute of Medicine of the National Academy of Sciences, the organization designated under the National Childhood Vaccine Injury Act of 1986, to investigate and report on vaccine safety.

[97] D. A. Salmon, W. A. Orenstein, S. A. Plotkin, and R. T. Chen. Funding Postauthorization Vaccine-Safety Science. N Engl J Med 2024; 391:102-105. DOI: 10.1056/NEJMp2402379.

**5.8    Childhood Immunizations Required By California Health And Safety Code Section 120335 Are Not Clearly Necessary To Prevent Serious Infection In Children**

     **5.8.1    There Is No Compelling State Interest That Can Be Shown To Be Served By Measles Immunizations Required Under Health and Safety Code Section 120335 Because No Overall Net Benefit Of Measles Immunization Has Been Shown By VU Studies**

295.    The measles virus is the most highly contagious infectious agent for which California Health and Safety Code section 120335 requires immunization.

296.    For this reason measles is the infection most likely to break out among non-immunized children. The fact that measles breaks out among populations of children not fully immunized for measles and does not break out among populations of children fully immunized for measles argues strongly that measles immunization is effective at preventing the spread of that infection.

297.    Given that the measles vaccine is effective, is it safe and is it worth it?

298.    Because the FDA and CDC do not test the measles vaccines for adverse effects as compared to placebo controls, there is no certainty as to the nature and frequency of those adverse effects, leading many parents to decline to follow California's requirements and the CDC's recommendations for measles immunization.

299.    Indeed, in 1998 Wakefield *et al.* reported that some children developed autism following parent-reported measles immunization but did not claim that the latter caused the former.[98] This report was widely attacked and was retracted by the publisher (but not the authors) twelve years later.[99] However, the finding was never actually refuted since, undeniably, most children who develop autism have received a measles immunization and the rate of autism in unvaccinated children is still either unknown or a matter of dispute.

300.    The issue here is whether measles cases occurring in unvaccinated children poses such a serious health problem that the requirements for strict scrutiny are met so as to permit state enforcement of requirements for measles immunization of all children, where strict scrutiny requires

---

[98] Wakefield AJ Murch SH Anthony A et al. Ileal-lymphoid-nodular hyperplasia, non-specific colitis, and pervasive developmental disorder in children. *Lancet*. 1998; 351: 637-641. https://www.thelancet.com/pdfs/journals/lancet/PIIS0140-6736(97)11096-0.pdf.

[99] Retraction—Ileal-lymphoid-nodular hyperplasia, non-specific colitis, and pervasive developmental disorder in children. The Editors of The Lancet. *Lancet.* 2010;375. https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(10)60175-4/fulltext.

that the state action at issue be narrowly tailored to advance a compelling state interest.[100]

301.    In the case of measles, there is no such compelling state interest. **Even before the measles vaccine was introduced, the death rate for measles in otherwise healthy children in the United States was nearly zero as shown below:[101]**



302.    Furthermore, there is simple and effective treatment for the infection, ordinary vitamin A, that likely reduces that mortality rate to zero in immuno-competent children and reduces measles complications drastically[102] and as also shown below:[103]

---

[100] *Roman Catholic Diocese Of Brooklyn v. Cuomo* (2020) 141 S.Ct. 63, 70 (J. Gorsuch concurring)

[101] Suzanne Humphries, MD and Roman Bystrianyk. Dissolving Illusions, page 201. www.dissolvingillusions.com.

[102] G.D. Hussey, M. Klein: A Randomized, Controlled Trial of Vitamin A In Children With Severe Measles. N. Engl. J. Med. Jul 19, 1990: 160-4. doi: 10.1056/NEJM199007193230304.

[103] A. Coutsoudis *et al.* Vitamin A Supplementation Reduces Measles Morbidity In Young African Children: A Randomized, Placebo-Controlled, Double-Blind Trial. Am. J. Clinical Nutrition 54:5 890-895 (Nov. 1991).



303.   More importantly, no compelling state interest can be argued until the true rate of benefits and adverse effects of measles immunization versus placebo control is known because it cannot now be shown with existing data that there is any overall net benefit of the measles vaccine for children in California.

### 5.8.2   There Is No Compelling State Interest That Can Be Shown To Be Served By Polio Immunizations Required Under Health and Safety Code Section 120335 Because No Overall Net Benefit Of Polio Immunization Has Been Shown By VU Studies

304.   The polio vaccines developed by Salk and Sabin are the poster children for the vaccine proponents, purportedly saving millions of children and young adults from living with crippled limbs walking with cumbersome leg braces like Franklin Roosevelt or, even worse, existing immobilized in massive iron lung machines.

305.   However, the reality of paralytic polio is more complicated and, to this day, still poorly understood.


https://doi.org/10.1093/ajcn/54.5.890

306.   While most of the dread infectious diseases of mankind, small pox for example, have been common and prevalent for much of recorded history and then receded with modern sanitation and improved nutrition, polio was just the opposite, mainly appearing only in advanced industrial societies and virtually unknown in primitive societies.

307.   More importantly, no compelling state interest can be argued until the true ratio of benefits to adverse effects of polio immunization versus placebo control is known because it cannot now be shown with existing data that there is any overall net benefit of the immunization to the child.

### 5.8.3   There Is No Compelling State Interest That Can Be Shown To Be Served By Human Papilloma Virus (HPV) Immunizations Required Under Health and Safety Code Section 120335 Because No Overall Net Benefit Of HPV Immunization Has Been Shown By VU Studies

308.   As shown above, human papilloma virus immunization not uncommonly results in serious complications.

309.   More importantly, no compelling state interest can be argued until the true rate of adverse effects of HPV immunization versus placebo control is known because it cannot be shown that there is any overall net benefit of the immunization to the child.

### 5.9   Other Than Measles Virus, Defendants Have Little Or No Data To Show That California's Mandated Vaccines Prevent Person-To-Person Transmission

310.   Under *Jacobson v. Massachsetts,* the legal justification for mandatory vaccinations is as a public health measure, to prevent the transmission of infectious diseases, in that case, epidemic small pox.

311.   The measles virus is highly contagious but its spread can be contained with a high background immunization rate, in the area of 90-95%.[104]

312.   On the other hand, the current pertussis vaccine is poorly effective in preventing the transmission of the infection.[105]

313.   Other than the measles virus, the California Department of Public Health and the CDC

[104] Doll, M.K., Correira, J.W.: Revisiting the 2014-15 Disneyland measles outbreak and its influence on pediatric vaccinations. Human Vaccines & Immunotherapeutics 2021, Vol. 17, No. 11, 4210-4215. https://doi.org/10.1080/21645515.2021.1972707.

[105] Warfel, J.M., Zimmerman, L.I., Merkel, T.J.: Acellular pertussis vaccines protect against disease but fail to prevent infection and transmission in a nonhuman primate model. PNAS, Vol. 111(2)787-792. www.pnas.org/cgi/doi/10.1073/pnas.1314688110.

1    have little or no data showing that California's mandated immunizations are effective at preventing

2    person-to-person transmission of the infections that they target.

3    **6.    THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH AND THE FEDERAL CENTERS FOR DISEASE CONTROL COLLABORATE TO MIS-INFORM PARENTS ON THE RISKS OF THOSE IMMUNIZATIONS**

5    314.    This case raises the fundamental question of patients' fundamental rights to give or

6    withhold informed consent to medical treatment of their children and particularly whether they are

7    entitled to all of the information that a reasonable person would wish to consider or only that

8    information that government experts determine that they should be allowed to have, sanitized of any

9    "misinformation"?

10   315.    This latter question is simply another version of the larger question now before us,

11   whether democracy can function, or even survive, when the people are only allowed to have the

12   information that the government deems it to be in their best interests to have and all else is

13   "misinformation." Under our Declaration of Independence, our government "derives [its] just powers

14   from the consent of the governed." This only works when that consent is informed consent, both as

15   to public affairs as well as personal affairs, such as medical care. Denial of informed consent for

16   medical care is an infringement of both our First Amendment right to speak and hear freely and our

17   Fourteenth Amendment right to give or withhold consent for medical treatment.

18   **6.1    The CDC Refuses To Do The Necessary VU (Placebo-Controlled) Studies Of The Safety And Effectiveness Of Its Vaccines Required To Assure The Public Of The Safety Of Those Vaccines, That Should Tell Us Something Important**

20   316.    The VU studies cited above are hardly conclusive and can be criticized for various

21   shortcomings. Just about every research study can be. But the most important point about these studies

22   is that the CDC has never reported its *own* comparable VU studies, either prospective or retrospective,

23   in the ensuing years to refute or rebut the privately conducted studies cited above.

24   317.    The CDC refuses to do VU studies on the pretextual, self-serving basis that it would

25   be unethical to withhold such safe, necessary and effective vaccines from children.[106]

26   318.    This argument is fatally flawed on two counts. First, there are numerous naturally-

27   occurring VU studies, cited above, to show that unvaccinated children are healthier and the vaccinated

28

---

[106] The Childhood Immunization Schedule and Safety, Institute of Medicine, 2013, pp. 13, 195. https://pubmed.ncbi.nlm.nih.gov/24901198/.

more injured. Second, the argument is circular in that it presupposes the proposition to be tested, that the CDC's recommended vaccines are actually safe and effective. In fact, biologic drugs, such as vaccines, are the only class of pharmaceuticals that are not required to be tested against a placebo control and none of the CDC's recommended vaccines have ever been tested against such placebo controls. Neither the FDA nor the CDC require it and the vaccine makers are afraid to do it, or to tell the public the results if they have done it.

**6.2    Instead Of VU Studies, The CDC Relies, For Vaccine Safety Assessment, Upon Data From Its Vaccine Safety Datalink System (VSD) That Is Fatally Underpowered For Negative Controls**

319.    The CDC has two sources of original data for its assessment of vaccine safety. The first is the Vaccine Adverse Event Reporting System (VAERS). This is a voluntary system wherein doctors and patients can file reports of what they believe to be vaccine-related adverse events. The Congress mandated the VAERS system under the Child Vaccine Safety Act of 1986 to provide the public with some way to follow the numbers and types of vaccine-related adverse events. The CDC makes no attempt to investigate these reports to determine whether the reported event was caused by a vaccine. The CDC does not use VAERS data to assess vaccine safety and does it best to ignore and discredit that inconvenient data reported by the public that does not fit its own narrative.

320.    The other data system that the CDC has and relies upon almost exclusively to assess vaccine safety is the Vaccine Safety Datalink (VSD) system. This is the system that the CDC has chosen to assess vaccine safety.[107]

321.    According to the CDC:

> The Vaccine Safety Datalink (VSD) is a collaborative project between CDC's Immunization Safety Office, integrated healthcare organizations, and networks across the United States...The VSD uses electronic health data from participating sites to monitor and assess the safety of vaccines. The VSD collects information about the kind of vaccine given to each patient, the date of vaccination, and other vaccinations given on the same day. This vaccine safety system also uses information about medical illnesses that have been diagnosed at doctors' offices, urgent care visits, emergency department visits, and hospital stays to help monitor the safety of vaccines.

(*Id.*)

322.    The fatal flaw in the VSD system for monitoring vaccine safety is that, since all the

---

[107] Vaccine Safety Datalink (VSD). CDC. https://www.cdc.gov/vaccinesafety/ensuringsafety/monitoring/vsd/index.html.

1  VSD data come from eleven "integrated healthcare organizations" (managed care organizations) which

2  use their data systems to track their patients to make sure that they all get all of their CDC-

3  recommended immunizations. Thus, the VSD data contains very few unvaccinated negative control

4  patients to compare with the vaccinated patients to determine vaccine-related and vaccine-caused

5  adverse events. It is fatally flawed and underpowered by near total lack of negative controls and is

6  underpowered for even partially vaccinated controls.

7      323.   In an ideal experiment, there should be a large and equal number of subjects in each

8  group, the experimental subjects who do receive the treatment under investigation and an equal

9  number of negative control subjects who do not receive the treatment under investigation.

10     324.   This fatal flaw of unequal distribution of experimental and negative control subjects

11 in the VSD system is clearly seen in a recent CDC paper that used VSD data to look at the safety of

12 the neurotoxic aluminum added to many vaccines to enhance the immunogenicity of those vaccines.[108]

13 In this study the authors tried to correlate the amount of aluminum that children received in their first

14 23 months of life with their later development of eczema and asthma. As seen in Figure 1 of that paper,

15 nearly all the patients, both those who developed eczema and those who did not, got all or nearly all

16 the recommended vaccines such that nearly all their aluminum exposures clustered right around 4 to

17 4.5 milligrams, with a few stragglers between three and four milligrams of aluminum, a handful

18 between two and three milligrams of aluminum, and none below two milligrams of aluminum except

19 for a few who got no aluminum, perhaps because they refused all their vaccinations:

20

21

22

23

24

25

26

27

28     [108] Daley, M.F., *et al.* Association Between Aluminum Exposure From Vaccines Before Age 24 Months and Persistent Asthma at Age 24 to 59 Months. https://www.academicpedsjnl.net/article/S1876-2859(22)00417-X/fulltext.



325.    When the investigators plotted this data out to see if the aluminum exposure predicted the later development of asthma (Figure 2 of the paper), the paucity of negative, or even partially vaccinated, controls is quite apparent because the standard error ranges (the bars above and below the data points) for the small numbers of patients with lesser aluminum exposures was quite large, greatly reducing the power of the statistical inferences that can be drawn from the data due to the small number of unvaccinated controls:



* Sample size n=14, not sufficient to estimate incidence rate and confidence intervals

326. Despite the paucity of unvaccinated and partially vaccinated patients the authors were able to find a statistically significant relationship between total aluminum exposure and the subsequent development of asthma among children with eczema:

> Among children with eczema after adjustment for covariates, cumulative vaccine-associated aluminum was positively associated with persistent asthma (adjusted hazard ratio [aHR] 1.26 per 1 mg increase in aluminum, 95% CI 1.07, 1.49). Other covariates which remained significant in the adjusted model included male sex, non-Hispanic Black race/ethnicity, food allergies, and both measures of health care utilization.

(*Id.,* at p. 41.)

327. Note, again, that African-American boys are at the greatest risk, a finding that merited no mention in the paper's Discussion section.

328. Note also that the investigators were only able to express the relationship of aluminum exposure to asthma incidence as an "adjusted hazzard ratio" of certain number of increased asthma cases "per 1 mg increase in aluminum." But they could not say what would be the difference in asthma cases between the children who got four milligrams of aluminum (the fully vaccinated), and those who

1    did not get any aluminum (the unvaccinated), that is, a VU study, because they did not have an

2    unvaccinated control group of any significant size. Thus, they were limited by the VSD data to

3    comparing the fully vaccinated, those with aluminum exposure between four and five milligrams, with

4    the mostly vaccinated, those with aluminum exposure between three and four milligrams, not a "VU

5    (vax-unvaxed) study" but a 'VMV' (vax-mostly vaxed) study.

6        329.    In the case of this CDC aluminum study, even a comparison of the fully vaccinated to

7    the mostly vaccinated produced a statistically significant result. However, all too often, when the CDC

8    does this kind of 'VMV' study and then fails to find a statistically significant result because of the

9    absence of unvaccinated controls, it then claims that their study proves that there is no causation. In

10    reality, all they have shown is that their VMV study model, with few, if any, unvaccinated controls,

11    is underpowered to detect causation, not that there is no causation that could be found with a VU study.

12        330.    The CDC has many highly intelligent, highly educated epidemiologists and scientists

13    on it staff. It begs credulity that this obvious flaw in their vaunted VSD system has never occurred to

14    any of them.

15        **6.2**    **California Relies Upon The Representations Of The Federal Centers For Disease Control (CDC) That The Vaccines That California Mandates Are Safe; Without**

16               **Those Assurances Of Vaccine Safety California's Mandates Are Untenable**

17        331.    In enacting California Health and Safety Code Section 120335(b) the State of California

18    failed to do its own assessment of the benefits and risks of each mandated immunization, *i.e.,* the

19    safety, effectiveness, and need for each mandated immunization, for each child, or even each category

20    of children (age, sex, race) or even for all children.

21        332.    Instead, the State of California simply accepted the representations of the U.S. Centers

22    For Disease Control (CDC) as to the safety and effectiveness of those mandated immunizations

23    without doing its own due diligence.

24        333.    Specifically, under California Code of Regulations, Title 17, Division 1, Chapter 4,

25    Section 6000, subsection (m),[109] California relies upon the federal Advisory Committee on

26

27        [109] California Code of Regulations, Title 17, Division 1, Chapter 4, Section 6000, subsection (m): "For purposes of this Article, 'vaccine' means an immunization administered in the United States

28    of America or other countries that is recommended by the federal Advisory Committee on Immunization Practices for the prevention of the respective diseases identified in section 120335 of the Health and Safety Code.

1    Immunization Practices to specify the vaccines required under section 120335 of the Health and Safety

2    Code.

3         334.    The "federal Advisory Committee on Immunization Practices" referenced above is a

4    part of the U.S. Centers For Disease Control ("CDC).

5         335.    Without the CDC's assurances of vaccine safety, California's immunization mandates

6    are untenable.

7    **6.3    The CDC's Representation That Its Recommended Vaccines Are "Safe" Is Flatly**
     **Contradicted And Refuted By The Very Studies It Cites As Authority For That**
8    **Claim**

9         336.    On the CDC's Vaccine Safety webpage, the CDC lists "Vaccine Safety FAQs for

10   Parents and Caregivers."[110] On that page it poses the rhetorical question, "Are vaccines safe for

11   children?" and answers that question in the affirmative:

12        Are vaccines safe for children?

13        Yes. The United States has the safest, most effective vaccine supply in its history. Years of
     testing are required by law to ensure that vaccines are safe before they are made available in
14   the United States. This process can take 10 years or longer. Once a vaccine is in use, the CDC
     and the Food and Drug Administration (FDA) monitor any possible side effects reported
15   through the Vaccine Adverse Event Reporting System (VAERS) and other vaccine safety
     systems. Any hint of a problem with a vaccine prompts the CDC and FDA to carry out further
16   investigations.[111]

17        337.    The CDC website also contains a webpage captioned as "Autism and Vaccines,

18   Questions and Concerns."[112] That webpage contains the following:

19   **Autism and Vaccines**

20   **Questions and Concerns**

21        Autism spectrum disorder (ASD) is a developmental disability that can cause significant social,
     communication, and behavioral challenges. Recent estimates from CDC's Autism and
22   Developmental Disabilities Monitoring Network found that about 1 in 44 children have been
     identified with ASD in communities across the United States. CDC is committed to providing
23   essential data on ASD, searching for causes of and factors that increase the risk for ASD, and
     developing resources that help identify children with ASD as early as possible.

24

25   _____

26        [110] https://www.cdc.gov/vaccinesafety/caregivers/faqs.html

27        [111] Vaccine Safety FAQs for Parents and Caregivers, Centers For Disease Control, available at
     https://www.cdc.gov/vaccinesafety/caregivers/faqs.html
28
          [112] Autism and Vaccines, Questions and Concerns, Centers for Disease Control, available at
     https://www.cdc.gov/vaccinesafety/concerns/autism.html

**Vaccines do not cause autism.**

Some people have had concerns that ASD might be linked to the vaccines children receive, but studies have shown that there is no link between receiving vaccines and developing ASD. The National Academy of Medicine, formerly known as Institute of Medicine, reviewed the safety of 8 vaccines to children and adults. The review found that with rare exceptions, these vaccines are very safe.
Source: Adverse Effects of Vaccines: Evidence and Causality [Institute of Medicine. 2012].

**6.4    The 2012 Institute Of Medicine Report Did Not Find That The Eight Studies Vaccines Were "Very Safe," In Truth, It Said That There Were Not Enough Data To Know Whether They Were Safe Or Not**

338.    The CDC representation that, "The National Academy of Medicine, formerly known as Institute of Medicine, reviewed the safety of 8 vaccines to children and adults...[t]he review found that with rare exceptions, these vaccines are very safe" is a flagrant misrepresentation of the conclusions of the Institute of Medicine (IOM) study. In fact, the IOM stated that it made no such findings for any of the vaccines that California mandates for children.

339.    Specifically, in 2012 a committee of the Institute of Medicine (IOM) of the National Academy of Sciences produced a report entitled, "Adverse Effects of Vaccines, Evidence and Causality."[113] The IOM was authorized by Congress to conduct this review under the federal National Childhood Vaccine Injury Act of 1986.[114] The charge to the committee was "...to assess dispassionately the scientific evidence about whether eight different vaccines cause adverse events (AE), a total of 158 vaccine-AE pairs, the largest study undertaken to date, and the first comprehensive review since 1994." (*Ibid.*)

340.    Of the 158 adverse reactions to the eight different vaccines studied in the 2012 IOM report, the committee, "concluded the evidence favors acceptance of four specific vaccine–adverse event relationships. These include HPV vaccine and anaphylaxis, MMR vaccine and transient arthralgia in female adults, MMR vaccine and transient arthralgia in children, and certain trivalent influenza vaccines used in Canada and a mild and temporary oculorespiratory syndrome."[115]

341.    The IOM committee also, "concluded the evidence favors rejection of five

---

[113] Adverse Effects of Vaccines, Evidence and Causality, National Institute of Medicine Report, available at http://nap.nationalacademies.org/13164.

[114] *Id.,* at p. ix.

[115] *Id.,* at p. 18.

vaccine–adverse event relationships. These include MMR vaccine and type 1 diabetes, diphtheria, tetanus, and pertussis (DTaP) vaccine and type 1 diabetes, MMR vaccine and autism, inactivated influenza vaccine and asthma exacerbation or reactive airway disease episodes, and inactivated influenza vaccine and Bell's palsy."[116]

342.    Thus, of the 158 vaccine-adverse event pairs that the IOM committee was asked to study, "[t]he vast majority of causality conclusions in the report are that the evidence was inadequate to accept or reject a causal relationship." (*Ibid.*)

343.    In other words, the IOM committee could not say whether the eight vaccines that it studied were safe or not with respect to all possible adverse effects. Yet the CDC continues, to this day, to claim that the IOM report "found that with rare exceptions, these vaccines are very safe," a flagrant misrepresentation of the IOM study findings.

344.    The only conclusion of the National Institute of Medicine Report about vaccines not causing childhood autism was a finding that the evidence "favored," but was not conclusive for, rejection of a causal relationship between one and only one vaccine, the MMR vaccine, and childhood autism, but did not categorically exclude that possibility. As for all the other vaccines on the list of vaccines recommended by the CDC and required of all California schoolchildren, there was not adequate evidence to support a conclusion that they did not cause childhood autism.

345.    Obviously, the CDC grossly misrepresented the findings of that report in making its claim that that report supported the CDC's categorical statement that, "Vaccines do not cause autism."

346.    Even the one and only causal association found by the 2012 IOM Report between any vaccine and childhood autism, the MMR vaccine, is open to serious question. That conclusion was based on five reported studies. Four of those studies did not compare MMR-vaccinated children to non-MMR-vaccinated children, so-called "VU" studies (vax vs. unvax). Two of those four studies were done on the same data. (*Ibid*.)

347.    Only one study described in the 2012 IOM report, that of Madsen *et. al.*, a study funded by the CDC itself, purported to compare the incidence of autism in MMR-vaccinated children with those not so vaccinated and reported that there was no significant difference. (*Ibid.*) However, there

_____

[116] *Id.,* at p. 23.

was no report as to any other vaccines the non-MMR vaccinated children received. So, the control group of children in the Madsen study was likely partially vaccinated rather than unvaccinated, thereby limiting the conclusions that can be drawn from that study.

348.    Furthermore, Madsen's raw data did show a higher autism rate in the vaccinated than the unvaccinated, a difference that disappeared after certain "adjustments" were made to that data. A review of the actual raw data reported in that study showed that 263 vaccinated children were diagnosed with autism during 1,647,504 years of person-observation ( a rate of 159 autism diagnoses per million person-years of observation) versus 53 children unvaccinated for MMR and diagnosed with autism during 482,360 person-years of observation (a rate of 109 autism diagnoses per million person-years of observation). Thus, in fact, the actual raw data reported showed that the rate of autism diagnoses was 45% higher in the vaccinated group as compared to the unvaccinated group.

349.    How then to explain the difference between the reported result of no difference with the actual difference of 45% more autism cases in the raw data in the Madsen study?

350.    According to the authors:

> We calculated the relative risk with adjustment for age, calendar period, sex, birth weight, gestational age, mother's education, and socioeconomic status. Overall, there was no increase in the risk of autistic disorder or other autistic-spectrum disorders among vaccinated children as compared with unvaccinated children (adjusted relative risk of autistic disorder, 0.92; 95 percent confidence interval, 0.68 to 1.24; adjusted relative risk of other autistic-spectrum disorders, 0.83; 95 percent confidence interval, 0.65 to 1.07).

351.    However, the Madsen authors never explained the formula that they used to make all these "adjustments" nor the scientific basis for those "adjustments." What, exactly, does the mother's education and socioeconomic status have to do with the incidence of autism and is it a negative or positive? The failure to state the adjustment process suggests that the authors simply massaged the data long enough to finally make the 45% difference in autism incidence between vaccinated and unvaccinated children disappear.

352.    Even more concerning, a footnote to the IOM Report that cited the Madsen study as evidence of no causality between MMR vaccination and autism also stated, rather cryptically, that, "One of the authors of this article, P. Thorsen, was indicted for embezzlement on April 13, 2011. The implications for the integrity of the study are unknown at this time."

353.    Perhaps the IOM reviewers should have looked into that a bit more before staking their

conclusion on any possible MMR relationship to autism on it. In fact, Poul Thorsen was indicted for

embezzling CDC funds that were supposed to be used to study the relationship of vaccines to autism:

> ATLANTA (Reuters) - A scientist in Denmark has been indicted by a federal grand jury in Atlanta for allegedly stealing $1 million in grant money that the Centers for Disease Control and Prevention had earmarked for autism research.

> U.S. prosecutors on Wednesday said they are seeking to extradite Poul Thorsen, 49, accused of wire fraud and money laundering.

> He used the stolen money to buy a home in Atlanta, a Harley Davidson motorcycle and two cars, prosecutors said.

> "Grant money for disease research is a precious commodity," said Sally Yates, U.S. attorney for the Northern District of Georgia, in a news release.
> "When grant funds are stolen, we lose not only the money, but also the opportunity to better understand and cure debilitating diseases."

> Thorsen, a visiting scientist at the Atlanta-based CDC in the 1990s, helped two government agencies in Denmark obtain $11 million in research grants.
> He moved back to Denmark in 2002 to be principal investigator for the program. Prosecutors said he was also in charge of administering the research dollars, earmarked in part to study the relationship between autism and exposure to vaccines.

354.    Obviously, Poul Thorsen was the money man between the CDC and Aarhus University where the Madsen study was conducted by the research group that he led and funded with CDC money for autism research, money from which he embezzled. The Madsen study that he funded with CDC money deliberately misstated its findings by applying "adjustments" to its data to produce the report that the CDC wanted, a report showing no causality between CDC vaccines and childhood autism. The Madsen study, the only VU study cited by the IOM report to show that MMR vaccines do not cause autism, cannot be accepted as legitimate.

355.    It is very telling that this misleading paper from a research group headed by an indicted con man is still the only study comparing the incidence of childhood autism in vaccinated children to that it partially vaccinated children, and only as to the MMR vaccine, cited by the CDC on its webpage as authority for its categorical statement that its "vaccines don't cause autism."

356.    California continues to mandate these vaccines of unproven safety for essentially all schoolchildren in California when all it has to do to see the falsity of the CDC claims of safety is to do its due diligence and read the IOM report for itself.

**6.5     The 2013 Institute Of Medicine Report Rejected Any VU Studies To Determine Vaccine Safety**

357.    The 2012 Institute of Medicine Report on Adverse Effects of Vaccines, Evidence and

Causality that concluded that there was inadequate data to find that CDC-recommended vaccines were safe led to a follow-on Institute of Medicine Report in 2013, entitled "The Childhood Immunization Schedule and Safety." The purpose of this study was, ostensibly, to identify methods to assess vaccine safety:

> The National Vaccine Program Office (NVPO) of the U.S. Department of Health and Human Services (HHS) asked the Institute of Medicine (IOM) to convene a committee of experts in pediatrics, neurology, medical ethics, immunology, statistics, epidemiology, and public health to identify feasible study designs to explore the safety of the U.S. childhood immunization schedule.[117]

358.   Additionally, the 2013 Institute of Medicine ("IOM") Report found that many parents had concerns about the safety of the CDC-recommended vaccines,[118] especially after the 2012 IOM Report pointed out the near total lack of such safety data. The 2013 IOM Report also found that public comments at its public sessions also shared those concerns, reporting that:

> During each of the three public sessions held in conjunction with committee meetings, the testimony of many individuals and organizational representatives revealed a lack of trust in the quality and thoroughness of vaccine safety research. Several individuals recommended that the committee review the scientific studies that have compared health outcomes among fully vaccinated, partially vaccinated, and unvaccinated children as well as children who have been vaccinated according to alternative schedules.[119]

359.   Thus, while the public was demanding VU trials to determine vaccine safety, the 2013 IOM Report rejected that call for placebo-controlled studies because:

> It would be unethical to do a randomized trial where children in one arm are completely unvaccinated, since the scientist will then knowingly put some of the children at increased risk for vaccine-preventable diseases, some of which may result in death.[120]

360.   This last argument is obviously disingenuous because it is circular; *i.e.*, it assumes the truth of that which it would purport to determine, whether childhood vaccines are actually safe and effective. On the other hand, if childhood vaccines are, in fact, *unsafe*, it is unethical **not** to determine that as soon and as conclusively as possible.

---

[117] The Childhood Immunization Schedule and Safety, Institute of Medicine, 2013, available at DOI: 10.17226/13563 and https://pubmed.ncbi.nlm.nih.gov/24901198/.

[118] *Id.,* at pp. 62-65.

[119] *Id.,* at p.66.

[120] *Id.,* at pp. 13, 195.

1

2

**6.6    Despite The Fact That The Institute Of Medicine Declined To Find The CDC'S Recommended Vaccines To Be "Safe," It Has Continued For Many Years To Allow The CDC To Make That Claim Anyway**

3    361.    Despite the fact that the 2012 IOM Report declined to find that the all of the CDC's

4    recommended vaccines were uniformly "safe," the IOM (now the National Academy of Medicine) has

5    permitted the CDC to make that claim on the CDC's website anyway for many years, the CDC

6    proclaiming, for example, that:

7    **Vaccines do not cause autism.**

8    Some people have had concerns that ASD might be linked to the vaccines children receive, but
studies have shown that there is no link between receiving vaccines and developing ASD. The

9    National Academy of Medicine, formerly known as Institute of Medicine, reviewed the safety
of 8 vaccines to children and adults. The review found that with rare exceptions, these vaccines

10    are very safe.
Source: Adverse Effects of Vaccines: Evidence and Causality [Institute of Medicine.

11    2012][121]

12    362.    Thus, the Institute of Medicine is a passive collaborator in the CDC's false claims about

13    the safety of its recommended vaccines.

14    **6.7    In 2000 The CDC Held A Secret Two-Day Off Campus Meeting To Discuss How To Conceal The Adverse Effects Of Its Recommended Vaccines From The Public,

15    Including The Increased Rates Of Autism Among African-American Boys Vaccinated With The Neurotoxic Mercury-Containing Thimerosal Preservative

16    Used In Some Of Its Recommended Vaccines**

17    363.    Mercury is very toxic to humans. Nonetheless, it was used, in the form of thimerosal,

18    for many years as a preservative in infant vaccines recommended by the CDC.

19    364.    In 1999 CDC researchers Thomas M. Verstraeten, R. Davies, D. Gu, F DeStefano

20    presented a report at an internal CDC conference entitled, "Increased risk of developmental neurologic

21    impairment after high exposure to thimerosal-containing vaccine in the first months of life."[122] They

22    reported that:

23    Methods: We categorized the cumulative ethylmercury exposure from thimerosal containing
vaccines after one month of life and assessed the subsequent risk of degenerative and

24    developmental neurologic disorders and renal disorders before the age of six. We applied

25

26    [121] CDC Webpage "Autism."
https://www.cdc.gov/vaccinesafety/concerns/autism.html#:~:text=Vaccine_ingredients_do_not_cause

27    autism.&text=Since 2003%2C there have been,thimerosal-containing vaccines and ASD.

28    [122] Verstraeten, Thomas M., Davies, R., Gu, D., DeStefano, F.: Increased risk of developmental
neurologic impairment after high exposure to thimerosal-containing vaccine in first month of life.
https://childrenshealthdefense.org/wp-content/uploads/1999-eis-conference-abstract-presentation-ver
straeten-et-al.pdf.

proportional hazard models adjusting for HMO, year of birth, and gender, excluding premature babies. Results: We identified 286 children with degenerative and 3702 with developmental neurologic disorders, and 310 with renal disorders. The relative risk (RR) of developing a neurologic development disorder was 1.8 ( 95% confidence intervals [CI] = 1.1-2.8) when comparing the highest exposure group at 1 month of age (cumulative dose> 25 ug) to the unexposed group. Within this group we also found an elevated risk for the following disorders: autism (RR 7.6, 95% CI = 1.8-31.5), non organic sleep disorders (RR 5.0, 95% CI = 1.6-15.9}, and speech disorders (RR 2.1, 95% (1=1.1-4.0). For the neurologic degenerative and renal disorders group we found no significantly increased risk or a decreased risk. Conclusion: This analysis suggests that high exposure to ethyl mercury from thimerosal-containing vaccines in the first month of life increases the risk of subsequent development of neurologic development impairment, but not of neurologic degenerative or renal impairment. Further confirmatory studies are needed.

365.    In short, they reported that infants injected with CDC recommended vaccines with the highest mercury exposures in the first month of life were 7.6 times more likely to develop autism, 5 times more likely to develop sleep disorders, and 2.1 times as likely to develop speech disorders as compared to to infants not so exposed.

366.    However, the CDC did not make this extremely important information available to the public, either immediately as it should have or even later.

367.    Instead, in June of 2000 the CDC convened a secret off-campus conference at the Simpsonwood conference facility in Norcross, Georgia, no press allowed, to discuss the problem of the Verstraeten report out of the public's view and to decide what to do about it. Secrecy of the information discussed there was emphasized:

...let me just reemphasize if I could the importance of trying to protect the information that we have been talking about. As many of you know, we are invited here. We have asked you to keep this information confidential. We do have a plan for discussing these data at the upcoming meeting of the Advisory Committee on Immunization Practices on June 21 and June 22. At that time CDC plans to make a public release of this information, so I think it would serve all of our interests best if we could continue to consider these data. The ACIP work group will be considering also. If we could consider these data in a certain protected environment. So we are asking people who have done a great job protecting this information up until now, to continue to do that until the time of the ACIP meeting. *So to basically consider this embargoed information.*[123]

368.    Despite the secrecy, the transcript of the Simpsonwood meeting eventually leaked to the public.

369.    The Simpsonwood transcript is telling. It is clear that the focus was not on how to make

---

[123] Scientific Review of Vaccine Safety Datalink Information, June 7-8, 2000, Simpsonwood Retreat Center, Norcross, Georgia. Emphasis added. https://www.safeminds.org/wp-content/uploads/2014/03/simpsonwood-transcript-scientific-review-of-vaccine-safety-datalink-information.pdf

1    vaccines safe, but on how to handle to public relations problem that the CDC had in pushing unsafe

2    vaccines. The comments of Dr. John Clements of the World Health Organization summed this up:

3           Dr. Clements: Thank you, Mr. Chairman, I will stand so you can see me.

4           First of all I want to thank the organizers for allowing me to sit quietly at the back. It has been
       a great privilege to listen to the debate and to hear everybody work through with enormous
5       detail, and I want to congratulate, as others have done, the work that has been done by the
       team.
6
       Then comes the but. I am really concerned that we have taken off like a boat going down one
7       arm of the mangrove swamp at high speed, when in fact there was no enough discussion really
       early on about which way the boat should go at all. And I really want to risk offending
8       everyone in the room by saying that perhaps this study should not have been done at all,
       because the outcome of it could have, to some extent, been predicted and we have all reached
9       this point now where we are left hanging, even though I hear the majority of the consultants
       say to the Board that they are not convinced there is a causality direct link between Thimerosal
10      and various neurological outcomes. I know how we handle it from here is extremely
       problematic. The ACIP is going to depend on comments from this group in order to move
11      forward into policy, and I have been advised that whatever I say should not move into the
       policy area because that is not the point of this meeting. But nonetheless, we know from many
12      experiences in history that the pure scientist has done research because of pure science. But
       that pure science has resulted in splitting the atom or some other process which is completely
13      beyond the power of the scientists who did the research to control it. And what we have here
       is people .who have, for every best reason in the world, pursued a direction of research. But
14      there is now the point at which the research results have to be handled, and even if this
       committee decides that there is no association and that information gets out, the work has been
15      done and through freedom of information that will be taken by others and will be used in other
       ways beyond the control of this group. And I am very concerned about that as I suspect it is
16      already too late to do anything regardless of any professional body and what they say.

17      *My mandate as I sit here in this group is to make sure at the end of the day that 100,000,000*
       *are immunized with DTP, Hepatitis B and if possible Hib, this year, next year and for many*
18      *years to come*, and that will have to be with Thimerosal containing vaccines unless a miracle
       occurs and an alternative is found quickly and is tried and found to be safe.[124]
19
20      370.    The way the committee decided to "handle" the problem was to "re-analzyze" the

21   Verstraeten data to find a way to get rid of the problem that it raised.[125]

22      371.    From the above it is clear that CDC officials knew full well how much the public,

23   especially parents, would want to know this important information in making the immunization

24   decisions for their children and how unfavorably they would view the CDC when they learned about

25   it.

26      372.    But, neither the Verstraeten report nor the results of the Simpsonwood meeting were

27   made public by the CDC at the time of the subsequent meeting of the Advisory Committee on

28      ---

       [124] *Id.,* at p. 247-248 (emphasis added).

       [125] *Id.,* at p. 248.

1   Immunization Practices (ACIP) or since. It only entered the public domain later under a Freedom of

2   Information Act request.

3       373.    Instead of making this vital information public, the CDC "handled" the Verstraeten

4   report problem by "re-analyzing the data for years in order to find ways to make its damning

5   conclusions go away. The CDC finally succeeded in doing so four years later in 2003 when it

6   published the paper entitled, "Safety of Thimerosal- Containing Vaccines: A Two-Phased Study of

7   Computerized Health Maintenance Organization Databases in the journal *Pediatrics*, the official

8   publication of the American Academy of Pediatrics. Remarkably, the 7.6 fold increase in autism cases

9   in infants exposed to the highest mercury levels reported by Verstraeten *et al.* in 1999 had vanished

10  by 2003, replaced by the bland statement that, "[i]n no analyses were significant increased risks found

11  for autism or attention-deficit disorder."[126]

12      374.    The disappearance was accomplished by watering down the original statistically

13  significant 1999 results so that they were no longer statistically significant.[127]

14      375.    A more troubling aspect of the 2003 paper by Verstraeten *et al.* is that the lead author,

15  Dr. Verstraeten, left the CDC as of July, 2001, and, "[f]rom 2001 to 2011, he has been employed by

16  GlaxoSmithKline where he was first responsible for the vaccine epidemiology group..."[128] Since the

17  2003 paper was not submitted for publication until January 24, 2003, he submitted that paper for

18  publication while he was employed by vaccine manufacturer GlaxoSmithKline, a fact not disclosed

19  in that publication as required, although it was surely known by his other CDC authors, including

20  senior CDC officials Drs. Frank DeStefano and Robert Chen of the Epidemiology and Surveillance

21

22      [126] Verstraeten, Thomas, *et al.,* Safety of Thimerosal-Containing Vaccines: A Two-Phased Study
    of Computerized Health Maintenance Organization Databases. *Pediatrics* 112:5, Nov 2003.
23      https://www.researchgate.net/publication/9028897_Safety_of_Thimerosal-Containing_Vaccines_A_
    Two-Phased_Study_of_Computerized_Health_Maintenance_Organization_Databases
24
        [127] The 1999 paper found that infants who received more than 25 micrograms of mercury from
25  infant vaccines in the first month of life were 7.6 times as likely to develop autism by age six as
    compared to infants who received no such mercury in the first month of life. By contrast, in the 2003
26  paper , the comparison was between infants who received only 12.5 micrograms of mercury and those
    who received none.
27
        [128] Thomas Verstraeten | Managing Director P95.
28  https://www.terrapinn.com/conference/immuno-oncology-profiling-congress/speaker-thomas-VERS
    TRAETEN.stm,   LinkedIn   Profile,Thomas   Verstraeten,   Managing   Director   at   P95.
    https://www.linkedin.com/in/thomas-verstraeten-6786386/.

1  Division, National Immunization Program, CDC.

2  **6.8    In 2014 CDC Whistleblower William Thompson Publically Admitted, With Regret, That He And His CDC Colleagues Concealed The Increased Rate Of Autism They Found In Vaccinated African-American Boys**

3

4  376.    The veil of mystery as to how the damaging conclusions of the unpublished Verstraeten

5  report of 1999 disappeared in the later published *Pediatrics* paper of 2003 was lifted in 2014 when a

6  whistleblower within the CDC, William Thompson, revealed the corrupt processes the CDC used for

7  disappearing unfavorable vaccine safety findings in another, different, study of the MMR vaccine.[129]

8  377.    Specifically, Dr. Thompson, while a CDC researcher, was a co-author of a research

9  paper entitled, "Age at First Measles-Mumps-Rubella Vaccination in Children With Autism and

10  School-Matched Control Subjects: A Population-Based Study in Metropolitan Atlanta," published in

11  the February, 2004 edition of the medical journal, *Pediatrics,* published by the American Academy

12  of Pediatrics.[130] The authors of the paper were all CDC employees, Frank DeStefano, MD, MPH;

13  Tanya Karapurkar Bhasin, MPH; William W. Thompson, PhD; Marshalyn Yeargin-Allsopp, MD;

14  Coleen Boyle, PhD.

15  378.    The paper reported that:

16  The overall distribution of ages at MMR vaccination among children with autism was similar to that of matched control children; most case (70.5%) and control children (67.5%) were vaccinated between 12 and 17 months of age. Similar proportions of case and control children had been vaccinated before 18 or before 24 months. No significant associations for either of these age cutoffs were found for specific case subgroups, including those with evidence of developmental regression.

19  In other words, they found no relationship between the age at which the child received an

20  MMR vaccine and the incidence of autism.

21  379.    However, in 2014 Dr. Thompson released a press statement through his attorney stating

22  that:

23  My name is William Thompson. I am a Senior Scientist with the Centers for Disease Control and Prevention, where I have worked since 1998.
   I regret that my coauthors and I omitted statistically significant information in our 2004 article published in the journal Pediatrics. **The omitted data suggested that African American males who received the MMR vaccine before age 36 months were at increased risk for**

27  [129] Vaccine Whistleblower, Kevin Barry. Skyhorse Publishing, 2015.

28  [130] DeStefano F, Bhasin TK, Thompson WW, Yeargin-Allsopp M, Boyle C: Age at first measles-mumps-rubella vaccination in children with autism and school-matched control subjects: a population-based study in metropolitan atlanta. Pediatrics 2004, 113:259–266.

**autism.** Decisions were made regarding which findings to report after the data were collected, and I believe that the final study protocol was not followed.[131]

380.    In other words, the CDC covered up the fact that MMR vaccines could cause autism in African-American boys who were vaccinated before 24 and 36 months of age as compared to those vaccinated later. As noted above, the Mawson I study reported in 2017 corroborated the original finding of Verstraeten in 1999 and the admission of William Thompson that autism rates were higher in vaccinated African-American boys.

381.    In 2020 California had an autism rate much higher than many other states:[132]



Percent of 8-year-old children identified with ASD by ADDM Network Sites

---

[131] Statement Of William W. Thompson, Ph.D., Regarding The 2004 Article Examining The Possibility Of A Relationship Between MMR Vaccine And Autism. Emphasis Added. https://morganverkamp.com/statement-of-william-w-thompson-ph-d-regarding-the-2004-article-examining-the-possibility-of-a-relationship-between-mmr-vaccine-and-autism/

[132] Key Findings from the ADDM Network. CDC. https://www.cdc.gov/ncbddd/autism/addm-community-report/key-findings.html.

382.    The incidence of Autism Spectrum Disorder among four year old children was 1.8 times as high among Hispanic children and 1.6 times as high among non-Hispanic Black children as compared to non-Hispanic white children.[133]

383.    Profound autism has been defined as a child who is either non-verbal, minimally verbal (jargon or echolalia only), or IQ less 50.[134] This is a very high needs population that strains parental, family, and community support resources, with mothers particularly impacted. The percentage of 8-year-old children with profound autism among all those with autism was 26.7%. (*Ibid.*) The prevalence ratio (PR) of profound autism was higher among non-Hispanic Asian/Native Hawaiian/Other Pacific Islander (PR = 1.55; 95 CI, 1.38-1.73), non-Hispanic Black (PR = 1.76; 95% CI, 1.67-1.86), and Hispanic (PR = 1.50; 95% CI, 0.88-1.26) children than among non-Hispanic White children. (*Ibid.*)

384.    The commonplace occurrence of childhood autism is a very recent phenomenon. The condition was not even known until 1943 when Kanner published a series from Johns Hopkins of the first eleven cases to ever be reported.[135] Since then the prevalence has risen exponentially, especially since 1986, as shown below:

---

[133] Early Identification of Autism Spectrum Disorder Among Children Aged 4 Years - Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, 2020, CDC, MMWR Surveill Summ. 2023 Mar 24;72(1):1-15.
doi: 10.15585/mmwr.ss7201a1. https://pubmed.ncbi.nlm.nih.gov/36952289/.

[134] The Prevalence and Characteristics of Children With Profound Autism, 15 Sites, United States, 2000-2016. CDC.
https://autismsciencefoundation.org/wp-content/uploads/2023/04/CDC-Profound-Autism-Statistics_ASF-Copy.pdf.

[135] Kanner, Leo. (1943) *Autistic Disturbances Of Affective Contact.* Nervous Child 2(3): 217-250. https://blogs.uoregon.edu/autismhistoryproject/files/2018/11/Kanner-Autistic-Disturbances-of-Affective-Contact-1943-vooiwn.pdf.

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15   385.   While there appears to be some genetic component to autism in that it is more common

16  in siblings than non-siblings, the dramatic increase in autism in the past 80 years argues strongly for

17  an environmental cause or causes.

18   386.   The most obvious environmental cause for the increase in the incidence of ASD is that

19  the number of immunizations recommended by the CDC for children by age 4 has also risen

20  dramatically (more than seven-fold), especially since 1986, over the same time span during which

21  autism has risen dramatically:[136]

22

23

24

25

26

27

28

---

[136] 1950: 7 immunizations, 1974: 13 immunizations, 1986: 24 immunizations, 2013: 33 immunizations, 2023: 51 immunizations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    **6.9    The CDC's Predecessor, The U.S. Public Health Service, Did The Same Thing To African-American Men In The Infamous Tuskegee Study When It Concealed And**
18    **Withheld Treatment From Them**

19        387.    This whole sordid mercury and MMR scandals and coverups are, of course, exactly

20    what happened in the infamous 1932 Tuskegee syphilis study conducted by the CDC's predecessor,

21    the U.S. Public Health Service, in which its African-American subjects were never told that there was

22    treatment for their infections.[137] That study involved 399 men with syphilis who were never told that,

23    beginning in 1942, that their syphilis was treatable with penicillin. (*Id.*) This fact was only discovered

24    in 1972. (*Id.*) A federal class action lawsuit was commenced in 1973 under 42 U.S.C. §§ 1981, 1983,

25    1985, and 1986 and under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et. seq.* wherein which the

26    federal government lost its summary judgment motion that the claims were time-barred and then

27
28

---

[137] "The U.S. Public Health Service Untreated Syphilis Study at Tuskegee." Centers For Disease Control. https://www.cdc.gov/tuskegee/timeline.htm

1   settled the case.[138]

2   388.   In the Tuskegee Syphilis case there were only 399 African-American men with syphilis

3   involved. By contrast, the fraud in the childhood vaccine administration here, just as to the African-

4   American boys harmed by the CDC coverup of the Verstraeten findings hatched at the Simpsonwood

5   conference, is certainly in the hundreds of thousands. Since there are now about 3.6 million infants

6   born each year in the U.S. alone, with one in thirty six now diagnosed with autism, if the findings of

7   Mawson and others are validated as to non-African-American boys, the numbers of vaccine-related

8   autism cases alone are in the millions, truly staggering numbers.

9   389.   The arrogance and insensitivity of the CDC are exemplified by the astonishing fact that

10  the word "Tuskegee" was never mentioned at all during the CDC's two day Simpsonwood conference,

11  convened to find a way to make the autism findings in African-American boys disappear.

12  **6.10   Despite The Very Close Temporal Relationship Between Infant Immunizations And Sudden Unexpected Infants Deaths, Numbering More Than Three Thousand**

13  **Healthy Infants Per Year, The CDC Stoutly Denies Any Connection**

14  390.   While autism likely accounts for the largest number of mandated vaccine-injured

15  children, especially among African-American boys, Sudden Unexpected Infant Death (SUID) likely

16  accounts for the largest number of mandated vaccine caused deaths, again much worse among African-

17  American boys.

18  391.   As discussed above (section 5.5.2), most Sudden Unexpected Infant Deaths occur in

19  close temporal proximity to infant immunizations.

20  392.   Yet the CDC maintains a webpage captioned as "Sudden Infant Death Syndrome

21  (SIDS) and Vaccines" that contains the statement that, "...studies have found that vaccines do not

22  cause and are not linked to SIDS."[139] That webpage contains the statement that, "...studies have found

23  that vaccines do not cause and are not linked to SIDS." That unambiguous claim is then followed by

24  a weaker claim that:

25      Multiple research studies and safety reviews have looked at possible links between vaccines

26      and SIDS. The evidence accumulated over many years do not show any links between childhood immunization and SIDS.

27  _____

28      [138] *Pollard v. United States* (1974) 384 F. Supp. 304.

    [139] Sudden Infant Death Syndrome (SIDS) and Vaccines. CDC.
    https://www.cdc.gov/vaccinesafety/concerns/sids.html.

1    (*Ibid.*)

2        393.    Again, the CDC uses the fact that its not so diligent studies have not found a causal

3    relationship between infant vaccines and SIDS to claim definitively that there is no such causal

4    relationship. This is, at best, a misrepresentation. As discussed above, it is flatly contradicted by the

5    statements of a veteran police investigator for such deaths.

6        394.    It is also contradicted by data from the CDC's Vaccine Adverse Events Reporting

7    System (VAERS) database shows that such deaths are closely related in time to infant vaccinations.

8    Specifically, among infant deaths reported to VAERS between 1990 and 2019, 16.9% were reported

9    to have occurred on the first day following an infant vaccination, 29.2% on the second such day, 12.0%

10   on the third such day, 8.2% on the fourth such day, 5.0% on the fifth such day, 3.5% on the sixth such

11   day, 3.5% on the seventh such day, and 21.7% on days 8-60.

12       **6.11    The CDC Is Unable To Identify Adverse Reactions To Its Recommended Vaccines
13            Because The FDA Does Not Require Vaccines To Be Tested Against Placebo
             Controls**

14       395.    The process by which the U.S. Food and Drug Administration (FDA) considers new

15   drugs for approval involves several phases. Typically, the first phase assesses the safety of the new

16   drug. In phase 1, some healthy volunteers get the experimental drug and others an inactive placebo

17   drug, such as the proverbial sugar pill. In this way investigators can compare the two groups to see if

18   the experimental group experiences side effects as compared to the placebo group.

19       396.    However, the FDA does not require experimental trials of vaccines to include a placebo

20   control group. Instead, the control group is given another, already approved, vaccine for comparison

21   and, if the new, experimental, vaccine does not cause any more side effects than the previous vaccine,

22   then it is deemed to be safe.

23       397.    The obvious question is, what was the first vaccine compared to? It turns out that the

24   FDA has no answer to that question for any of the vaccines it has approved. The FDA's whole

25   approval process for vaccines is built upon sand.[140]

26

27

28

---

[140] Turtles All The Way Down, Vaccine Science and Myth. Anonymous. Edited by Z. O'Toole and M. Holland. Children's Health Defense. 2022.

1  **6.12    The CDC Has A Major Financial Conflict Of Interest Regarding Its Promotion
2      Of Childhood Vaccines**

3      398.    The CDC has a large financial conflict of interest on the issue of vaccine safety since

4  about 42% of the CDC's budget comes from the vaccines that it promotes and provides under the

5  Vaccine For Children program.[141] It would appear that almost half of people at the CDC, from the top

6  on down, would be out of a job if that program ever went away.

7  **6.13    The Outside Academic Experts Who Typically Appear As Expert Witnesses In
8      Support Of Childhood Immunization Programs Are Financially Conflicted
      Because They And Their Institutions Get Most Of Their Funds From Defendant
      The Department Of Health And Human Services (DHHS) And Its Subdivisions,
9      Including Defendant The CDC And The National Institutes Of Health NIH)**

10     399.    The outside academic experts who typically appear as expert witnesses in vaccine case

11  in support of childhood immunization programs are invariably financially conflicted because they and

12  their academic institutions invariably get most of their funding from defendant the federal Department

13  of Health and Human Services (DHHS), including its subdivisions such as the National Institutes of

14  Health (NIH), the Centers For Medicare and Medicaid Services (CMS), the CDC, and/or the FDA.

15     400.    Thus, these academic experts who are so funded must be considered to be government

16  witnesses and not independent experts.

17  **7.    THE    CDC'S    SUPPRESSION    OF    DISFAVORED    OPINIONS    AS
18      "MISINFORMATION" ON SOCIAL MEDIA FURTHER UNDERMINES    ITS
      CREDIBILITY ON THE SAFETY OF ITS RECOMMENDED VACCINES**

19     **7.1    Post-COVID, The Public No Longer Trusts The CDC Or Its Vaccines**

20     401.    Trust in the CDC has plummeted since the COVID vaccine debacle with its conflicting

21  advice on face masks, social distancing, and as the proliferation of boosters it recommends is

22  approaching double digits, even for infants. Public trust in the CDC plummeted from 69% in April of

23  2020 to 44% in January of 2022.[142]

24     402.    Another indicator that the public no longer trusts the CDC's immunization programs

25

26
_____

27     [141] Centers for Disease Control and Prevention (CDC) Funding Overview. Updated July 16, 2024.
    https://crsreports.congress.gov/product/pdf/R/R47207.

28     [142] NBC News, January 2022 Poll, page 17.
     https://s3.documentcloud.org/documents/21184709/220027-nbc-news-january-poll.pdf

is that only about half of Americans have either gotten the latest COVID booster or plan to.[143]

403.    Another indicator that the public no longer trusts the CDC or the safety of its immunization programs is that "[t]he latest Rasmussen Reports national telephone and online survey finds that 53% of American Adults believe it is likely that side effects of COVID-19 vaccines have caused a significant number of unexplained deaths – up from 49% a year ago – including 30% who think it's Very Likely."[144]

404.    The public also distrusts the CDC because it has a long history of concealing and denying the adverse effects of its recommended vaccines, at least as far back as its secret Simpsonwood meeting in 2000 to discuss how the conceal the adverse effects of neurotoxic mercury in many of its vaccines (see above) to its current campaign to suppress differing points of view on social media as to the safety of its recommended COVID vaccines (see next).

### 7.2    The CDC Waged A War Against Any Free Speech By The Public That Questioned The CDC's COVID Vaccines, Calling It "Misinformation"

405.    The CDC has campaigned, overtly and covertly, to suppress any voices that might be raised to question the safety of its COVID vaccines. As part of its overt campaign the CDC, on July 22, 2021, posted a webpage captioned as, "How to Address COVID-19 Vaccine Misinformation."[145] It stated that, "The spread of misinformation on social media and through other channels can affect COVID-19 vaccine confidence."

406.    The "spread of misinformation on social media" was also attacked by way of a covert campaign, directed from the White House itself, to pressure social media to suppress such dissenting voices, social media. This covert campaign later expanded to enlist the public in an Orwellian "whole

---

[143] KFF COVID-19 Vaccine Monitor. January 15, 2024.
https://www.kff.org/coronavirus-covid-19/dashboard/kff-covid-19-vaccine-monitor-dashboard/

[144] More Than Half Suspect COVID-19 Vaccines Have Caused Deaths. Rasmussen Reports, January 12, 2024.
https://www.rasmussenreports.com/public_content/politics/public_surveys/more_than_half_suspect_covid_19_vaccines_have_caused_deaths.

[145] How to Address COVID-19 Vaccine Misinformation. CDC.
https://web.archive.org/web/20210803215813/https://www.cdc.gov/vaccines/covid-19/health-departments/addressing-vaccine-misinformation.html.

of society" "moral imperative" effort to limit "the spread of health misinformation:"[146]

> I am urging all Americans to help slow the spread of health misinformation during the COVID-19 pandemic and beyond. Health misinformation is a serious threat to public health. It can cause confusion, sow mistrust, harm people's health, and undermine public health efforts. Limiting the spread of health misinformation is a moral and civic imperative that will require a whole-of-society effort.
> Vivek H. Murthy, M.D., M.B.A.
> Vice Admiral, U.S. Public Health Service
> Surgeon General of the United States

407.    The vast scope of the Surgeon General's call for a "whole of society" attack on "health misinformation" included the following chapters:

> What Individuals, Families, and Communities Can Do
> What Educators and Educational Institutions Can Do
> What Health Professionals and Health Organizations Can Do
> What Journalists and Media Organizations Can Do
> What Technology Platforms Can Do
> What Researchers and Research Institutions Can Do
> What Funders and Foundations Can Do
> What Governments Can Do

(*Id.*)

408.    This "whole of society" effort was clearly a comprehensive plan to use all the levers of government power to enlist all public and private institutions in the effort to enforce government-dictated orthodoxy on vital matters of life and death and to eliminate First Amendment rights to dissent from that government-dictated orthodoxy.

409.    The CDC's campaign against misinformation, waged in large part through social media platforms like Facebook, was not limited to COVID vaccines for adults but also targeted COVID and non-COVID vaccines for children. The Facebook guidelines page included this statement:[147]

> We remove content that repeats other false health information, primarily about vaccines, that are widely debunked by leading health organizations such as the World Health Organization (WHO) and the Centers for Disease Control and Prevention (CDC). The goal of this policy is to combat misinformation about vaccinations and diseases, which if believed directly contribute to imminent vaccine refusals. The claims we have applied this to include:
> • Vaccines cause autism
> • Ex: "Increased vaccinations are why so many kids have autism these days."
> • Vaccines cause Sudden Infant Death Syndrome

---

[146] Confronting Health MisInformation: The U.S. Surgeon General's Advisory on Building a Health Information Environment, Introduction. Vivek Murthy, Surgeon General of the United States. July 14, 2021. https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf

[147] Facebook COVID-19 and Vaccine Policy Updates & Protection. https://www.facebook.com/help/230764881494641.

1        ● Ex: "Don't you know vaccines cause SIDS?"

2        410.    These Facebook examples show that: (1) these are very common concerns for many

3   parents who, quite obviously, don't believe the CDC's denials on these issues, despite all the social

4   media propaganda that the CDC is putting out, and (2) the CDC used the "whole of society" tools to

5   suppress any dissent from it childhood vaccine orthodoxy.

6        **7.3     California Has Also Attempted To Suppress Dissenting Voices On Vaccine Safety**

7        411.    In 2022 the California Legislature heeded the Surgeon General's call to:

8        Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners to
         explore the impact of health misinformation, identify best practices to prevent and address it,
9        issue recommendations, and find common ground on difficult questions, **including
         appropriate legal and regulatory measures that address health misinformation** while
10       protecting user privacy and freedom of expression[148]

11       412.    The California legislature then passed AB 2098, which was then approved by Governor

12   Newsom and took effect January 1, 2023. It forbade California doctors from saying anything to their

13   patients that differed from CDC statements.

14       413.    Among other things, AB 2098 provided that:

15       Section 1. The Legislature finds and declares all of the following:
         (a) The global spread of the SARS-CoV-2 coronavirus, or COVID-19, has claimed the lives
16       of over 6,000,000 people worldwide, including nearly 90,000 Californians.
         (b) Data from the federal Centers for Disease Control and Prevention (CDC) shows that
17       unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than
         those who are fully vaccinated.
18       (c) The safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by
         the federal Food and Drug Administration (FDA) and the vaccines continue to undergo
19       intensive safety monitoring by the CDC.
         (d) The spread of misinformation and disinformation about COVID-19 vaccines has weakened
20       public confidence and placed lives at serious risk.
         (e) Major news outlets have reported that some of the most dangerous propagators of
21       inaccurate information regarding the COVID-19 vaccines are licensed health care
         professionals.
22       (f) The Federation of State Medical Boards has released a statement warning that physicians
         who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk
23       losing their medical license, and that physicians have a duty to provide their patients with
         accurate, science-based information.
24       (g) In House Resolution No. 74 of the 2021–22 Regular Session, the California State Assembly
         declared health misinformation to be a public health crisis, and urged the State of California
25       to commit to appropriately combating health misinformation and curbing the spread of
         falsehoods that threaten the health and safety of Californians.
26
         Section 2. Section 2270 is added to the Business and Professions Code, to read:
27

28       [148] Confronting Health MisInformation: The U.S. Surgeon General's Advisory on Building a
     Health Information Environment, p. 15. Vivek Murthy, Surgeon General of the United States. July 14,
     2021. https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf

2270. (a) It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.
(b) For purposes of this section, the following definitions shall apply:
...
(2) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.
...
(4) "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

414.     As seen in AB 2098, section 1(f), the idea of revoking the medical licenses of dissenting doctors came from the Federation of State Medical Boards (FSMB). (*Id.*) The FSMB likely got the idea for revoking the medical licenses of dissenting doctors from the U.S. Surgeon General's call for "legal and regulatory measures" to stamp out "misinformation" since footnote 5 to the FSMB statement cites to the Surgeon General's statement on "Confronting Health Misinformation."

415.     AB 2098 was enjoined by the U.S. District Court for the Eastern District of California as an infringement on First Amendment rights of expression a few weeks after it took effect on January 1, 2023. A similar case from the Central District of California seeking a similar injunction was denied and appealed to the Ninth Circuit Court of Appeals where counsel for the California Attorney General got a rather unsympathetic hearing. Shortly thereafter the legislature repealed AB 2098.

**8.     CALIFORNIA MAKES NO EFFORT TO NARROWLY TAILOR ITS IMMUNIZATION MANDATES FOR THE UNAVOIDABLY UNSAFE VACCINES TO THE NEEDS AND VULNERABILITIES OF EACH CHILD BASED ON KNOWN FACTORS SUCH AS AGE, SEX, RACE, OR HISTORY OF PREVIOUS INFECTION SO AS TO ACHIEVE A COMPELLING STATE INTEREST**

416.     California Health and Safety Code Section 120335(b) is not narrowly tailored because it mandates ten different immunizations for essentially all California schoolchildren, regardless of the harms certain to befall some of them. It makes no effort to determine which immunizations are appropriate for each child based upon age, sex, or race. They must all comply, even children who already have natural immunity to the communicable diseases covered by those immunizations and pose no risk to others, even some children who have already been injured by mandated immunizations.

417.     Even if the mandated immunizations would prevent spread of the listed infectious diseases, there is little or no data to show that the Legislature narrowly tailored those mandates to assure that the prevention of the listed infectious diseases was not achieved at the expense to a minority of children of serious, long term adverse events, such as autism, attention deficit hyperactivity

disorder (ADHD), neuro-development disorder (NDD), asthma, type 1 diabetes, Crohn's disease, eczema, and others.

418.    Universal mandates are the antithesis of narrow tailoring. Each precludes the other. Thus, no universal vaccine mandate can pass strict scrutiny review.

**9.    THIS IS ALSO A REQUEST FOR INJUNCTIVE RELIEF TO REQUIRE CALIFORNIA SCHOOLS TO ALL ALLOW DISABLED STUDENTS WITH INDIVIDUALIZED EDUCATION PROGRAMS (IEP'S), SUCH AS D.C., TO ATTEND SCHOOL REGARDLESS OF THEIR IMMUNIZATION STATUS, AS REQUIRED UNDER BOTH FEDERAL AND STATE LAW**

**9.1    The IDEA Act Provides Federal Funds To California For Special Education Programs That Must Provide Qualified Children With A Free Appropriate Public Education (FAPE), To Include *Both* Special Education Services *And* Mainstream Classroom Teaching Whenever Appropriate**

419.    Under the Individuals With Disabilities Education Act (IDEA)(20 U.S.C. § 1400 *et. seq.*), states are given federal money to assist in educating children with disabilities.[149]

420.    "In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education—a FAPE, for short—to all eligible children." *Id.*

421.    To be eligible for these federal benefits, a child must be determined to have a "disability" as defined under 20 U.S.C. § 1401(3):

(3) Child with a disability
(A) In general, [t]he term "child with a disability" means a child--
(i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and
(ii) who, by reason thereof, needs special education and related services.
(B) Child aged 3 through 9
The term "child with a disability" for a child aged 3 through 9 (or any subset of that age range, including ages 3 through 5), may, at the discretion of the State and the local educational agency, include a child--
(i) experiencing developmental delays, as defined by the State and as measured by appropriate diagnostic instruments and procedures, in 1 or more of the following areas: physical development; cognitive development; communication development; social or emotional development; or adaptive development; and
(ii) who, by reason thereof, needs special education and related services.

422.    From this it is clear that the child's immunization status is not relevant to the determination of the child's "disability." If a child qualifies as a "child with a disability," then the

---

[149] *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 993 (2017).

1  school district develops an Individualized Education Program (IEP) specific to the educational needs

2  of that child.

3      423.    Under 20 U.S.C. § 1401(9):

4  The term "free appropriate public education" means special education and related services
   that--

5  ...
   (C) include an appropriate preschool, elementary school, or secondary school education in the

6  State involved...

7      424.    Thus, a "free appropriate public education" includes, not only the special education

8  services, but also "related services" to include "an appropriate preschool, elementary school, or

9  secondary school education," *i.e.,* all the other regular classroom and other learning activities that

10 comprise an "appropriate" educational experience for that student., not just the "special education

11 services ."

12     425.    A child's IEP, the specification of the child's FAPE, is comprised, not only of "special

13 education services" but also "related services" such that the IEP encompasses the totality of the child's

14 educational program, not just the "special education services" component.

15     426.    The above report of the California Legislative Analyst's Office on special education

16 in California supports this conclusion:

17 **Districts Must Serve Students With Disabilities in the Least Restrictive Environment.**
   Federal law generally requires districts to serve students with disabilities in whichever

18 educationally appropriate setting offers the most opportunity to interact with peers who do not
   have disabilities. For students with relatively mild disabilities, this typically means receiving

19 instruction in mainstream classrooms. For students with relatively severe disabilities, this may
   mean receiving most of their instruction in special day classrooms (which exclusively serve

20 students with disabilities) but participating in lunch or recess alongside students who do not
   have disabilities. As with all elements of a child's IEP, the least restrictive environment must

21 be determined collaboratively by each student's parents, teachers, and district administrators.[150]

22     427.    When there is a dispute about or denial of IEP services to a disabled child, the child is

23 entitled to extensive procedural protections under the IDEA, under 20 U.S.C. § 1415, including notice

24 from the school, mediation, an administrative hearing, and then resort to the federal courts, with the

25 child entitled to remain at the child's previous level of service until the conclusion of that process.

26

27

28

---

[150] California Legislative Analyst's Office, Overview of Special Education in California, November 6, 2019, at p. 6. https://lao.ca.gov/Publications/Report/4110#Students_With_Disabilities.

**9.2     All California Students With IEP's Are Legally Exempt From The Immunizations Required Under Health and Safety Code Section 120335**

428.     California Health and Safety Code Section 120335, subsection (h) exempts school children attending school under IEP's from California's childhood immunization mandates:

(h) This section does not prohibit a pupil who qualifies for an individualized education program, pursuant to federal law and Section 56026 of the Education Code, from accessing any special education and related services required by his or her individualized education program.

Some California schools read this exemption narrowly to allow the disabled child to continue the child's special education activites but to exclude the child's attendance in regular classroom activities.

**9.3     As Shown By Their Web Pages, The Policy Of The California Department Of Public Health And The Schools Under Its Jurisdiction Is To Require All Children, Including Those With IEP's Under The IDEA, To Comply With Its Immunization Mandates**

429.     The website of the California Department of Public Health has a page captioned as "REQUIRED IMMUNIZATIONS FOR SCHOOL ENTRY."[151] While it lists a number of immunizations required to attend school in California, it makes no mention that IEP students are legally exempt from those requirements. The Department of Public Health also has a web page captioned as, "Exemption FAQs." While it lists procedures for medical exemptions, there is no mention that IEP students are legally exempt from these requirements.

430.     The California Department of Education also has a web page captioned as "Immunization Requirements."[152] It states that children who are home schooling or in independent study are excused from those requirements but says nothing about the IEP students.

431.     According to the California Department of Education,[153] the five largest public school districts in the State of California are: (a) Los Angeles Unified (529,902 students), (b) San Diego

---

[151] California Department of Public Health: "REQUIRED IMMUNIZATIONS FOR SCHOOL ENTRY" under a header reading, "Parents/Guardians - Are Your Kids Ready For School?" https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Immunization/IMM-222_School.pdf.

[152] California Department of Education, Immunization Requirements. https://www.cde.ca.gov/ls/he/hn/immunization.asp.

[153] California Department of Education, Largest & Smallest Public School Districts. https://www.cde.ca.gov/ds/ad/ceflargesmalldist.asp.

1    Unified (114,315 students), (c) Fresno Unified (71,480 students), (d) Long Beach Unified (64,267

2    students), and (e) Elk Grove Unified (63,518 students).

3         432.    The estimated numbers of students in these school districts enrolled in IEP's, and

4    therefore legally exempt from California's mandated school immunizations would be: (a) Los Angeles

5    Unified, 68,887 IEP students, (b) San Diego Unified, 14,861 IEP students, (c) Fresno Unified, 9,292

6    IEP students, (d) Long Beach Unified, 8,355 IEP students, and (e) Elk Grove Unified, 8,257 IEP

7    students.

8         433.    California's largest school district, the Los Angeles Unified School District, has a web

9    page captioned as "Parent's Guide To Immunization Requirements."[154] On that web page is an image

10   captioned as "Shots For School" with the sub-caption, "Does your child need vaccines?" That image

11   is hyperlinked to a web page of the Defendant California Department of Pubic Health, Immunization

12   Branch[155] containing a section "Shots For School" with subsections for, *inter alia,* "TK-12th Grade."

13   The latter subsection links to a web page of the Immunization Branch captioned as "Shots Required

14   for TK-12 and 7th Grade.[156] That web page appears below:

15

16

17

18

19

20

21

22

23

24
_____

25   [154] Los Angeles School District, "Parent's Guide To Immunization Requirements."
     https://www.lausd.org/Page/12621#spn-content.
26
     [155] California Department of Public Health, Immunization Branch, Shots For School.
27   https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/School/shotsforschool.aspx

28   [156] California Department of Public Health, Immunization Branch, Shots Required for TK-12 and
     7th Grade.
      https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/School/tk-12-immunizations.aspx

**IMMUNIZATION BRANCH**

# Shots Required for TK–12 and 7th Grade



**En Español**

### Students Admitted at TK/K–12 Need Records of:

- **Diphtheria, Tetanus, and Pertussis (DTaP, DTP, Tdap, or Td) — 5 doses**
  (4 doses OK if one was given on or after 4th birthday. 3 doses OK if one was given on or after 7th birthday.)
  For 7th–12th graders, at least 1 dose of pertussis-containing vaccine is required on or after 7th birthday.

- **Polio (OPV or IPV) — 4 doses**
  (3 doses OK if one was given on or after 4th birthday)

- **Hepatitis B — 3 doses**
  (Required at admission to any grade except 7th grade)

- **Measles, Mumps, and Rubella (MMR) — 2 doses**
  (Both given on or after 1st birthday)
- **Varicella (Chickenpox)** — 2 doses

The TK/K–12 immunization requirements apply to new admissions and transfers for all grades, including 7th grade, and students whose exemptions are no longer valid.

### Students Advancing to 7th Grade Need Records of:

- **Tetanus, Diphtheria, Pertussis (Tdap) —1 dose**
  (Whooping cough booster usually given at 11 years and up)

- **Varicella (Chickenpox) — 2 doses**
  (Usually given at ages 12 months and 4-6 years)

California schools are required to check immunization records for all new student admissions at transitional kindergarten (TK)/Kindergarten through 12th grade and all students advancing to 7th grade before entry. Parents must show their child's Immunization Record as proof of immunization.

### Resources

- Parents' Guide to Required Immunizations and Other Resources
- How Well-Vaccinated Is Your School?

Page Last Updated : February 13, 2024

434.     As can be seen, while the parents are told that all school children must have all required immunizations, nowhere does the Los Angeles Unified School District tell the parents of IEP students that their children are legally exempt from these immunization requirements under both federal and

state law.

435.    California's second largest school district, the San Diego Unified School District, has a web pagte captioned as "Immunization Requirements."[157] That web page states that:

> California Health Laws require that all students under age 18 years, pre-kindergarten through grade 12, be immunized against certain diseases unless they are exempt for medical reasons.

436.    That page has a subsection captioned as "Immunization Exemptions" That caption is hyperlinked to a web page of Defendant California Department of Public Health captioned as "Exemption FAQs."[158]    The "Exemption FAQs" heading has a subheading entitled "Medical Exemptions," which has subheadings for "Resources," "Frequently Asked Questions," "Medical Exemptions Prior to 2021," and "Personal Beliefs Exemptions."

437.    This "Immunization Exemptions" web page of the California Department of Public Health has no information for parents or schools about the availability of "Legal Exemptions" from California's immunization requirements for students enrolled in Individual Educational Plans (IEP's) under either the federal IDEA act or California Health and Safety Code Section 120335, subsection (h).

438.    Thus, while the parents are told that all school children must have all required immunizations, nowhere does the San Diego Unified School District tell the parents of IEP students told that their children are legally exempt from these immunization requirements under both federal and state law.

439.    California's third largest public school district, the Fresno Unified School District, has a web page captioned as "Back-To-School-Resources" which contains a subheading captioned as "Immunizations."[159] The "Immunizations" caption is linked to a web page captioned as "Free

---

[157] San Diego Unified School District, Immunization Requirements. https://www.sandiegounified.org/departments/nursing_and_wellness_program/immunization_requirements.

[158] California Department of Public Health, Immunization Branch, Exemption FAQs. https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/School/laws-exemptions.aspx.

[159] Fresno Unified School District, Back-To-School Resources." https://www.fresnounified.org/community/back-to-school.

1  Immunizations Clinics Available."[160] That web page simply states that, "All students entering school
2  must meet state immunization requirements. Students entering kindergarten and seventh grade must
3  provide proof of updated immunizations." There is no mention of any kind of exemption from those
4  "state immunization requirements."

5     440. Thus, while the parents are told that all school children must have all required
6  immunizations, nowhere does the Fresno Unified School District tell the parents of IEP students told
7  that their children are legally exempt from these immunization requirements under both federal and
8  state law.

9     441. California's fourth largest public school district, the Long Beach Unified School
10  District, has a web page captioned as "Back to School."[161] That web page links to a booklet entitled,
11  "Guidelines for Families and Students.[162] Pages 13-14 of that booklet appears to be a reprint from the
12  Defendant California Department of Public Health captioned as "California Immunization
13  Requirement for K-12th Grade. Nowhere does the Long Beach Unified School District or Defendant
14  California Department of Public Health tell the parents of IEP students that their children are legally
15  exempt from these immunization requirements under both federal and state law.

16     442. California's fifth largest school district, the Elk Grove Unified School District, has a
17  web page captioned as "Health and Nursing Services."[163] That web page has a subsection captioned
18  as "Immunization Requirements." That caption is hyperlinked to the same California Department of
19  Public Health page as used by the Long Beach Unified School District in the preceding paragraph.[164]

20

21    [160] Fresno Unified School District, Free Immunizations Clinics Available.
22  https://www.fresnounified.org/community/back-to-school/immunizations.

23    [161] Long Beach Unified School District, Back to School.
  https://www.lbschools.net/about/back-to-school

24    [162] Long Beach Unified School District, Guidelines for Parents and Students.
25  https://resources.finalsite.net/images/v1723132538/lbusdk12caus/pg4ctfdgtyrdjrnnfy05/Guidelines-EN.pdf.

26    [163] Elk Grove Unified School District, Health and Nursing Services.
27  https://www.egusd.net/Departments/Health-and-Nursing-Services/index.html.

28    [164] Elk Grove Unified School District, Parent's Guide To Immunizations Required For School
Entry.

1    443.    Nowhere does the Elk Grove Unified School District or Defendant California

2  Department of Public Health tell the parents of IEP students that their children are legally exempt from

3  these immunization requirements under both federal and state law.

4    444.    The fact that all the California school districts defer to Defendant California

5  Department of Public Health as to their requirements for immunization follows from Health and Safety

6  Code Section 120330:

7         The department, in consultation with the Department of Education, shall adopt and enforce all
         regulations necessary to carry out Chapter 1 (commencing with Section 120325, but excluding
8         Section 120380) and to carry out Sections 120400, 120405, 120410, and 120415.

9    445.    Thus, the 800,000 IEP students in California are falsely told by most, if not all, of their

10  schools, at the direction of Defendant California Department of Public Health, that they must comply

11  with California's immunization requirements when they are legally exempt from those requirements.

12    446.    On information and belief, many, if not most, California school districts are forcing

13  children with IEP plans to comply with California's school immunization mandates by either: (1)

14  falsely telling parents that those students must comply without informing them of their rights under

15  the IDEA act and Health and Safety Code Section 120335(h) or, (2) when some parents assert their

16  rights under the IDEA act and Health and Safety Code Section 120335(h), the school then tells the

17  parent that the child will only be allowed to attend the child's special education activities and nothing

18  more, such as the child's mainstream classroom and extracurricular activities to which they are entitled

19  under the federal IDEA act.

20    447.    Defendant California Department of Public Health is ultimately responsible for this

21  abuse of the rights of disabled students to access their federally mandated FAPE's because it has

22  falsely told the schools that they must immunize every student without informing those schools of the

23  child's rights under the federal IDEA act and California Health and Safety Code Section 120335(h).

24    448.    African-American and other ethnic minorities are disproportionately affected by the

25  falsehoods. According to California's Legislative Analyst, California's IEP students "are

26  disproportionately African American, with African American students representing 6 percent of the

27

28  https://www.egusd.net/documents/Departments/Health-and-Nursing-Services/Immunization-Require
    ments-2019-2020.pdf.

overall student population but 9 percent of students with disabilities."[165] As noted above, African-American children are more susceptible to vaccine injuries, especially learning disabilities such as autism, attention-deficit disorder, and neuro-developmental delay.

449.   Neither the California Department of Public Health nor the CDC have data to show that any of California's required immunizations are safe for African-American children with learning disabilities.

450.   This Court should enjoin Defendant California Department of Public Health from enforcing the requirements of Health and Safety Code Section 120325 *et seq.* as to any students until all the parents of California IEP students have been fully and specially noticed of their child's rights under the IDEA act and Health and Safety Code Section 120335(h) to be legally exempt from those requirements.

**9.4   B.P., Mother Of D.C., Who Has An IEP Plan, Was Told By The Gilroy Unified School District That Her Child Could Not Attend Classes There Unless He Complied With California's School Immunization Requirements**

451.   D.C. is a twelve year old who, at two years of age, had normal verbal development for that age, *i.e.,* identifiable words in short sentences.

452.   At age two years and three months he was given several vaccines at the same time and then had an adverse reaction. The arm that had been injected became very hot and swollen and he had a high fever. Within a day or two after that immunization his speech was no longer intelligible. It was "gibberish" according to his mother, B.P.. He also became less emotionally attached to her. His speech remained unintelligible until about age four when he slowly improved. He has always been in special education classes for his speech delay since kindergarten, which his mother attributes to his adverse vaccine reaction. He had to repeat first grade. According to his most recent IEP evaluation in 2023, his overall IQ is low normal at 86 but his verbal comprehension score was below that of most other children at 76.

453.   D.C. has attended school in the Gilroy Union School District for the past several years and has received special education services under a formal IEP program through that school district.

---

[165] California Legislative Analyst's Office, Overview of Special Education in California, November 6, 2019, at p. 1. https://lao.ca.gov/Publications/Report/4110#Students_With_Disabilities.

454.     This year, on June 6, B.P. was informed by an email sent by Defendant Gilroy Unified School District that her child would need further immunizations before he could enroll for the 2024-2025 school year:

> Hello, If you are receiving this notification, our school records show that your child has not provided proof of their Tdap vaccination and does not currently meet the requirements of the California School Immunization Law, Health and Safety Code Sections 120325-120375 and/or County Immunization Requirements for 7th grade. Most likely your child has already received this vaccination, but we are in need of documented proof. We are asking that you provide this documentation by June 7, 2024 so that we may update your child's records. According to state law, we will not beable to allow your child to attend the 2024-2025 school year unless we receive evidence that all requirements are met. Your student will NOT receive their 7th grade schedule until immunization requirements are met. You may contact the school if you need more information. School Phone #: 669-205-5200 Proof of missing immunizations maybe dropped off at the school or emailed to the School Health Clerk and School Nurse @flora.morales-diego@gilroyunified.org
> ronda.boykin@gilroyunified.org.

455.     On June 15, 2024 counsel for B.P. sent a demand letter to Anisha Munshi, Superintendent, Gilroy Unified School District, demanding that D.C. be allowed to enroll for classes in the Gilroy Unified School District for the 2024-2025 school year despite his failure to comply with the requirement for the Tdap immunization under Health and Safety Code Section 120335 because he, as a student with an IEP, was legally exempt from that requirement under Health and Safety Code Section 120335(h) and under federal law. No response to that demand letter was ever received.

456.     On July 23, 2024 B.P. submitted a complaint to the Office of Civil Rights of the U.S. Department of Education alleging that her child, D.C., was being denied his educational benefits due to his disability. B.P. has had no response to this complaint to this date.

457.     A student with an IEP plan who is denied an FAPE is entitled to an extensive set of notice and procedural protections under 20 U.S.C. § 1415, none of which have been provided in this case.

458.     Within the last few days, the school nurse at the school D.C. normally attends relented and told the child's mother that he could start school after all.

459.     However, the Parent and Student Information Handbook posted on the website of Defendant Gilroy Unified School District continues to require of all students all the immunizations required under California Health and Safety Code Section 120335 with no exception for IEP

1  students.[166]

2  460.    Thus, it is not yet clear that Defendant will not change its mind again and reimpose its

3  stated immunization requirement upon him.

4  **10.    THIS IS ALSO A REQUEST FOR INJUNCTIVE RELIEF, UNDER THE FIRST AMENDMENT, TO ENJOIN DEFENDANT THE MEDICAL BOARD OF CALIFORNIA, FROM MAINTAINING ITS REVOCATION OF THE MEDICAL LICENSE OF DR. DOUGLAS V. HULSTEDT IN RETALIATION FOR SPEECH THAT DID NOT COMPORT WITH CALIFORNIA'S GUIDELINES ON THE SUBJECT OF CHILDHOOD IMMUNIZATIONS**

5

6

7

8  **10.1    The Rights Of Physicians To Speak Candidly With Patients And Patients' Rights To Hear Their Physician's Candid Opinions**

9  461.    The rights to free speech and freedom of association in the First Amendment have been

10  incorporated to and made enforceable against the states through the Fourteenth Amendment guarantee

11  of Due Process. *NAACP v. Alabama*, 357 U.S. 449 (1958); *Gitlow v. New York*, 268 U.S. 652 (1925).

12  462.    42 U.S.C. § 1983 provides a cause of action against any person who, under color of law

13  of any state, subjects any person within the jurisdiction of the United States to a deprivation of any

14  rights, privileges, or immunities secured by the Constitution.

15  463.    The First Amendment to the Constitution of the United States provides that:

16  Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

17

18  463.    The fact that some doctors' views are at odds with the official views of government

19  health authorities does not undermine the right of doctors to express them; instead "minority views are

20  treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wis. Sys. v.*

21  *Southworth*, 529 U.S. 217, 235 (2000).

22  464.    The fact that doctors belong to a regulated profession does not undermine their right

23  to speak their views. As the Supreme Court recently held, "[s]peech is not unprotected merely because

24  it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361,

25  2371–72 (2018). "To the contrary, professional speech may be entitled to 'the strongest protection our

26

27  ─────────────────────
[166] Gilroy Unified School District, Parent and Student Information Handbook, Health/ Immunizations required for school attendance..., at p. 28.

28  https://resources.finalsite.net/images/v1694623538/gusdk12caus/qtqccn6jqgm5paqaopw4/2023-24_ Student_Handbook_Gilroy_Unified_School_District_updated091323.pdf.

1 Constitution has to offer.'" *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (quoting *Florida Bar*

2 *v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)).

3     465.    The First Amendment not only protects the physician's right to speak, but, even more

4 importantly, the rights, indeed, the necessity, of patients to hear frankly whatever the physician may

5 have to say. *Kleindienst v. Mandel* 408 U.S. 753, 762-3 (1972)("It is now well established that the

6 Constitution protects the right to receive information and ideas,") *Virginia State Board of Pharmacy*

7 *v. Virginia Citizens Consumer Council, Inc,* 425 U.S. 748, 770 (Virginia consumers of pharmacy

8 products entitled to hear the prices of those products from state-regulated pharmacists.)

9     466.    In *Nat'l Inst. of Fam. & Life Advocs*, the Supreme Court discussed the particular

10 dangers of state regulation of physician speech to their patients:

11     "The dangers associated with content-based regulations of speech are also present in the
12 context of professional speech. As with other kinds of speech, regulating the content of
professionals' speech "pose[s] the inherent risk that the Government seeks not to advance a
legitimate regulatory goal, but to suppress unpopular ideas or information." Turner
13 Broadcasting, 512 U.S., at 641, 114 S.Ct. 2445. Take medicine, for example. "Doctors help
patients make deeply personal decisions, and their candor is crucial." Wollschlaeger v.
14 Governor of Florida, 848 F.3d 1293, 1328 (C.A.11 2017) (en banc) (W. Pryor, J. concurring).
Throughout history, governments have "manipulat[ed] the content of doctor-patient discourse"
15 to increase state power and suppress minorities:

16     "For example, during the Cultural Revolution, Chinese physicians were dispatched to the
countryside to convince peasants to use contraception. In the 1930s, the Soviet government
17 expedited completion of a construction project on the Siberian railroad by ordering doctors to
both reject requests for medical leave from work and conceal this government order from their
18 patients. In Nazi Germany, the Third Reich systematically violated the separation between state
ideology and medical discourse. German physicians were taught that they owed a higher duty
19 to the 'health of the Volk' than to the health of individual patients. Recently, Nicolae
Ceausescu's strategy to increase the Romanian birth rate included prohibitions against giving
20 advice to patients about the use of birth control devices and disseminating information about
the use of condoms as a means of preventing the transmission of AIDS." Berg, *Toward a First*
21 *Amendment Theory of Doctor–Patient Discourse and the Right To Receive Unbiased Medical*
*Advice*, 74 B.U.L. Rev. 201, 201–202 (1994) (footnotes omitted).
22
Further, when the government polices the content of professional speech, it can fail to "
23 'preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.' "
*McCullen v. Coakley*, 573 U.S. ——, —— – ——, 134 S.Ct. 2518 2529, 189 L.Ed.2d 502
24 (2014). Professionals might have a host of good-faith disagreements, 'both with each other and
with the government, on many topics in their respective fields.'"
25
*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374-2375 (2018).
26
27     467.    The need for unfettered speech is nowhere more important than in the sensitive

28 discussions of physicians with patients as to treatment options, the informed consent process, and the

rights of patients to hear all reasonable options, and to know who is speaking to them on those matters.

1    A patient only allowed to hear one side of an issue is not fully informed.

2        468.    The law in California is that patients are entitled to hear all reasonable opinions and

3    options in the informed consent process, with the determination of the standard of care as to that

4    informed consent process left, not to the Medical Board of California, but to a lay trier of fact.[167]

5        469.    The State of California has a history of abusing physician-patient communication about

6    controversial issues in medicine, most recently with the passage of AB 2098 in 2022.

7        470.    AB 2098 threatened to revoke the medical licenses of any physicians who dared to

8    spread whatever the Medical Board deemed to be "misinformation" about the COVID-19 infection,

9    especially its treatment with remedies not favored by the State, such as the inexpensive generic drugs,

10   ivermectin and hydroxychloroquine; apparently because the effectiveness of those drugs led patients

11   to question their need for the state recommended COVID vaccine, *i.e.,* "vaccine hesitancy."

12       471.    AB 2098, the COVID-19 gag law, was immediately challenged by two lawsuits, the

13   first brought in the Central District of California by Drs. McDonald and Barke, and the second brought

14   in the Eastern District of California by Dr. Hoang. Motions for preliminary injunctions were filed in

15   each. The McDonald motion for a preliminary injunction was denied; the Hoang motion was granted.

16       472.    The denial of the McDonald motion for preliminary injunction was appealed to the

17   Ninth Circuit. The case was argued and submitted on July 17, 2023.

18       473.    The video recording of the oral argument[168] suggests that the argument did not go well

19   for the State, a conclusion supported by the fact that the California Legislature then enacted SB 815

20   on September 30, 2023, which fully repealed SB 2098. The Ninth Circuit then filed an opinion on

21   February 29, 2024 finding the case to be moot and remanded it to the district court, which dismissed

22   the case as moot on March 26, 2024.

23       474.    Importantly for this case, even though the California Legislature repealed AB 2098, the

24   bill's sponsor, Assemblyman Evan Low, maintained that the Medical Board of California retained the

25   power to closely regulate physician speech:

26   _____

27       [167] *Cobbs v. Grant*, 8 Cal.3d 229 (standard of care for informed consent is determined by the layperson, not the Medical Board.)

28       [168] https://youtu.be/lShpRZ2KxbA

...with this update, the Medical Board of California will continue to maintain the authority to hold medical licensees accountable for deviating from the standard of care and misinforming their patients about COVID-19 treatments."[169]

**10.2    The Medical Board Of California Revoked Dr. Hulstedt's Medical License, Not For His *Conduct*, But In Retaliation For His *Speech*, Refusing To Parrot The Stance Of The CDC, The American Academy Of Pediatrics, And The Medical Board On Childhood Vaccines**

475.    On February 27, 2023 Defendant the Medical Board of California revoked the medical license of Plaintiff Dr. Douglas V. Hulstedt, M.D., a pediatrician.[170]

476.    The medical case that led to this action involved a child whose parents did not agree as to immunizations for the child, the mother in favor and the father opposed.

477.    The Medical Board's purported reason for that revocation was that Dr. Hulstedt had "committed extreme departures from the medical standard of care by giving advice and issuing statements exempting a child (Patient 1) on medical grounds from all vaccination"[171] that occurred in 2015 and 2017.

478.    What made this "advice" and "statements" an "extreme departure" from the "standard of care" for physicians was that they did not comport with the views of the financially conflicted CDC, the financially conflicted American Academy of Pediatrics (AAP), or those of the Board's expert witness, Dr. Lehman, a professor from the UCLA School of Medicine who specializes in pediatric infectious diseases. *Id.,* at pp. 5-8.

479.    Specifically, Dr. Lehman testified:

...that the standard of care in California for pediatricians is to follow the AAP and CDC guidelines with respect to vaccination. A pediatrician should recommend and administer vaccines to children in accordance with the guidelines, modifying the guidelines' vaccination schedules only for patients as to whom the pediatrician diagnoses and documents vaccine contraindications that also conform to the guidelines.

480.    While Dr. Hulstedt's "advice" and "statements" occurred in 2015 and 2017, the complaint filed against him with the medical board by the child's mother was not made until 2021, at

---

[169] Controversial law punishing doctors who spread COVID misinformation on track to be undone. *Los Angeles Times*, September 11, 2023.

[170] Statement of Decision, In the Matter of the Accusation Against: Douglas V. Hulstedt, M.D., Case No. 800-2021-079497, January 18, 2023.

[171] *Id.,* at § 5.

around the time that the mother went to family court to get a court order for the immunization of the child. In that family court proceeding Dr. Hulstedt "provided a declaration to the family court supporting Patient 1's father's wish that Patient 1 receive no further vaccinations. Respondent's [Dr. Hulstedt's] declaration emphasized his medical credentials and long experience as a pediatrician. He explained his beliefs that vaccination already had harmed Patient 1 and that further vaccination would be medically risky, [footnote 3]"[172]

481.    Footnote 3 to the Medical Board's Statement of Decision then states that:

Based on Patient 1's mother's complaint to the Board, complainant alleges that the family court ordered that Patient 1's mother could arrange vaccinations for Patient 1. Complainant alleges further that Patient 1's father reacted to this order by killing both Patient 1 and himself. No non-hearsay evidence addressed these allegations.[173]

482.    The Medical Board's Statement of Decision does not state the date of the Family Court hearing or its Order nor the date upon which the mother filed her complaint with the Medical Board but all appear to date from 2021. Thus, from this record it would be reasonable to conclude that the mother's complaint was less likely related to Dr. Hulstedt's actions years earlier in 2015 and 2017 but to his refusal to change his opinion before the Family Court as to the advisability of immunization of the child.

483.    The temporal association of the mother's complaint with Dr. Hulstedt's declaration in the Family Court proceeding in 2021 suggests that the complaint was retaliation for that declaration or litigation tactics rather than being related to the earlier conduct in 2015 and 2017.

484.    The Medical Board then filed its complaint against Dr. Hulstedt on July 27, 2022, purportedly based on Dr. Hulstedt's alleged conduct years earlier in 2015 and 2017.

485.    On January 1, 2021 California SB 1371 became effective. Among other provisions, SB 1371 created a whole new system for the creation of medical exemptions to the immunization requirements set forth under Health and Safety Code Section 120335. Under that new system,[174] physicians must submit any medical exemptions from those immunization requirements electronically

---

[172] *Id.,* at § 12.

[173] *Id.,* at footnote 3.

[174] Health and Safety Code Section 120372.

1   to a state-operated database, the California Immunization Registry (CAIR), where they are reviewed

2   for appropriateness by state reviewers. This state-reviewed and approved exemption from the CAIR

3   is the only document that California schools have been allowed to accept for this purpose since January

4   of 2021, eighteen months before the Medical Board even filed its accusation against Dr. Hulstedt..

5          486.   By the time that the Medical Board filed its accusation against Dr. Hulstedt for events

6   of 2015 and 2017, the issue of his practice of exempting patients from immunization requirements was

7   moot because schools no longer accepted his type of exemption. Thus, the purpose of the Medical

8   Board's accusation and later revocation of Dr. Hulstedt's medical license was not remedial but

9   retaliatory.

10         487.   The real reasons why the Medical Board pursued a disciplinary action against Dr.

11   Hulstedt were two-fold.

12         488.   The first was to punish him for taking the position before the Family Court that, in his

13   opinion, the child should not be immunized for the sake of his health. The inclusion of the hearsay

14   evidence in the record at footnote 3, that sometime after that hearing the father allegedly murdered the

15   child and himself, implies that the Medical Board held Dr. Hulstedt responsible for the child's death

16   on the basis of the position he took with the court.

17         489.   This is not idle speculation; it is supported by the Medical Board's own Statement of

18   Decision:

19         Finally, respondent argued that revocation of his certificate would be overly harsh, because
           even if his recommendations against vaccinating Patient 1 were unprofessional conduct they
20         caused Patient 1 no actual harm. To the contrary, and as summarized in Findings 4 through 20,
           respondent not only delayed Patient 1 's receipt of immunizations that would have protected
21         Patient 1 and his community against common childhood diseases, but also contributed to
           conflict between Patient 1 's parents. *Respondent's failure to appreciate the profound harm he*
22         *caused confirms that public safety requires the Board to revoke his medical license.*[175]

23         490.   Obviously, the "profound harm" of which this speaks was not that the child was

24   unvaccinated since, as Dr. Hulstedt correctly pointed out, no harm in terms of infections ever befell

25   the child. No, the "profound harm" of which the Medical Board speaks was the murder of the child,

26   which the Medical Board speculates was due to the conflict between the parents, which the Medical

27   Board then laid at Dr. Hulstedt's feet because he declined to change his medical opinion under

28

_____

     [175] *Id.,* at p. 14, § 12 (emphasis added).

1    pressure. Basically, the crime for which Dr. Hulstedt's medical license was revoked, years after writing

2    the years earlier immunization recommendations, was being a contributor to the murder of the child

3    based upon, as the Medical Board admits, hearsay and speculation.

4        491.    The Medical Board's decision here also makes it an "extreme departure" from the

5    medical standard of care to give any medical advice that might lead to "conflict" between the parents.

6        492.    It is easy to see how this weapon could be deployed against any physician who is

7    consulted by a parent who, for example, is opposed to, say, gender transition treatments and surgeries

8    for the parent's minor child. The American Academy of Pediatrics has a "guideline" on this too,[176] and

9    it is very highly controversial, to say the least, with many states and some European countries now

10   banning some such treatments.[177]

11       493.    Thus, it is easy to imagine that the Medical Board of California could revoke the

12   medical licenses of physicians who give advice to their patients and families that does not comport

13   with the "guidelines" of the AAP on gender care, just as it did with Dr. Hulstedt on his opposition to

14   those "guidelines" on childhood immunizations.

15       494.    This is what is so dangerous about the Medical Board's decision in this case, the

16   chilling effect that it has, not only on Dr. Hulstedt's speech to his patients, but on the speech of all

17   physicians who give advice not in accord with government-adopted "guidelines" and the rights of

18   patients and parents to hear that advice. For this reason, federal courts must review any such

19   disciplinary actions that relate to active medical/political controversies with great care to protect First

20   Amendment rights under a very strict scrutiny standard of review.

21       495.    In fact, the issue of childhood immunizations has been a very active medical/political

22   controversy since at least the time of the passage of the National Childhood Vaccine Injury Act of

23   1986 and ever since, even more active since the introduction of the controversial COVID-19 vaccines,

24   as evidenced by the passage of AB 2098 (see above). Review of the Medical Board's revocation action

---

[176] AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update. AAP News, August 4, 2023. https://aap2.silverchair-cdn.com/aap2/content_public/autogen-pdf/cms/25340/25340.pdf.

[177] A Consensus No Longer: The American Society of Plastic Surgeons becomes the first major medical association to challenge the consensus of medical groups over "gender-affirming care" for minors. City Journal, August 12, 2024. https://www.city-journal.org/article/a-consensus-no-longer.

1   in the case of Dr. Hulstedt's medical license must take cognizance of that fact.

2         496.    The chilling effect reaches much farther. When the Medical Board puts physicians at

3   risk for creating "conflict" by their advice, that could be "conflict" between just about anyone,

4   anything that makes someone even feel "uncomfortable," anything not politically correct, anything that

5   does not comport, as here, with government-adopted "guidelines," now termed "misinformation" as

6   in the AB 2098 law.

7         497.    As discussed above in Section 7.3, California and its Medical Board have tried to

8   silence other physicians who have departed from the "guidelines" on the treatment of COVID-19

9   infection by spreading "misinformation," attempts enjoined by this Court.

10        498.    As the record here shows, the real "departure from the standard of care" was Dr.

11  Hulstedt's failure to lend his voice to the effort, not to *advise* as to the advisability of immunization,

12  but to *persuade* the child's father to consent to the child's immunization:

> Patient 1 's mother conferred several times during the next few years with pediatricians at
> GetzWell Personalized Pediatrics and with Patient 1 's father about vaccinating Patient 1.
> Patient 1 underwent extensive allergy testing, including testing specifically to identify potential
> allergies to various common vaccine preparations, which did not show that Patient 1 was likely
> to have any allergic reaction to any vaccine. Dr. Getzelman and her colleague Nicole Glynn,
> M.D., advised Patient 1's parents on multiple occasions that Patient 1 was a generally healthy
> child who had no medical reason not to receive routine childhood vaccinations. Nevertheless,
> **no one was able to persuade Patient 1 's father to consent to Patient 1's receiving further
> vaccines.**

18  *Id.,* at p. 4 (emphasis added.)

19        499.    A government mandate that imposes a duty, not just to parrot the government

20  guidelines, but to actively persuade others to follow them on pain of revocation of a professional

21  license, clearly tramples on First Amendment rights.

22        500.    Furthermore, the requirement of the Medical Board that California physicians, such as

23  Dr. Hulstedt, who disagree with the recommendations of the CDC and AAP must, nonetheless, parrot

24  those recommendations as if they were their own is a fraud on the patient. To be fully truthful and

25  honest, California physicians adhering to the mandates of the Medical Board would need to advise

26  their patients that the only recommendation that they are allowed to give is the official Medical Board/

27  AAP recommendation. Obviously, this tramples on the First Amendment rights of not only the

28  physicians to speak, but also of the patients to hear, frankly, what their doctor has to say.

501.    Where the Medical Board imposes a duty on a physicians, not merely to advise patients as to a recommended course of treatment, but to *actively persuade* them on a course of treatment that has been mandated by government authorities, this is, quite obviously, a duty of compelled, content-based, speech, a clear infringement of the First Amendment to be free of such a compulsion of physicians to speak it and of patients to have to listen to it.

502.    The Medical Board's other error here was its misunderstanding of the physician's duties in matters of informed consent under California law, a duty that physicians must present all relevant points of view in obtaining informed consent, where relevance is determined by a lay trier of fact, not the medical authorities, as discussed above. *Cobbs, id.*

503.    A further problem with the Medical Board's action against Dr. Hulstedt for giving his own recommendation and not that of the Medical Board, the CDC, and the AAP is the chilling effect that this then has on the willingness of other physician's to give their honest and candid recommendations to their patients.

504.    This self-censorship then shifts the "community standard of care" to be only that of the voices not silenced, *i.e.,* just those of the financially conflicted CDC and AAP, since no other dissenting voices can speak or be heard.

505.    This self-censorship then also deprived Dr. Hulstedt of his Fourteenth Amendment Due Process rights because any California-licensed physicians who might have come to Dr. Hulstedt's defense could reasonable fear being similarly targeted.

506.    In sum, the revocation of Dr. Hulstedt's medical license was not a remedial measure based on his conduct, but a retaliatory measure based on his speech, his refusal to parrot controversial "guidelines" put forth by the financially conflicted CDC and financially conflicted AAP and his refusal to "persuade" others to follow them.

**10.3    The Medical Board Of California Rebuffed Dr. Hulsteeth's Request For Reinstatement, Never Even Acknowledged It, More Evidence Of Retaliation**

507.    Under the California Business and Professions Code Section 2230,

All proceedings against a licensee for unprofessional conduct, or against an applicant for licensure for unprofessional conduct or cause, shall be conducted in accordance with the Administrative Procedure Act (Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code)...

1    508.    Under California Government Code Section 11522 (Administrative Procedures Act):

2    A person whose license has been revoked or suspended may petition the agency for
3    reinstatement or reduction of penalty after a period of not less than one year has elapsed from
     the effective date of the decision or from the date of the denial of a similar petition. The agency
     shall give notice to the Attorney General of the filing of the petition and the Attorney General
4    and the petitioner shall be afforded an opportunity to present either oral or written argument
     before the agency itself.
5
6    509.    Dr. Hulstedt wrote to Defendant Reji Varghese, Executive Director of the Medical

     Board of California, on May 14, 2024, more than one year after his medical license was revoked,
7
     requesting that his medical license be reinstated, specifically citing to Government Code Section
8
     11522:
9
     Dear Executive Director Varghese:
10   The Medical board of California revoked my Medical license, Number A42397 effective
     February 27,2023 for (1)the writing of a childhood Immunization exemption for a patient
11   determined by the MBC to be not in accordance with the standard of care, and (2) failure to
     produce requested medical records.
12   Since more than one year has passed since the the revocation, I request that my revoked
     medical license be re-instated under government Code Section 11522. If my license is
13   re-instated I will agree that: (1) henceforth I will not write any immunization exemptions for
     any of my patients for any reason and (2 ) that I will be fully cooperative with any future
14   requests from the MBC for patient medical records.

15   Sincerely yours,

16   Douglas V. Hulstedt M.D

17   510.    Dr. Hulstedt never received any response the this letter from the Medical Board nor was

18   ever afforded the hearing to which has was entitled under government Code Section 11522. This

19   refusal of the Medical Board to deal with Dr. Hulstedt in good faith is further evidence of its retaliation

20   against him.

21   **11.    THIS ACTION ALSO REQUESTS THAT THE U.S. CENTERS FOR DISEASE
     CONTROL BE ENJOINED FROM REPRESENTING TO PLAINTIFFS AND THE
22   PUBLIC THAT THE CHILDHOOD VACCINES ON ITS CHILDHOOD
     VACCINATION SCHEDULE ARE "SAFE" EVEN THOUGH CONGRESS HAS
23   FOUND THEM TO HAVE "UNAVOIDABLE ADVERSE EFFECTS" INCLUDING
     DEATH AND SERIOUS, PERMANENT, INJURY**

24
25   511.    As seen below, the U.S. Centers For Disease Control (CDC) represents to the public

     that the vaccines it recommends for children are "safe":[178]
26

27
     ─────────────────────
28   [178] CDC, Vaccines for Your Children, Reasons To Vaccinate.
     https://www.cdc.gov/vaccines-children/reasons/?CDC_AAref_Val=https://www.cdc.gov/vaccines/parents/why-vaccinate/vaccine-decision.html

**CDC** Vaccines for Your Children

AUGUST 9, 2024

# Reasons to Vaccinate

## Vaccines are safe

Before a new vaccine is ever given to people, extensive lab testing is done. Once testing in people begins, it can still take years before clinical studies are complete and the vaccine is licensed.

After a vaccine is licensed, the Food and Drug Administration (FDA), CDC, National Institutes of Health (NIH), and other federal agencies continue routine monitoring and investigate any potential safety concerns.



**Keep in mind**

CDC and the FDA take great care to make sure that a vaccine is safe both before it is licensed and after the public begins using it. Making sure that all vaccines are safe is a top priority for CDC.

512.     This statement by the CDC is, at best, misleading, because, as noted above, Congress, under the NCVIA, recognized that some childhood vaccines are unavoidably unsafe and can cause "injury or death...from side effects that [are] unavoidable," as the U.S. Supreme Court noted in *Bruesewitz v. Wyeth*:

> ...the [NCVIA] Act expressly eliminates liability for a vaccine's unavoidable, adverse side effects:
>
> "No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, **if the injury or death resulted from side effects that were unavoidable** even though the vaccine was properly prepared and was accompanied by proper directions and warnings."     (*Bruesewitz v. Wyeth LLC* (2011) 562 U.S. 223, 230.)(emphasis added.)

513.     It has known for many years that the CDC's own Institute of Medicine study reported, in 2012, that it could not attest to the overall safety of any of those vaccines. This "vaccines are safe" representation is a fraudulent misrepresentation by the CDC because: (1) the representation is false, (2) the CDC has known for years that it is false, (3) the CDC intends to induce reliance of the public on the CDC's assurances of safety to induce public acceptance of those unsafe vaccines, (4) the public was justified in relying on the representations of the CDC, a federal agency, (5) the CDC has made tens of billions over the years from this misrepresentation, 7.2 billion dollars in 2023 alone, and (6) millions of children have been seriously, permanently, harmed by these supposedly "safe" vaccines.

514.   Even long-time vaccine advocate Professor Plotkin now acknowledges that, "In 234 reviews of various vaccines and (adverse) health outcomes conducted from 1991 to 2012, the IOM[179] found inadequate evidence to prove or disprove causation in 179 (76%) of the relationships it explored, *illustrating the need for more rigorous science*."[180]

515.   The CDC simply dismisses all the reports of increased autoimmune and neuro-developmental disorders in vaccinated children as compared to those that are unvaccinated, as set forth above, without doing any of its own vaccinated/unvaccinated studies.

516.   Injunctive relief is necessary to prevent further harm to more children. That injunctive relief must: (1) require the CDC to cease and desist with its current misrepresentations that its approved vaccines are categorically "safe", (2) revise its vaccine information sheets to include all the information as to risks, benefits, and the limitations of that information as found by the Institute of Medicine report that a "reasonable" parent would want to have in order to give fully informed consent, and (3) require the CDC to undertake a program of public education satisfactory to this Court to correct this misrepresentations of the safety of its recommended vaccines by parents, by the public, by federal and state legislators, by public health authorities, by doctors and other health care providers, and by school educators.

## 12.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Infringement Of The Fundamental Substantive Due Process Right Of Un-Immunized Plaintiff Children, As Exercised By Their Parents, To Refuse Medical Treatments, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983**

517.   Plaintiffs incorporate here by reference paragraphs 1 through 516, *supra*, as if fully set forth herein.

518.   The Substantive Due Process rights under the Fifth Amendment have been incorporated to and made enforceable against the states through the Fourteenth Amendment guarantee of Due

---

[179] The Institute of Medicine of the National Academy of Sciences, the organization designated under the National Childhood Vaccine Injury Act of 1986, to investigate and report on vaccine safety.

[180] D. A. Salmon, W. A. Orenstein, S. A. Plotkin, and R. T. Chen. Funding Postauthorization Vaccine-Safety Science. N Engl J Med 2024; 391:102-105 (emphasis added). DOI: 10.1056/NEJMp2402379.

1   Process. *NAACP v. Alabama*, 357 U.S. 449 (1958); *Gitlow v. New York*, 268 U.S. 652 (1925).

2   519.    42 U.S.C. § 1983 provides a cause of action against any person who, under

3   color of law of any state, subjects any person within the jurisdiction of the United States to a

4   deprivation of any rights, privileges, or immunities secured by the Constitution.

5   520.    Plaintiffs challenge the constitutionality of California's mandated childhood

6   immunizations as infringements of the Plaintiffs' fundamental Substantive Due Process Right, as

7   exercised by their plaintiff parents, to refuse unwanted medical treatments that Congress has found to

8   be unavoidably unsafe and to risk death and serious, permanent injury.

9   521.    These infringements cannot pass strict scrutiny review since California cannot show

10  that those infringements are narrowly tailored to achieve a compelling state interest; here that being

11  that California cannot show that each of the mandated immunizations are absolutely necessary

12  ("narrowly tailored") for the public health (California's "compelling state interest") and do not infringe

13  on the fundamental right of the individual to be free from the risk of death or serious injury at the

14  hands of the government.

15  522.    In fact, California cannot produce compelling evidence that any of its mandated

16  immunizations are essential, or even desirable, for the overall health of California's children, given

17  their limited benefits and all of their serious and fatal side effects that are extensively described above.

18  Thus, these infringements should, and must, be enjoined.

19  523.    Defendant U.S. Centers for Disease Control (CDC) and its parent agency, the U.S.

20  Department of Health and Human Services (DHHS), are joined to this Fourteenth Amendment claim

21  as co-parties because: (1) California relies upon the false representations of the CDC for assurances

22  to California parents as to the safety and effectiveness of its mandated immunizations to allay parental

23  concerns and overcome parental hesitancy and resistance to those unconstitutional immunization

24  mandates, and (2) some of the representations of the CDC as to the safety of its recommended vaccines

25  are falsehoods perpetrated upon California's parents that can and should be enjoined until corrected.

26  **SECOND CAUSE OF ACTION**

27  **Infringement Of The Un-Immunized Plaintiffs' Fundamental Right To Refuse Vaccination
    Where The Vaccine Has Not Been Shown To Effectively Prevent Transmission Of The**

28  **Infection To Others,  Fourteenth Amendment, 42 U.S.C. § 1983**

524,     Plaintiffs incorporate here by reference paragraphs 1 through 523, *supra,* as if fully set forth herein.

525.     Under *Jacobson v. Massachsetts,* the legal justification for mandatory vaccinations is as a public health measure, to prevent the transmission of infectious diseases, in that case, epidemic small pox.

526.     Other than the measles virus, the California Department of Public Health and the CDC have little or no data showing that California's mandated immunizations are effective at preventing person-to-person transmission of the infections that they target.

527.     Because California cannot show that its mandated immunizations, with the exception of the measles virus, prevent transmission of the infections that they target, California cannot show that those mandated immunizations are narrowly tailored to achieve a compelling state interest

### THIRD CAUSE OF ACTION

**Infringement Of The Fundamental Substantive Due Process Right Of Un-Immunized Plaintiff Children To Attend School, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983**

528,     Plaintiffs incorporate here by reference paragraphs 1 through 527, *supra,* as if fully set forth herein.

529.     Under *Meyer v. Nebraska,* all children have a fundamental, due process, right under the Fourteenth Amendment to attend school, as the Court put it, to "acquire useful knowledge:"

> The problem for our determination is whether the statute as construed and applied unreasonably infringes the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment:
> 'No state * * * shall deprive any person of life, liberty or property without due process of law.'
> While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. **Without doubt, it denotes not merely freedom from bodily restraint** but also the right of the individual to contract, to engage in any of the common occupations of life, **to acquire useful knowledge**, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

> *Meyer v. State of Nebraska*, 262 U.S. 390, 399 (1923)(holding that Nebraska could not forbid the teaching of the German language in its public schools)(emphasis added.)

530.     California Health and Safety Code Section 120335 categorically denies California children who wish to assert their right to be free from restraint (unvaccinated) from also enjoying their

1    right to attend school and "acquire useful knowledge," thus infringing those fundamental rights.

2        531.    These infringements cannot pass strict scrutiny review since California cannot show

3    that those infringements are narrowly tailored to achieve a compelling state interest; here that being

4    that California cannot show that each of the mandated immunizations are absolutely necessary

5    ("narrowly tailored") for the public health (California's "compelling state interest") and do not infringe

6    on the rights of the individual to be free from the risk of death or injury at the hands of the government.

7
                                    **FOURTH CAUSE OF ACTION**
8
         **Infringement Of The Right Of Un-Immunized Children To Peacefully Assemble To Listen**
9            **and Learn As Provided Under The First Amendment, 42 U.S.C. § 1983**

10       532.    Plaintiffs incorporate herein by reference paragraphs 1 through 531, *supra*, as if fully

11   set forth herein.

12       533.    The First Amendment to the Constitution of the United States provides that:

13       Congress shall make no law respecting an establishment of religion, or prohibiting the free
         exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people
14       peaceably to assemble, and to petition the government for a redress of grievances.

15       534.    Under the First Amendment, "the right of the people peaceably to assemble" is not

16   restricted as to the purpose for which they may assemble as long as it is peaceful. That right is

17   especially protected under the First Amendment when the purpose for which people assemble

18   peacefully is for the purpose of exercising their freedom of speech, which includes the not only the

19   right to speak, but also the right to listen to the words spoken.

20       535.    In *Tinker v. Des Moines,*[181] the Supreme Court held that school children also enjoy First

21   Amendment rights.

22       536.    Here, California's school immunization mandates infringe on the plaintiff children's

23   First Amendment right to assemble peaceably at willing private and public schools, pre–schools, and

24   daycare centers to listen to the teachings of their teachers and to respond to the teacher's questions.

25       537.    Restrictions on First Amendment rights in public spaces and willing private spaces are

26

27   ────────────────

28   [181] *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503
     (1969)(upholding First Amendment rights of students to peacefully express opinions by
     wearing black arm bands).

reviewed under the strict scrutiny standard that requires that such restrictions be narrowly tailored to achieve a compelling government interest.

538.   In *Meyer v. State of Nebraska,* the Supreme Court held that:

The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted. The Ordinance of 1787 declares: 'Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.'

( *Meyer v. State of Nebraska* (1923) 262 U.S. 390, 400),

539.   Nothing in the First Amendment relegates to an inferior status the rights of children to peaceably assemble in willing schools for the purpose of speaking and listening in order to learn new ideas. Indeed, given the special solicitude to the education of children shown under *Meyer,* the protection of the First Amendment rights of children to peaceably assemble for the purpose of education should receive the highest priority.

540.   Any limitations on the First Amendment of children to peaceably assemble in a willing spaces designated for their education must be narrowly tailored to meet a compelling government interest.

541.   However, California has forbidden one class of children from peacefully assembling for the purpose of education in such willing spaces, *i.e.,* the children who do not meet certain immunizations requirements as set forth under Health and Safety Code Section 120335.

542.   But California does not forbid such un-immunized children from assembling at other willing spaces, such as a public library, a public museum, the Monterey Bay Aquarium, Disneyland, a birthday party, a sports event, church, Sunday school, a crowded shopping mall, or most public places.

543.   California makes no secret as to why it has singled out schools as the only place at which unvaccinated children cannot peaceably assemble in willing spaces and exercise their First Amendment rights to speak, listen, and learn, and it has nothing to do with education *per se.* The purpose of Health and Safety Code Section 120335 is to *coerce* parents to immunize their children by withholding one of the things that the parents of those children hold most dear, the education of their children:

1
2

Health and Safety Code Section 120325. In enacting this chapter...*it is the intent of the Legislature to provide:*
*(a) A means for the eventual achievement of total immunization of appropriate age groups against the following childhood diseases...*[182]

3
4
5
6

544.     Because California's school immunization requirements infringe on children's First Amendment rights to peaceably assemble in willing spaces to listen, learn, and speak, those requirement must pass strict scrutiny review to determine whether those requirements are narrowly tailored to achieve a compelling government interest.

7
8
9
10
11
12

545.     As noted under Health and Safety Code Section 120325, the mandated immunizations are those that are merely "recommend[ed by] the Advisory Committee on Immunization Practices of the United States Department of Health and Human Services, the American Academy of Pediatrics, and the American Academy of Family Physicians." However, just because these immunizations have been recommended by those groups, that does not *automatically establish* that those "recommendations" have been narrowly tailored to achieve a compelling government interest.

13
14
15

546.     On the contrary, it is California's burden to show, under strict scrutiny, that its immunization requirements for children to assemble in willing spaces *are* (1) narrowly tailored (2) to achieve a compelling government interest.

16
17
18

547.     There is nothing to show that California has so tailored its immunization requirements. Instead, it simply adopted nearly all of the immunizations recommended by the CDC, without making any individual determinations of the safety or effectiveness of any of them.

19
20
21

548.     As noted above, the most recent report from the Institute of Medicine concluded that it could not make any determinations of safety for most of the immunizations recommended by California under Health and Safety Code section 120335.

22
23
24
25

549.     Nor can California show that its immunization requirements meet a compelling government need because, as the Institute of Medicine also found, it could not determine the effectiveness of most of the immunizations required under California Health and Safety Code section 120335.

26
27

550.     Furthermore, California cannot show narrow tailoring to meet a compelling government

28

_____

[182] California Health and Safety Code Section 120325 (emphasis added).

interest in light of Plaintiffs' evidence above showing that: (1) the benefits and safety of many of these vaccines is unproven due to the lack of placebo controls for any of them, (2) many studies have shown that many children are harmed by these required immunizations, **especially the hundreds of California infants who annually die of Sudden Unexpected Infant Death Syndrome within the first few days of immunizations mandated by the State of California and the thousands of California toddlers who annually develop autism within the first hours and days after their immunizations mandated by the State of California.**

551.    California has no studies to refute Plaintiffs' studies of vaccine harms because, again, it has no placebo-controlled studies to show that Sudden Unexpected Infant Death Syndrome, autism, and the other adverse events described above occur just as commonly in unvaccinated children as in those vaccinated according to California's requirements.

552.    Furthermore, Congress determined, under the National Childhood Vaccine Injury Act, that childhood vaccines have unavoidable adverse side effects.

553.    Because California cannot show that each and every one of its childhood immunization requirements can pass strict scrutiny review as being narrowly tailored to achieve a compelling state interest, California's infringement of children's First Amendment rights to peaceably assemble in willing spaces to speak, hear, and learn cannot stand and must be enjoined.

554.    California's immunization requirements cannot even pass a rational basis review because, again, without placebo controls, California cannot show that adverse events, such as Sudden Unexpected Infant Death Syndrome, autism, and others occur just as often in the unvaccinated children as they do in the vaccinated children, nor can California show that the benefits of its mandated immunizations even outweigh their harms.

555.    Because California cannot show that each and every one of its childhood immunization requirements can even pass rational basis review, California's infringement of children's First Amendment rights to peaceably assemble in willing spaces to hear, learn, and speak cannot stand and must, again, be enjoined.

1

**FIFTH CAUSE OF ACTION**

2

3

**Unconstitutional Conditioning Of Un-Immunized Plaintiffs' California Benefit Of A Free Public Education On Condition That Plaintiffs Give Up Their Fundamental Right To Refuse Medical Treatment, 42 U.S.C. § 1983**

4

556.     Plaintiffs incorporate here by reference paragraphs 1 through 555, *supra*, as if fully set

5

forth herein.

6

557.     The Constitution of the State of California has provided, since 1879, that:

7

8

The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established.

9

558.     Thus, every school-age child residing within the State of California is entitled to the

10

benefit of a free education in a common (public) school.

11

559.     Since 1891, the U.S. Supreme Court has recognized the fundamental common law right

12

to refuse un-consented medical treatment. (*Union Pacific Railway Company v. Botsford* (1891) 141

13

U.S. 250.) Such un-consented medical treatment was regarded by the common law as a battery unless

14

undertaken by order of a court.

15

560.     Thus, the right to be free from unwanted medical treatment is a fundamental right

16

protected under the Substantive Due Process Clause of the Fourteenth Amendment to the Constitution

17

of the United States.

18

561.     California Health and Safety Code section 120335 mandates that school age children

19

who wish to avail themselves of their right, under the California Constitution, to attend, at no cost to

20

themselves, their local public schools must then give up their fundament right, under the Substantive

21

Due Process Clause of the Fourteenth Amendment, to refuse medical treatment with the state-

22

mandated vaccines.

23

562.     Thus, California Health and Safety Code section 120335 runs afoul of the rule that the

24

government "may not deny a benefit to a person on a basis that infringes his constitutionally protected

25

interests." (*Sheetz v. Cnty. of El Dorado* (2024) 601 U.S. __, citing the unconstitutional conditions

26

doctrine as set forth under *Perry v. Sindermann* (1972) 408 U.S. 593, 597.)

27

563.     Because California Health and Safety Code section 120335 violates the unconstitutional

28

conditions doctrine by conditioning the child's right to attend public school on the child's giving up

COMPLAINT - PAGE 140

the child's fundamental constitutional right to refuse unwanted medical treatment, it cannot stand and must be enjoined.

### SIXTH CAUSE OF ACTION

**Infringement Of Un-Immunized Plaintiffs' Fourteenth Amendment Equal Protection Right To Attend California's Public Schools Under The California Constitution, Article IX, Section 5, 42 U.S.C. § 1983**

564.    Plaintiffs incorporate here by reference paragraphs 1 through 563, *supra*, as if fully set forth herein.

565.    Since 1879, the Constitution of the State of California, Article IX, Section 5, has provided for a system of free public schools for all California children to attend:

> The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established.

566.    Under the Equal Protection Clause of the Fourteenth Amendment, "No state shall...deny to any person within its jurisdiction the equal protection of the laws."

567.    While children are afforded the right to attend California public schools under California law, there is no such fundamental right under the Fourteenth Amendment's Substantive Due Process Clause.

568.    However, if California grants the right to children to attend its public schools, it must, under the Equal Protection Clause, grant it equally to all. Because that right to attend California public schools is not a fundamental right under the Substantive Due Process Clause, any exceptions adopted by California to its right to attend its public schools are reviewed under a rational basis standard of review.

569.    However, California Health and Safety Code Section 120335's mandated immunization requirements cannot and do not even meet the rational basis standard of review for the reasons discussed extensively, *i.e.,* that the known harms exceed the known benefits.

570.    Briefly, the reason that California cannot meet that rational basis standard of review is that: (1) neither California, nor the CDC upon which California relies, can show that children who have had all of the immunizations required under Health and Safety Code Section 120335 are any healthier than those who have not, (2)

571.    Plaintiffs have provided extensive evidence above that the opposite is true, that, overall, **the adverse effects of the mandated immunizations, including hundreds of annual deaths due to Sudden Unexpected Infant Death Syndrome and tens of thousands of serious cases of injury and disability, such as autism, vastly outweigh the limited benefits of those mandated immunization,** and (3) overall, the un-immunized children who have *not* complied with Health and Safety Code Section 120335 are actually healthier than those who have.

572.    Thus, there is no rational basis for the immunization mandates set forth under Health and Safety Code Section 120335.

573.    Because California Health and Safety Code section 120335 violates the requirement under the Equal Protection Clause that all children be allowed an equal opportunity to attend California's public schools and because California has no rational basis for Health and Safety Code section 120335's exclusion of children from California's public schools who do not comply the mandated immunizations under California Health and Safety Code section 120335, it cannot stand and must be enjoined.

**SEVENTH CAUSE OF ACTION**

**Denial By Defendant Gilroy Unified School District And The California Department of Public Health Of A Free Appropriate Public Education (FAPE) To D.C. And Others In Violation Of The IDEA Act, 20 U.S.C. § 1400 *Et. Seq.*, And California Health And Safety Code Section 120335(h)**

574,    Plaintiffs incorporate here by reference paragraphs 1 through 573, *supra,* as if fully set forth herein.

575.    The IDEA act provides federal money to state and local governments to provide special education and related services to students with learning disabilities who qualify for Individual Education Programs (IEP) without regard to their immunization status.

576.    California Health and Safety Code Section 120335 (h) specifically exempts students with IEP plans from the immunization requirements otherwise set forth under section 120335.

577.    Nonetheless, many California school districts, including all five of the largest such school districts, continue to misrepresent to the parents of children with IEP plans that their children must meet the immunization requirements of section 120335, as set forth by the California Department of Public Health, in order to attend those schools at all.

578.    Because these misrepresentations by the school districts, undertaken at the direction of Defendant, the California Department of Public Health, misstate both federal and state law, Defendant the California Department of Public Health should be enjoined from continuing those misrepresentations to both the school districts and the public and required to remediate that misinformation by informing the school districts and all the parents of IEP students that those IEP students are legally exempt from the immunization requirements of section 120335.

579.    D.C. is a twelve year old child with a learning disability who has attended the public schools operated by the Gilroy Unified School District in Santa Clara County, California under an IEP prepared for him by that school district.

580.    B.P. is the mother of D.C..

581.    Because D.C. has an IEP, he is entitled to a Free Appropriate Public Education (FAPE) under the federal IDEA act regardless of his immunization status. Defendant Gilroy Unified School District has, until very recently, denied D.C. the FAPE to which he is entitled under the IDEA act.

582.    Furthermore, because Defendant Gilroy Unified School District still maintains an official policy of requiring full compliance with its stated immunization requirements of all students, even its IEP students. Plaintiffs 5 and 6 have no assurance that those requirements will not be reinstated at some time in the future.

**EIGHTH CAUSE OF ACTION**

**Infringement Of The First Amendment Rights Of Dr. Douglas Hulstedt, M.D., To Speak To His Patients And For Them To Listen To Him, U.S. Constitution, First Amendment, 42 U.S.C. § 1983**

583.    Plaintiffs incorporate here by reference paragraphs 1 through 582, *supra*, as if fully set forth herein.

584.    The First Amendment to the Constitution of the United States provides that:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

585.    The fact that some doctors' views are at odds with the official views of government health authorities does not undermine the right of doctors to express them; instead "minority views

1  are treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wis. Sys. v.*

2  *Southworth*, 529 U.S. 217, 235 (2000).

3      586.    The fact that doctors belong to a regulated profession does not undermine their right

4  to speak their views. As the Supreme Court recently held, "[s]peech is not unprotected merely

5  because it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct.

6  2361, 2371–72 (2018). "To the contrary, professional speech may be entitled to 'the strongest

7  protection our Constitution has to offer.'" *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002)

8  (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)).

9      587.    The State of California has a history of abusing physician-patient communication

10  about controversial issues in medicine, most recently with the passage of AB 2098 in 2022.

11      588.    Defendant the Medical Board of California revoked Plaintiff Dr. Hulstedt's medical

12  license in 2022, many years after the exemptions he wrote back in 2015 and 2017, but not long

13  after he submitted a declaration to the Family Court opposing California's mandated childhood

14  immunizations for his patient on health grounds similar to those set forth above in Section 5.

15      589.    In other words, the revocation of Dr. Hulstedt's medical license was *retaliation* for

16  his then *speech* that did not support California's highly controversial state-mandated immunization

17  requirements, not remediation for his years earlier *conduct* in writing exemptions to those

18  requirements, which were merely used as pretext.

19      590.    In revoking Dr. Hulstedt's medical license in retaliation for his speaking out against

20  California's controversial immunization requirements, the Medical Board of California infringed

21  upon Dr. Hulstedt's First Amendment rights.

22  <div align="center">**NINTH CAUSE OF ACTION**</div>

23  <div align="center">**Common Law Fraudulent Misrepresentation, Federal Torts Claims Act, 28 U.S.C. §**</div>

24  <div align="center">**1346(a)(2)**</div>

25      591.    Plaintiffs incorporate here by reference paragraphs 1 through 590, *supra*, as if fully

26  set forth herein.

27      592.    The Federal Tort Claims Act (FTCA), at 28 U.S.C. Section 2674, provides that:

28      The United States shall be liable, respecting the provisions of this title relating to tort
    claims, in the same manner and to the same extent as a private individual under like

circumstances...

593.    Jurisdiction over the claims brought under the FTCA in this action is found under 28 U.S.C. Section 1346(a)(2), which provides that:

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, , of:
...
Any other civil action or claim against the United States, not exceeding$10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department...

594.    The elements of a California common law fraud claim include:

(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage.

595.    Fraudulent misrepresentation can be enjoined. *Village of Schaumburg v. Citizens For Better Environment*, 444 U.S. 620, 637 (1980).

596.    Where the relief sought by injunction is the prevention of future fraudulent misrepresentation, the only elements of fraudulent misrepresentation that are pertinent are the first three, (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e. to induce reliance.

597.    Under the NCVIA, U.S. Code Title 42, Section 300aa-26, all health care providers who intend to provide a covered vaccine to a child must provide the parent or other legal representative of the child with a Vaccine Information Sheet (VIS) prepared by the CDC:

...each health care provider who administers a vaccine set forth in the Vaccine Injury Table shall provide to the legal representatives of any child or to any other individual to whom such provider intends to administer such vaccine a copy of the information materials developed pursuant to subsection (a) of this section...

Title 42, Section 300aa-26(d).

598.    The VIS is specific to the vaccine to be administered and must include the following:

The information in such materials shall be based on available data and information, shall be presented in understandable terms and shall include—
(1) a concise description of the benefits of the vaccine,
(2) a concise description of the risks associated with the vaccine,
(3) a statement of the availability of the National Vaccine Injury Compensation Program, and

1    (4) such other relevant information as may be determined by the Secretary.

2    Title 42, Section 300aa-26(c).

3    599.    For example, the current version of the VIS for the DtaP vaccine given to infants

4    contains the statement that, "The risk of DTaP vaccine causing serious harm, or death, is extremely

5    small."

6    600.    For another example, the current version of the VIS for the simultaneous

7    administration of vaccines for eight infections, including diphtheria, tetanus, pertussis (whooping

8    cough), haemophilus influenzae type b (Hib), hepatitis B, polio, rotavirus, pneumococcal disease,

9    states that, "Serious ... problems happen so rarely that it is hard to tell whether they were actually

10   caused by the vaccination or just happened afterward by chance."

11   601.    However, these representations as to the safety of childhood vaccines are, at best,

12   seriously misleading and, more likely, knowingly fraudulent because the CDC has done no

13   placebo-controlled trials of any of its recommended vaccines to establish the truth of its assertions

14   that the risk of "serious harm, or death, is extremely small."

15   602.    Tellingly, the CDC even refuses to do placebo-controlled trials of the recommended

16   vaccines to determine the truth of these statements. Virtually every other drug approved by the

17   federal Food and Drug Administration has to be studied with placebo-controlled trials to establish

18   its safety, but not the CDC's vaccines.

19   603.    Parents expect and assume that the drugs approved by the CDC and FDA to be

20   given to their children have been studied for safety by placebo-controlled studies. They have a right

21   to know that the CDC's childhood vaccines, however, have not been subject to placebo-controlled

22   trials of vaccine safety because, for many, it would be very important to know that.

23   604.    Thus, the CDC and its Vaccine Information Sheets conceal from parents by

24   nondisclosure the fact that, unlike all other FDA-approved drugs, the CDC's childhood vaccines

25   have not been subject to placebo-controlled studies to determine the true incidence of adverse

26   events such as SUID, autism, and neurodevlopmental delay in the vaccinated versus the

27   unvaccinated.

28   605.    These VIS statements are also seriously misleading because the CDC's claim that

1   the "risk of DTaP vaccine causing serious harm, or death, is extremely small" implies that the CDC

2   has done such placebo-controlled trials. The VIS should contain the information that the CDC has

3   never done such placebo-controlled trials and has no plans to ever do such trials.

4       606.    The fact that such misleading statements are included in the VIS statements is a

5   serious and material omission that should be construed as an intent to mislead and to induce

6   reliance upon those misleading VIS statements for the financial benefit of the CDC.

7       607.    The other seriously misleading characteristic of the CDC's VIS statements is that

8   many, if not most, California physicians and patients assume that the VIS is sufficient to meet the

9   physician's obligations under California state law to obtain informed consent for the administration

10  of these childhood vaccines.

11      608.    However, California state law on informed consent has held, for more than fifty

12  years, that the information necessary to be provided by the physician to the patient to meet the

13  requirements for informed are determined, not by federal or state health officials, but by the needs

14  of a reasonable patient based on the risks and benefits of the particular proposed course of

15  treatment, as determined by the trier of fact and not by the medical profession or medical

16  regulators. *Cobbs v. Grant*, 8 Cal.3d 229 (1972), *Arato v. Avedon*, 5 Cal.4th 1172 (1993).

17      609.    Importantly, under *Cobbs,* the physician obtaining informed consent must discuss

18  *all* the issues and options that a reasonable patient, or parent, would wish to have discussed, even

19  those issues and options with which the physician does not agree.

20      610.    Therefore, if a reasonable parent would want to know what are the risks of SUID,

21  autism, or neurodevelopmental delay following CDC recommended, California-mandated,

22  childhood vaccines, the physician obtaining informed consent is obliged to discuss those risks, *sua*

23  *sponte,* giving both the CDC's estimate of those risks and the CDC's basis for those estimates, as

24  well as other estimates of risk by other scholars if a reasonable parent would want to know of those

25  estimates, even if the particular parent before him does not ask about that issue. In other words, the

26  physician must present all sides of controversial issues *sua sponte* since the parent cannot be

27  expected to know what they don't know. Otherwise, there is no informed consent.

28      611.    Given these requirements of California law, the CDC's VIS statements do not fulfill

the California physician's requirements for informed consent, although to many patients that is what they look like.

612.    In order to *not* be misleading on this isse, the CDC's VIS statements should explicitly state, in bold letters, that these VIS statements are not intended to substitute for the informed consent discussion required under applicable state law.

613.    Plaintiff children are harmed by the misrepresentation of the U.S. Centers For Disease Control (CDC) that its recommended childhood vaccines are "safe," even though those childhood vaccines have been found by the Congress, under the National Childhood Vaccine Injury Act, to be unavoidably unsafe, and because that false representation is used by defendants Brentwood Union School District and the California Department of Public Health to exclude them from the public and private school educations as to which they have fundamental rights.

614.    For this reason plaintiff children and their parents respectfully request that this Court enjoin defendant CDC from misrepresenting to the public that its recommended vaccines are "safe" until the CDC has conducted placebo-controlled trials that support any such statements of safety and adopts qualifying language that does not conflict with the findings of Congress in the NCVIA or the findings of the Institute of Medicine (now the National Academy of Medicine) as required under the NCVIA.

615.    The usual requirements for a preliminary injunction in a federal court are:

1. Likelihood of success on the merits;
2. Irreparable injury in the absence of relief;
3. The balance of equities tips in plaintiff's favor; and,
4. Showing the public interest favors granting the injunction.

*Winter v. Natural Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008).

616.    **Likelihood of success on the merits:** a lay trier of fact would likely find the CDC's VIS statements that vaccines risks of serious harm, or death being extremely small are unsupported by evidence from placebo-controlled trials.

617.    **Irreparable injury in the absence of relief:** it is likely that one or more children on behalf of whom the plaintiff advocacy organizations in this case are appearing will suffer irreparable injury of death in the absence of relief. Certainly, one or more parents on behalf of whom the plaintiff advocacy organizations in this case are appearing will suffer irreparable injury

1  by being denied the information that parent is entitled to for purposes of informed consent under
2  California law.

3  618.  **The balance of equities tips in plaintiff's favor:** the parents of children being
4  considered for immunization, parents represented here by the plaintiff advocacy organizations in
5  this case, have an equitable interest in receiving all the information required by California law for
6  purposes of informed consent, information that is complete and accurate, while the CDC has no
7  equitable interest in providing incomplete and inaccurate information, the balance of the equities
8  tips strongly in the plaintiff's favor.

9  619.  **The public interest favors granting the injunction:** the public interest is best
10  served when the parents of children being considered for immunization, parents represented here
11  by the plaintiff advocacy organizations in this case, receive all the information required by
12  California law for purposes of informed consent, information that is complete and accurate, while
13  the public has no legitimate interest in providing incomplete and inaccurate information about the
14  medical treatment of children.

15  620.  For this reason plaintiffs respectfully request that this Court enjoin defendant CDC
16  from mis-representing to the public and the State of Californa that its recommended vaccines are
17  "safe" until the CDC has conducted placebo-controlled trials that establish the purported benefits
18  of its recommended immunizations for children's overall health and revised its promotional
19  materials to present all sides of controversial vaccine issues that a reasonable parent would want to
20  here in order to give informed consent.

21  **11.   IRREPARABLE INJURY**

22  621.  Plaintiffs incorporate here by reference paragraphs 1 through 620, *supra*, as if fully
23  set forth herein.

24  622.  Plaintiffs are now severely and irreparably injured by California Health and Safety
25  Code Section 120335, a state law that infringes upon plaintiffs fundamental rights as provided
26  under the Fourteenth Amendment to the Constitution of the United States, including without
27  limitation the fundamental rights to Refuse State-Mandated Medical Care, the Child's Right to an
28  Education, and the Right to Due Process. Plaintiffs' injuries as a result of Section 120335 also

includes the deprivation of rights guaranteed by the California Constitution and the humiliation, emotional distress, financial hardship, pain, suffering, psychological harm, and stigma caused by the inability to receive a free K-12 public-school education while consequently being forced into home schooling away from other children. Plaintiffs' injuries will be redressed only if: (1) this Court finds Health and Safety Code Section 120335 and any substantively similar or related California statutes to be infringements of rights guaranteed under the Substantive and Procedural Due Process Clauses of the Fourteenth Amendment and the First Amendment, and enjoins Defendants from any further enforcement of them, (2) enjoins the CDC from claiming that its recommended vaccines are "safe" unless and until the CDC has conducted placebo-controlled studies that support those claims and revised its promotional materials as above, and (3) enjoins the children's respective school districts from excluding them because they have not had the immunizations required under Health and Safety Code Section 120335. .

## 12.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request and pray for judgment as follows:

1.      All plaintiffs respectfully request that this Court enter a declaratory judgment that the immunization mandates set forth under California Health and Safety Code Section 120335 infringe the fundamental rights, under the Substantive Due Process Clauses of the Fifth and Fourteenth Amendments, of minor plaintiffs and all others similarly situated to be free of coerced medical treatments.

2.      All plaintiffs respectfully request that this Court enter preliminary and permanent injunctions enjoining the Defendants from infringing the fundamental rights, under the Substantive Due Process Clauses of the Fifth and Fourteenth Amendments, of minor plaintiffs and all others similarly situated to be free of medical treatments coerced by mandating that they comply with the immunization mandates set forth under California Health and Safety Code Section 120335.

3.      All plaintiffs respectfully request that this Court enter a declaratory judgment that the immunization mandates required for children to attend any schools or pre-schools, as set forth under California Health and Safety Code Section 120335, infringe the fundamental rights, under the Substantive Due Process Clauses of the Fifth and Fourteenth Amendments, of minor plaintiffs and

all others similarly situated to be free of coerced medical treatments because, with the exception of the measles immunization, those immunizations do not prevent transmission of the infections that they target.

4.      All plaintiffs respectfully request that this Court enter preliminary and permanent injunctions enjoining the Defendants from infringing the fundamental rights, under the Substantive Due Process Clauses of the Fifth and Fourteenth Amendments, of minor plaintiffs and all others similarly situated to be free of coerced medical treatments with vaccines required under California Health and Safety Code Section 120335  that have not been shown to prevent the transmission of the infections that they target.

5.      All plaintiffs respectfully request that this Court enter a declaratory judgment that the immunization mandates required for children to attend any schools or pre-schools, as set forth under California Health and Safety Code Section 120335, infringe the fundamental rights, under the Substantive Due Process Clauses of the Fifth and Fourteenth Amendments, of minor plaintiffs and all others similarly situated to attend school so as to acquire useful knowledge.

6.      All plaintiffs respectfully request that this Court enter preliminary and permanent injunctions enjoining the Defendants from  infringing the fundamental rights, under the Substantive Due Process Clauses of the Fifth and Fourteenth Amendment, of minor plaintiffs and all others similarly situated to attend school so as to acquire useful knowledge by requiring them to comply with the immunization mandates required for children to attend any schools or pre-schools, as set forth under California Health and Safety Code Section 120335.

7.      All plaintiffs respectfully request that this Court enter a declaratory judgment that the immunization mandates required for children to attend any schools or pre-schools, as set forth under California Health and Safety Code Section 120335, infringe the fundamental rights, under the First Amendment, of minor plaintiffs and all others similarly situated to peacefully assemble in willing spaces so as to listen and learn.

8.      All plaintiffs respectfully request that this Court enter preliminary and permanent injunctions enjoining the Defendants from infringing the fundamental rights, under the First Amendment, of minor plaintiffs and all others similarly situated to peacefully assemble in willing

spaces so as to listen and learn by requiring them to comply with the immunization mandates required for children to attend any schools or pre-schools, as set forth under California Health and Safety Code Section 120335.

9.    All plaintiffs respectfully request that this Court enter a declaratory judgment that the immunization mandates set forth under California Health and Safety Code Section 120335 as conditions for exercising their rights to attend school infringe the fundamental rights, under the Substantive Due Process Clauses of the Fifth and Fourteenth Amendments, of minor plaintiffs and all others similarly situated to exercise their rights to attend school without the condition that they give up their rights be free of coerced medical treatments.

10.    All plaintiffs respectfully request that this Court enter preliminary and permanent injunctions enjoining the Defendants from infringing the fundamental rights, under the Substantive Due Process Clauses of the Fifth and Fourteenth Amendments, of minor plaintiffs and all others similarly situated to exercise their rights to attend school without the condition that they give up their rights be free of coerced medical treatments required under the immunization mandates set forth under California Health and Safety Code Section 120335.

11.    All plaintiffs respectfully request that this Court enter a declaratory judgment that the exclusion of students from California schools who have not complied with the immunization mandates set forth under California Health and Safety Code Section 120335 violates their rights under the Equal Protection Clause of the Fourteenth Amendment.

12.    All plaintiffs respectfully request that this Court enter preliminary and permanent injunctions enjoining the Defendants from infringing the rights, under the Equal Protection Clause of the Fourteenth Amendment, of minor plaintiffs and all others similarly situated who have not complied with the immunization mandates set forth under California Health and Safety Code Section 120335 to attend school.

13.    Plaintiffs 5 and 6 respectfully request that this Court enter a declaratory judgment that the exclusion of students attending school under Individualized Education Programs from those schools because they have not complied with the immunization mandates set forth under California Health and Safety Code Section 120335 is a violation of the federal IDEA act and also

of California Health and Safety Code Section 120335, subsection (h).

14. D.C. and B.P. further respectfully request that this Court enter preliminary and permanent injunctions enjoining the Defendants from excluding D.C. from attending the schools within the Gilroy Unified School District under his Individualized Education Programs because he has not complied with the immunization mandates set forth under California Health and Safety Code Section 120335.

15. Plaintiff Brave and Free Santa Cruz respectfully requests that this Court enter a declaratory judgment that the exclusion of any students attending California schools under Individualized Education Programs from those schools because they have not complied with the immunization mandates set forth under California Health and Safety Code Section 120335 is a violation of the federal IDEA act and also of California Health and Safety Code Section 120335, subsection (h).

16. Plaintiff Brave and Free Santa Cruz respectfully requests that this Court enter preliminary and permanent injunctions (1) enjoining the Defendants from excluding, or directing the exclusion of, students attending school under Individualized Education Programs from those schools because they have not complied with the immunization mandates set forth under California Health and Safety Code Section 120335, and (2) requiring Defendant California Department of Public Health to notify all California schools subject to its jurisdiction that: (a) they may not exclude any students attending school under Individualized Education Programs from those schools because they have not complied with the immunization mandates set forth under California Health and Safety Code Section 120335, and (b) they must notify the families of all those IEP students that those students are legally exempt from the requirement that they comply with the immunization mandates set forth under California Health and Safety Code Section 120335.

17. Plaintiff Dr. Douglas V. Hulstedt, M.D., respectfully requests that this Court enter a declaratory judgment finding that Defendant the Medical Board of California acted in excess of its authority by revoking Dr. Hulstedt's medical license for exercising his First Amendment rights to professional speech.

18. Plaintiff Dr. Douglas V. Hulstedt, M.D., further respectfully requests that this Court

enter preliminary and permanent injunctions: (1) enjoining the Medical Board of California from infringing his First Amendment rights to professional speech to his patients and all others by continuing the revocation of his medical license for exercising those rights, and (2) enjoining the Medical Board of California from any further actions that infringe either physicians' or patients' First Amendment rights to discuss reasonable treatment options as set forth under *Cobb.*

19.    All plaintiffs  respectfully request that this Court enter preliminary and permanent injunctions enjoining the Centers for Disease Control and the California Department of Public Health from making any claims as to the safety of childhood vaccines: (1) that conflict with or are inconsistent with the findings of Congress, under the National Childhood Vaccine Safety Act of 1986 and as amended, that those childhood vaccines have "unavoidable adverse side effects," including "injury or death," and (2) until the CDC has conducted placebo-controlled trials that establish the safety and purported benefits of its recommended immunizations for children's overall health.

20.    All plaintiffs  respectfully request that this Court award costs and attorney fees as permitted by law, including 42 U.S.C. §1988(b), and

21    All plaintiffs respectfully request that this Court award all further relief as to which they may be justly entitled.

*Richard B. Fox*

_____
Richard B. Fox, J.D., M.D.

Counsel For Plaintiffs